# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK
### ALBANY DIVISION

| | | |
|---|---|---|
| **CRISS MURPHY, NORMAN JORDAN, ANDINO WARD, EDDIE BARNES, JR., PAUL HANNON, CURTIS NELSON, DAVID CHAMBERS, DENNIS COLEMAN, HERION MURPHY, and VINCENT SAFFORD,** Individually and on Behalf of Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 06-CV-0480 District Judge: Gary L. Sharpe Magistrate Judge: David R. Homer |
| Plaintiffs, | ) | |
| v. | ) ) | |
| **SUPER STEEL SCHENECTADY INC.,** | ) ) | |
| Defendant. | | |

## EXHIBITS TO PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CONSENT <u>DECREE</u>

**SANFORD WITTELS & HEISLER, LLP**
950 Third Avenue, 10th Floor
New York, NY 10022
Tel: (646) 723-2947
Fax: (646) 723-2948
swittels@nydclaw.com

*Counsel for Plaintiffs and the Class*

## Table of Contents

Preliminary Approval Order……………………………………....   Exhibit A

Class Action Complaint…………………………………………...   Exhibit B

Consent Decree ………..…………………………………………   Exhibit C

Banyai v. Mazur, 2007 WL 927583 (S.D.N.Y.) ………………...   Exhibit D

Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C., 2006 WL
3681138 (E.D.N.Y.,2006) ………………………………………   Exhibit E

Armstrong v. Whirlpool Corporation, 2007 U.S. Dist. LEXIS
14635 (M.D. Tenn. 2007) ………………………………………...   Exhibit F

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

| | | |
|---|---|---|
| CRISS MURPHY, NORMAN JORDAN, ANDINO WARD, EDDIE BARNES, JR., PAUL HANNON, CURTIS NELSON, DAVID CHAMBERS, HERION MURPHY, and VINCENT SAFFORD, Individually and on Behalf of Others Similarly Situated, | ) ) ) ) ) ) ) ) ) | |
| **PLAINTIFFS,** | ) ) | CASE NO. 06-CV-00480-GLS-DRH |
| v. | ) ) | |
| **SUPER STEEL SCHENECTADY, INC.,** | ) ) | |
| **DEFENDANT.** | ) ) ) ) | |

## PROPOSED ORDER PRELIMINARILY APPROVING THE CLASS SETTLEMENT

WHEREAS, this matter having been opened to the Court by plaintiff CRISS MURPHY, ET AL., by SANFORD, WITTELS, & HEISLER, LLP, counsel for plaintiff and the class, by application for an order preliminarily approving the settlement of the above captioned class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, which, together with the consent decree and appendices annexed thereto sets forth the terms and conditions for a proposed settlement of the Action; and the Defendant SUPER STEEL SCHENECTADY, INC. (hereafter "SSSI") having appeared by its counsel, KAUFMAN BORGEEST & RYAN LLP, and joined in the application;

WHEREAS, the parties and their attorneys have entered into a Consent Decree (hereafter "Settlement Agreement" or "Consent Decree"), as revised and submitted to the Court dated January 19, 2007, in which the parties have agreed upon a settlement of the Action, subject to the final approval of the Court as to the fairness, reasonableness and adequacy of the Settlement Agreement which, if approved at a fairness hearing, will result in dismissal of the Action with prejudice.

NOW, THEREFORE, upon reviewing the Settlement Agreement, including the appendices attached thereto, and upon reviewing all prior proceedings herein, and upon application of the parties based on the record.

IT IS HEREBY ORDERED as follows:

1.     The Court preliminarily approves the Settlement Agreement as being fair, reasonable, and adequate, subject to the right of any Class Member to challenge the fairness, reasonableness, or adequacy of the Settlement Agreement and to show cause, if any exists, why a final judgment dismissing the Action and all Released Claims and awarding compensation to Class Counsel,

should not be entered after due and adequate notice to the Class and after a hearing on final approval.

2.      The Class is preliminarily certified pursuant to the Settlement Agreement as follows: all African Americans individuals who have been employed by or provided contract services to SSSI, at any time, or for any length of time, during the liability period.

3.      A hearing (the "Fairness Hearing") shall be held before this Court on _April 23_ 2007 at _1:30_ p.m., at the United States District Court for the Northern District of New York, James T. Foley – U.S. Courthouse, 445 Broadway, Albany, NY 12207, before the Honorable Gary L. Sharpe, to determine whether the proposed Settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be approved by the Court pursuant to Fed. R. Civ. P. 23(e); whether the Judgment as provided in the Settlement should be entered herein; and to determine the amount of attorneys' fees and expenses that should be awarded to Class Counsel.

4.      The Court approves, as to form and manner of notice, the Notice of Settlement (the "Notice") and the Claim Form, annexed to the Settlement Agreement. Consistent with Fed. R. Civ. P. 23(c), the Notice will include a) the Consent Decree's provisions that a class member may request exclusion from the monetary relief of the settlement within forty-five (45) days of the date Notice was mailed, b) that the class member may enter an appearance through counsel, c) that the class judgment will have a binding effect on class members, and d) the date, time, and location of the Fairness Hearing. The parties are directed to mail such Notice and Claim Form to the Class within 10 days after the Court enters this Order.

5.      Pursuant to 28 U.S.C. § 1715(a) and (b), no later than ten (10) days from January 25, 2007, SSSI shall serve upon an appropriate state official, as defined by 28 U.S.C. § 1715(a)(2), notice of the proposed class action settlement and the materials listed in 28 U.S.C. § 1715(b). SSSI shall provide both the Court and plaintiffs' counsel with proof of such service no later than March 1, 2007.

6.      The Court reserves the right to adjourn the date of the Fairness Hearing without further notice to the Class Members, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement Agreement. The Court may approve the Settlement Agreement, with such modifications as may be agreed to by the settling parties, if appropriate, without further notice to the Class.

7.      As of the date hereof, all discovery and other proceedings in the Action are stayed until further order of this Court, except as may be necessary to implement the Settlement Agreement.

IT IS SO ORDERED:

_Gary L. Sharpe_
Hon. ~~Gary L. Sharpe~~
UNITED STATES DISTRICT JUDGE

Dated: January _25_, 2007

2

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

| | | |
|---|---|---|
| CRISS MURPHY, NORMAN JORDAN, ANDINO WARD, EDDIE BARNES, JR., PAUL HANNON, CURTIS NELSON, DAVID CHAMBERS, HERION MURPHY, and VINCENT SAFFORD, | ) ) ) ) ) | CLASS ACTION COMPLAINT |
| Individually and on Behalf of Others Similarly Situated, | ) ) ) ) | |
| **PLAINTIFFS,** v. | ) ) ) ) | CASE NO. _____ |
| SUPER STEEL SCHENECTADY INC., | ) ) ) | |
| **DEFENDANT.** | ) ) | JURY TRIAL DEMAND |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Criss Murphy, Norman Jordan, Andino Ward, Eddie Barnes, Jr., Paul Hannon, Curtis Nelson, David Chambers, Herion Murphy, and Vincent Safford ("Class Representatives" or "Plaintiffs"), by and through undersigned counsel, bring this action against Defendant Super Steel Schenectady Inc. ("Defendant" or "Super Steel") on behalf of themselves and the class of persons they seek to represent.  Plaintiffs, who are current and former employees of Super Steel, bring this action to redress the racial discrimination and harassment they have suffered while working at Super Steel.

## I.      PLAINTIFFS' RACIAL DISCRIMINATION CLAIMS AGAINST SUPER STEEL

2.      Plaintiffs Criss Murphy, Norman Jordan, Andino Ward, Eddie Barnes, Jr., Paul Hannon, Curtis Nelson, David Chambers, Herion Murphy, and Vincent Safford all came to Super Steel with common goals: to work hard, to do their jobs well, and to save money to improve their lives.

1

3.    Some of these Plaintiffs came farther than others. Many came from the deep south – from Mississippi, Alabama, Louisiana – only to find that the pervasive racism at Super Steel in New York was far worse than any they had ever confronted in their home states. In the words of one plaintiff, "As a fifty-year-old black man, born and raised in Mississippi, I have never experienced the kind of racism that was at Super Steel." Another Plaintiff compared his arrival at Super Steel to that of a slave being sold at market. He described being treated as though he had been "ordered up" from "some small farm" in Mississippi, and being given orders as if he was a "boy" that was "not supposed to know any better."

4.    For the limited number of African Americans who pass through Super Steel's doors, racial discrimination and hostility permeate every aspect of the working day. A typical day for these workers involves using a restroom decorated with graffiti that derides "niggers" and expounds support for the KKK, working in the midst of drawings depicting men hung from "hanging loops," or nooses, walking past the hostile stares of white co-workers, enduring unending criticism from white supervisors, avoiding the "white" parts of segregated break areas, and trying to ignore the persistent awareness that, at any time, the festering racial hostility might erupt and challenge their physical safety.

5.    For those African American employees who find themselves the targets of more vitriolic, directed racism, days are even worse. The hostility directed at one former Super Steel employee included slurs like "nigger monkey" and "nigger bastard." He was told on one occasion that a "nigger whipping" would make him work faster, and on another that he should be hung. White co-workers laughed when the threat of a hanging was followed with the musing that the hanging would make him "scream like a bitch." The constant intimidation destroyed this Plaintiff's sense of well-being, plaguing his thoughts even at home, and lingering long after he closed Super Steel's plant doors for the final time behind him.

6.    Another Plaintiff slogged through months of hard work, trying to ignore the hostility from his white co-workers when his white supervisors consistently ignored his pleas for

2

intervention. His efforts to succeed in spite of his circumstances were rewarded with graffiti inside of his locker that said "Die Nigger Die" and "KKK," and a monkey hanging from his coat hook, its head torn off and its body ripped apart.

7.       The racism these Plaintiffs have confronted at Super Steel is not limited to wayward employees or outlying miscreants, but is deeply embedded in the Super Steel structure. Super Steel has built racism into its ranks by selecting for supervisory positions white workers who are blatantly racist. The Plaintiffs in this action worked under supervisors who used racial epithets, subjected them to harsh criticism and intense scrutiny, withheld promotions and other opportunities for advancement, and failed to reprimand white employees for racially hostile behavior.

8.       When one Plaintiff went to his Supervisor for support in dealing with the racial harassment he was experiencing, his Supervisor replied by turning to another Supervisor and asking, "What does this fucking nigger expect me to do?" The requests for support by other Plaintiffs were alternatively ignored or dismissed.

9.       The reaction of Super Steel's Human Resources Department to complaints of racial discrimination by African American employees was similarly deficient. Despite the numerous complaints and the clear racial antagonism at Super Steel, Human Resources systematically ignored the racism brought to its attention. One Plaintiff's concerns were pushed aside by a Human Resources Representative with an exasperated "[I thought your] people [were] used to that kind of stuff." In a letter to a different Plaintiff, Super Steel Human Resources Director Gerald Nelson describes the racist comments of a white co-worker as "isolated," and the "KKK" hat made by another as constructed "in jest."

10.      In a letter sent March 15, 2006 to yet another plaintiff, Super Steel's Counsel writes that "no similar incident has occurred ever before or since at the Company's plant in Glenville." This letter was written after the police had visited Super Steel at least twice to respond to complaints about racial harassment, after Human Resources Director Gerald Nelson

3

wrote the above-cited letter to another Plaintiff, and after virtually all of the racially charged incidents described in this Complaint occurred.

11.     A police officer investigating the drawing of a man hanging by a noose in one Plaintiff's workstation commented in his police report that Super Steel "had not yet come to an understanding of the serious nature of the incident(s) and was still under the assumption that they would be able to handle everything internally."

12.     Super Steel decides time and again to cultivate an atmosphere in which its African American employees are threatened, harassed, criticized, and denied advancement, and in which white employees can threaten, harass, criticize, and deny advancement with impunity. That Super Steel does not welcome African Americans is manifest in its emaciated roster of African American employees.  The company has hired so few permanent African American employees that one Plaintiff was taunted as the "default hire" because Super Steel had simply run out of white applicants to choose from.

13.     While the "default hire," a Schenectady resident, remains an employee at Super Steel, all of the African Americans listed in this action that traveled to Super Steel from southern states have since returned to their homes.  All have expressed relief at being able to return to the relative safety of Alabama, Georgia, Louisiana, and Mississippi.

14.     A line in an employment handbook, a few words from the company's president, or a lofty statement about "zero tolerance" will not change the discriminatory policies that Super Steel has so successfully ingrained in its company culture.  For these reasons, Plaintiffs seek the support of this Court in securing relief. The relief Plaintiffs seek include: (1) programs that remedy the racially hostile work environment at Super Steel; and (2) one hundred seventy-five million dollars in compensatory and punitive damages.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201 and 2202; and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (hereafter § 1981), to redress and

4

enjoin employment practices of Super Steel in violation of these statutes. Venue is proper in the District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. Section 2000e-5(f)(3) because Defendant Super Steel is a resident of this District and because a substantial part of the events or omissions giving rise to these claims occurred in this District.

## III.   PARTIES

### A.   CLASS REPRESENTATIVES

16.   **Class Representative Criss Murphy** ("Criss Murphy" or "Mr. C. Murphy") is an African American resident of Lawrenceville, Georgia. Mr. C. Murphy was employed at Super Steel's facility in Schenectady, New York from approximately April 2005 until April 17, 2006. Mr. C. Murphy took a paid leave of absence from Super Steel on January 3, 2006, when his locker was vandalized with threatening, racist graffiti. On February 20, 2006, Super Steel put Mr. C. Murphy on an unpaid leave of absence, scheduled to end on April 17, 2006. As a result of the continuing hostility displayed by Super Steel towards Mr. C. Murphy, as well as the lack of reliable assurance that Mr. C. Murphy's safety at Super Steel is assured, Mr. C. Murphy did not return to Super Steel by April 17, 2006, and was terminated on that date.

17.   **Class Representative Norman Jordan** ("Norman Jordan" or "Mr. Jordan") is an African American resident of Lawrenceville, New Jersey. Mr. Jordan was employed at Super Steel from approximately April 2005 to September 2005.

18.   **Class Representative Andino Ward** ("Andino Ward" or "Mr. Ward") is an African American resident of Schenectady, New York. Mr. Ward has been employed at Super Steel from approximately July 27, 2005 until the present.

19.   **Class Representative Eddie Barnes, Jr.** ("Eddie Barnes, Jr." or "Mr. Barnes") is an African American resident of Moss Point, Mississippi. Mr. Barnes was contracted to work at Super Steel from approximately February 2004 until September 2004, and from approximately February 2005 until October 2005.

5

20.     **Class Representative Paul Hannon** ("Paul Hannon" or "Mr. Hannon") is an African American resident of Jackson, Alabama. Mr. Hannon was contracted to work at Super Steel from approximately June 2004 until November 2004, and from approximately February 2005 until October 2005.

21.     **Class Representative Curtis Nelson** ("Curtis Nelson" or "Mr. Nelson") is an African American resident of Moss Point, Mississippi. Mr. Nelson was contracted to work at Super Steel from approximately June 2004 until August 2004, and from approximately June 2005 until August 2005.

22.     **Class Representative David Chambers** ("David Chambers" or "Mr. Chambers") is an African American resident of Reserve, Louisiana. Mr. Chambers was an employee at Super Steel from approximately February 2005 until September 2005.

23.     **Class Representative Heroin Murphy** ("Herion Murphy" or "Mr. H. Murphy") is an African American resident of Marrero, Louisiana. Mr. H. Murphy was an employee at Super Steel from approximately July 2005 until November 2005.

24.     **Class Representative Vincent Safford** ("Vincent Safford" or "Mr. Safford") is an African American resident of Moss Point, Mississippi. Mr. Safford was contracted to work at Super Steel from approximately April 2005 until the end of August 2005.

B.      **DEFENDANT**

25.     **Defendant Super Steel Schenectady Inc.** is a corporation doing business in Schenectady, New York. Super Steel is subject to suit under 42 U.S.C. §1981, as amended.

V.      **CLASS CERTIFICATION WITH RESPECT TO THE §1981**

A.      **CLASS DEFINITION**

26.     The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current, former and future African American Super Steel permanent and contract employees. Each of the Class Representatives is a member of the putative class.

6

27.    The Class consists of all African Americans who are, or have been, employed by Super Steel, whether as permanent or contract employees, and have experienced and/or witnessed racial discrimination and/or harassment at any time during the applicable liability period. All of the Class Representatives are proposed representatives of the class.

### B.    EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS

28.    Certification of a class of similarly situated African Americans is the most efficient and economical means of resolving the questions of law and fact that are common to the individual claims of the named Class Representatives and the class. The individual claims of the Class Representatives require resolution of the common question of whether Defendant Super Steel has engaged in a systemic pattern of racial discrimination and harassment against African Americans. The Class Representatives seek remedies to undo the adverse effects of such discrimination in their own lives, careers and working conditions and to prevent continued racial discrimination in the future. The named Class Representatives have standing to seek such relief, in part because of the adverse effect that racial discrimination and harassment targeted at African Americans has had on their own interest in working conditions free from the pernicious effects of racial bias and hostility. In order to gain such relief for themselves, as well as for the class members, the Class Representatives must establish the existence of systemic racial discrimination and harassment as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to repeated relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the class of African Americans affected by the common questions of law and fact is the most efficient and judicious means of presenting the evidence and argument necessary to resolve such questions for the Class Representatives, the class and Defendant Super Steel. The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic

7

disparate treatment claims of the type at issue in this Complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

## C.   NUMEROSITY AND IMPRACTICABILITY OF JOINDER

29.    The class is so numerous that it is impracticable to bring all of its members before the Court. On information and belief, the class of black former, current, and future Super Steel employees comprises over fifty persons. The actual number of class members who have been or are currently employed by the defendant during the relevant liability period can be determined from Defendant Super Steel's records.

## D.   COMMON QUESTIONS OF LAW AND FACT

30.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the class they seek to represent. The common questions of law include, *inter alia*, whether Defendant Super Steel has engaged in systemic racial discrimination and harassment in its selection practices and its terms and conditions of work and employment in a manner made unlawful by the statute under which this action is brought.

## E.   TYPICALITY OF CLAIMS AND RELIEF SOUGHT

31.    The claims of the Class Representatives are typical of the claims of the proposed class. In particular, Super Steel ignores, and in some cases actively supports, racist threats, comments, jokes and behavior among its staff and fails to enforce policies prohibiting racial discrimination.

32.    Defendant Super Steel's illegal practices and procedures are premised on an invidious and racially discriminatory animus directed against African American people. It is specifically calculated to deny members of the African American race equal treatment and opportunities guaranteed by §1981.

8

33.     The employment practices at issue in this Complaint are neither unique nor limited to one department, but affect the named Class Representatives and members of the class in the same way throughout Super Steel's operations.

34.     The relief necessary to remedy the claims of the named Class Representatives is the same as that necessary for the class.

## F.     ADEQUACY OF REPRESENTATION

35.     The Class Representatives' interests are coextensive with those of the class in that each seeks to remedy Defendant Super Steel's discriminatory employment practices so that racially hostile conditions of work will be eradicated. The Class Representatives are able and willing to represent the class fairly and vigorously, as they pursue their common goals through this action. The Class Representatives have retained counsel who are qualified, experienced and able to conduct the litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interest, experience and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue clearly satisfy the Class Representatives' and class members' entitlement to equitable remedies at Stage II of such a trial. Declaratory and injunctive relief flow directly and automatically from proof of the common question of law and fact regarding the existence of systemic racial discrimination against African Americans. Such relief is the factual and legal predicate for the Class Representatives' and class members' entitlement to equitable remedies for individual losses caused by such systemic discrimination.

36.     The common issues of fact and law affecting the claims of the Class Representatives and proposed class members predominate over any issues affecting only individual claims.

37.     A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

9

38.    The cost of proving Super Steel's pattern or practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

## VI.    ALLEGATIONS OF THE CLASS REPRESENTATIVES

### A.    CRISS MURPHY

39.    **Class Representative Criss Murphy** is currently a resident of Lawrenceville, Georgia.    Mr. C. Murphy has been employed as a welder at Super Steel's facility in Schenectady, New York from approximately April 2005 to the present.  Mr. C. Murphy took a paid leave of absence from Super Steel from January 3, 2006, when his locker was vandalized with threatening, racist graffiti.  On February 20, 2006, Super Steel put Mr. C. Murphy on an unpaid leave of absence, scheduled to end on April 17, 2006.  As a result of the continuing hostility displayed by Super Steel towards Mr. C. Murphy, including Super Steel's decision to cancel Mr. C. Murphy's health benefits on March 31, 2006, as well as the lack of reliable assurance that Mr. C. Murphy's safety at Super Steel is assured, Mr. C. Murphy did not return to Super Steel by April 17, 2006, and was terminated on that date..

40.    As an employee at Super Steel, Mr. C. Murphy worked daily in an environment that was rife with racial hostility.  As an African American employee at Super Steel, this hostility forced Mr. C. Murphy to contend with specific challenges, including racist threats and taunts, disparate terms and conditions of employment, the denial of training opportunities, and other forms of discrimination.

41.    Mr. C. Murphy's most recent incident of racial hostility occurred on January 3, 2006.  Through the end of December 2005, Mr. C. Murphy was busy working and flying to Atlanta, Georgia to visit his mother, who was recovering from surgery.  On January 3, 2006, he flew from Atlanta back to New York in time to work the night shift at Super Steel.  When Mr. C. Murphy went to his locker to get his supplies, he found that his locker had been vandalized. Someone had written "KKK" and "Die Nigger Die" with a white welder marker.  Hanging from

10

the coat hook was the head of a black stuffed animal: a monkey. The rest of the monkey was torn apart. Mr. C. Murphy took pictures of his locker and called the police.

42.     The police in Schenectady have been investigating this incident as a felonious hate crime.

43.     After reporting the incident, Mr. C. Murphy took a paid leave of absence from Super Steel. Mr. C. Murphy returned to Atlanta to see his girlfriend, who, as a result of the stress she experienced due to Mr. C. Murphy's treatment at Super Steel, had suffered a miscarriage.

44.     On February 14, 2006, Mr. C. Murphy received a letter from Gerald J. Nelson ("Director Nelson"), Super Steel's Director of Human Resources. Although Director Nelson acknowledged that those who vandalized Mr. C. Murphy's locker had not yet been identified, and that the steps planned to address Mr. C. Murphy's safety concerns had not all been taken, Director Nelson demanded that Mr. C. Murphy return to work.

45.     On March 15, 2006, Mr. C. Murphy received notice that, beginning nearly one month earlier, on February 20, 2006, his leave of absence had been changed from paid to unpaid. Mr. C. Murphy further received notice that his unpaid leave of absence would last until April 17, 2006, by which time his failure to return to work would lead to termination.

46.     Additionally, without explanation or warning, Super Steel discontinued Mr. C. Murphy's health insurance beginning March 31, 2006. Mr. C. Murphy only became aware of his cancelled benefits when he went to the pharmacy to fill a prescription. The medication he sought was prescribed by his doctor to help Mr. C. Murphy deal with panic attacks, a condition that he developed as a result of the racism at Super Steel. When Mr. C. Murphy called his insurance company to inquire about his inability to collect this prescription, he was told that Super Steel cancelled his health insurance. It was only after that call that Mr. C. Murphy received a letter from Super Steel, verifying that his coverage had been cancelled beginning March 31, 2006.

11

47.     As a result of the continuing hostility form Super Steel, and the lack of reliable assurance that Mr. C. Murphy's physical safety can be assured as an employee there, Mr. C. Murphy did not return to work on April 17, 2006, and was terminated by the company.

48.     The racist graffiti on Mr. C. Murphy's locker that precipitated his January 3, 2006 leave of absence was a culmination of months of racism that Mr. C. Murphy experienced almost as soon as he began his employment with the Super Steel. During his second week of employment with the company, Mr. C. Murphy and his cousin, Plaintiff David Chambers, waited on the plant floor with their co-workers while one of the company's Leadmen, white male Ed _____ ("Supervisor Ed"), distributed work assignments. Supervisor Ed ignored Mr. C. Murphy and Mr. Chambers completely during this process, leaving them standing alone after he assigned jobs to all of their white co-workers. Mr. C. Murphy and Mr. Chambers waited for work assignments for forty-five minutes. At that time, realizing that Supervisor Ed had no intention of giving them work assignments, Mr. C. Murphy and Mr. Chambers left.

49.     The next day, Mr. C. Murphy and Mr. Chambers returned to Super Steel to collect their checks and quit. Mr. C. Murphy and Mr. Chambers saw little opportunity in working with a company that allowed its managerial employees to so blatantly disregard African American workers. Wayne Allen ("Supervisor Allen") and Kevin Harrington ("Supervisor Harrington"), both white, male, plant Supervisors, intercepted Mr. C. Murphy and Mr. Chambers on their way to quit. Supervisors Allen and Harrington requested that Mr. C. Murphy and Mr. Chambers continue working at Super Steel, and assured Mr. C. Murphy and Mr. Chambers that they would talk to Supervisor Ed. Mr. C. Murphy and Mr. Chambers agreed. Since this incident, however, Supervisor Ed has been promoted to plant Supervisor. On occasion, when Supervisor Ed's department has needed additional workers, Mr. C. Murphy has been forced to work in Supervisor Ed's department.

50.     The incident with Supervisor Ed followed a pattern that would be repeated throughout Mr. C. Murphy's employment. Namely, a white co-worker would target Mr. C.

12

Murphy for hostile treatment, Mr. C. Murphy would report the incident to Supervisor Allen, and Supervisor Allen would promise to "talk" to the co-worker causing problems. In all of these cases, the hostility and intimidation that Mr. C. Murphy was subjected to by his white co-workers was starkly different from the type of treatment extended to white employees, and the response of management to Mr. C. Murphy's requests for intervention unfailingly inconsistent with Super Steel's expressed written policies regarding harassment and intimidation.

51.     In addition to the harassment that Mr. C. Murphy faced from his white co-workers and the lackadaisical response Mr. C. Murphy received from Super Steel management, Mr. C. Murphy experienced and witnessed other discriminatory acts by management personnel at Super Steel. For example, in 2005 Supervisor Allen was choosing people to send to Milwaukee for training on different types of machines. Mr. C. Murphy requested that he be able to attend. Mr. C. Murphy had reason to believe that he would be chosen, as Supervisor Allen had acknowledged that Mr. C. Murphy's welding was the best at Super Steel. However, without giving any explanation as to how he chose them, Supervisor Allen announced the next day that he had chosen to send Manny, a co-worker whose harassment Mr. C. Murphy reported to Supervisor Allen, and two white employees. None of those selected for the training had demonstrated the technical expertise of Mr. C. Murphy.

52.     On another occasion, Supervisor Allen and Supervisor Harrington asked Mr. C. Murphy if he knew any good welders. The supervisors told Mr. C. Murphy that new hires would be paid $17 per hour. Mr. C. Murphy's brother, Plaintiff Herion Murphy, came up from New Orleans, Louisiana for the job. When Mr. H. Murphy started working, however, he only received $13 per hour. Mr. C. Murphy spoke to Supervisor Allen and Supervisor Harrington about the discrepancy. Supervisor Allen and Supervisor Harrington claimed that Mr. H. Murphy was being paid less because he could not read blueprints. When Mr. C. Murphy challenged this assertion, the supervisors promised to raise Mr. H. Murphy's salary to $16 per hour. The supervisors never fulfilled this promise and eventually Mr. H. Murphy returned to New Orleans.

13

53.     Mr. C. Murphy is also aware of a racial bias in hiring at Super Steel. Mr. C. Murphy would regularly see management walk African-American and white applicants through the factory. Although there were at least as many African-American applicants as white applicants, the applicant hired was almost invariably white. When Plaintiff Andino Ward, an African-American male, was hired, Mr. C. Murphy heard other employees call Mr. Ward the "default hire" because the only other applicants for his position, white females that Super Steel had attempted to hire, both failed their drug tests.

54.     As a result of Mr. C. Murphy's hostile work environment at Super Steel, culminating in the threatening, racist graffiti in his locker, Mr. C. Murphy began to have panic attacks. Mr. C. Murphy has seen a doctor and a psychiatrist to deal with this problem. Although Mr. C. Murphy's doctor prescribed him medication to address his condition, Mr. C. Murphy was unable to get his medication when his health insurance was cancelled by Super Steel on March 31, 2006.

55.     As a result of the racial discrimination at Super Steel, Mr. C. Murphy has suffered extreme harm.

### B.     NORMAN JORDAN

56.     **Class Representative Norman Jordan** is a resident of Lawrenceville, New Jersey. Mr. Jordan was hired by Super Steel as a Sandblaster in approximately April 2005. In September 2005, Mr. Jordan was constructively discharged from his position at Super Steel due to continuing racial harassment.

57.     As an employee at Super Steel, Mr. Jordan worked daily in an environment that was rife with racial hostility. As an African American employee at Super Steel, this hostility forced Mr. Jordan to contend with specific challenges, including racist threats and taunts, the denial of promotion and other employment opportunities, disparate terms and conditions of employment, and other forms of discrimination.

58.     Mr. Jordan's six-month tenure at Super Steel was characterized by a hostile work environment.  On August 2, 2005 the Glenville Police Department came to Super Steel to investigate racist graffiti drawn on a train that Mr. Jordan was working on.  The graffiti was a drawing of a dead man hanging from a rope around his neck.  The dead man had a dot on his forehead, similar to the prostration mark that Mr. Jordan has on his forehead.  The police Sergeant investigating the incident, Sergeant Alan Craver, noted in his police report that the Super Steel Plant Manager "had not yet come to an understanding of the serious nature of the incident(s) and was still under the assumption that they would be able to handle everything internally."

59.     The blatant, threatening racism exhibited by the graffiti in Mr. Jordan's workspace, and Super Steel's attempt to dismiss and underplay the seriousness of it, is characteristic of Mr. Jordan's experience at Super Steel.

60.     As an employee at Super Steel, Mr. Jordan was regularly called "nigger," "fucking nigger," "nigger bastard," and "nigger monkey."  These racial slurs were directed at Mr. Jordan from both his white co-workers and his white supervisors.  Often, the racial slur was attached to some sort of threat or other hostile comment.

61.     For example, Paint Supervisor Ben Rodgers ("Supervisor Ben Rodgers") often expressed his racial hatred towards Mr. Jordan in starkly violent terms.  On one occasion, Supervisor Ben Rodgers said to his father, Supervisor Phil Rodgers ("Supervisor Phil Rodgers"), that it would be fun to see Mr. Jordan's "black fat ass" being hung, and that Mr. Jordan would "scream like a bitch."  They both started laughing.  This comment was heard by co-workers Ernie _____, Chris Kennely, and Mike Clemens.

62.     On another occasion, when Mr. Jordan had just finished a prayer, Supervisor Ben Rodgers said to Supervisor Phil Rodgers "What does this nigger Muslim think he's doing?" Supervisor Phil Rodgers replied "we know how to get rid of niggers like this."

63.    Supervisor Ben Rodgers also made racist comments directly to Mr. Jordan. One time, Supervisor Ben Rodgers asked Mr. Jordan how he liked working for a white man, adding that white men are superior to black men. Another time, Mr. Jordan was in the sandblast booth when Supervisor Ben Rodgers came in and said he was taking too long. Supervisor Ben Rodgers then said that he knew what would make "these niggers" work faster: "a good old nigger whip."

64.    Supervisor Phil Rodgers confronted Mr. Jordan with racist threats as well. When Mr. Jordan was getting a cup of coffee during his shift, Supervisor Phil Rodgers said that the "bull's eye" mark on Mr. Jordan's forehead looked like it needed a bullet in it. When Mr. Jordan asked Supervisor Phil Rodgers what his problem was, Supervisor Phil Rodgers replied that he was just letting Mr. Jordan know "how much [he hates Mr. Jordan's] black ass." Supervisor Phil Rodgers also told Mr. Jordan that his days were limited because "we are tired of your kind of people."

65.    During this interaction, Supervisor Phil Rodgers also asked Mr. Jordan why African Americans take a "black god" when a "white god" is the superior god.

66.    Gary _____, a white Inspector Supervisor ("Supervisor Gary") was another Supervisor that made racist comments to Mr. Jordan. One day, as Mr. Jordan came out of the sandblast booth after praying during his lunch hour, Supervisor Gary asked Todd _____, the Plant Manager ("Plant Manager Todd"), why Super Steel hired "somebody like that," referring to Mr. Jordan. Plant Manager Todd responded that they could not "put up" with it.

67.    When Mr. Jordan addressed Plant Manager Todd about the conversation, Plant Manager Todd said that Mr. Jordan was hearing things. When Mr. Jordan approached Supervisor Gary about the conversation, Supervisor Gary said that he did not have a problem letting Mr. Jordan know that he does not like black people or Muslims. Supervisor Gary said that Mr. Jordan should have told Super Steel that he was Muslim, because Supervisor Gary could guarantee that Mr. Jordan would never have been hired.

68.     Supervisor Gary also made comments that were physically threatening.    For example, Supervisor Gary commented on one occasion that he would "get rid of this black monkey," referring to Mr. Jordan.

69.     Supervisor Gary's hostility was so apparent that a white co-worker who was friendly with Mr. Jordan, Bob _____, told Mr. Jordan that he should watch out for his physical safety.

70.     Paint Supervisor Harry _____ ("Supervisor Harry"), was yet another Super Steel supervisor who threatened Mr. Jordan with impunity. On one occasion when Mr. Jordan was working on the first shift, Mr. Jordan had to leave the plant for an hour and a half for religious services. Normally, a worker is permitted to leave during the first shift for personal business if he clocks in and out, and finishes his work during the second shift. However, when Mr. Jordan clocked in and out for his religious service, Supervisor Harry approached him and told him that he needed a note to excuse his absence. Supervisor Harry told Mr. Jordan that if he left for service, he did not need to come back. Supervisor Harry continued by saying "We're not here to cater to your black ass or your bullshit services."

71.     Mr. Jordan overheard a related conversation between Supervisor Harry, Supervisor Gary, and his direct Supervisor Chris Fain ("Supervisor Fain") in which they discussed how they were not willing to "cater" to Mr. Jordan, and in which Supervisor Gary said they should just hang Mr. Jordan to "let all these niggers know who's really in charge."

72.     Mr. Jordan reported this incident to Kim Evans ("Human Resources Representative Evans") in Human Resources. Human Resources Representative Evans said that she did not believe Mr. Jordan's accusation, and, despite its seriousness, took no action to find out whether Mr. Jordan's claim was true.

73.     This was not the first incident that Mr. Jordan brought to Ms. Evans. Mr. Jordan went to Human Resources repeatedly to report the racist threats and taunts he confronted at work.

17

74.     One morning, at approximately 3:00 a.m., Ernie came into the spackling booth where Mr. Jordan was working. Ernie started harassing Mr. Jordan, claiming that Mr. Jordan was not doing his work properly and saying that he was tired of Mr. Jordan's "shit." Ernie then said that Mr. Jordan and his family could go to hell and, while drawing a hand across his throat, Ernie said that he could have Mr. Jordan disappear.

75.     Mr. Jordan immediately told Human Resources Representative Evans about Ernie's comments. Human Resources Representative Evans responded by asking Mr. Jordan what he expected her to do about it. Mr. Jordan told Human Resources Representative Evans that he expected her to protect his rights. Human Resources Representative Evans replied that there was nothing that she could do.

76.     Later that day, Ernie again approached Mr. Jordan and asked Mr. Jordan why he went "crying" to the office. Ernie said that if Mr. Jordan made any more noise, Mr. Jordan knew what would happen to him.

77.     Mr. Jordan again told Human Resources Representative Evans about Ernie's threats. Human Resources Representative Evans again claimed there was nothing she could do. Approximately three weeks later, Ernie made more threats to Mr. Jordan during break. When Mr. Jordan went to Human Resources Representative Evans to report them, her response was that she thought that Mr. Jordan's "people" were "used to that stuff."

78.     Mr. Jordan also went to Human Resources only three days before the graffiti of the man hanging appeared on his train. At that time, Mr. Jordan went to Human Resources to report a sign that had been hung in his workspace that said "Kiss my white ass." Mr. Jordan was unsettled by the sign because of the threats he had received and the knowledge that someone had been lurking in his workspace.

79.     When Human Resources, yet again, took no action, Mr. Jordan finally accepted that Super Steel would never address his harassment. At that point, Mr. Jordan called the police. The policeman that came to Super Steel to investigate Mr. Jordan's claims told Mr. Jordan's

supervisor that Mr. Jordan was being harassed, and told Mr. Jordan that he should call the police at the next racist comment or action.

80.     A few days later, the graffiti of the man hanging appeared on Mr. Jordan's train. The morning that the graffiti was discovered, one of Super Steel's head managers from Milwaukee was visiting the plant. The manager told Ms. Evans, Supervisor Fain, and Plant Manager Todd to erase the drawing and to get everyone back to work. When another employee heard the manager say this, the employee got a camera to take pictures. Mr. Jordan and the employee took the pictures and called the police before Super Steel could erase the drawing.

81.     Two days later Human Resources Representative Evans came to the Spackling booth where Mr. Jordan was working. She told Mr. Jordan that he should not have called the police, and that if he did not handle things the way that he was directed to by Super Steel, he would lose his job. Mr. Jordan's co-worker Mike Clemens was standing next to Mr. Jordan when Human Resources Representative Evans threatened Mr. Jordan with termination.

82.     The Super Steel employees to whom Mr. Jordan was supposed to report his grievances, including Ms. Evans, were hostile to hearing them. Plant Manager Todd, for example, called Mr. Jordan "nigger bastard" to his face. Mr. Jordan also heard Plant Manager Todd say racist things to other employees.

83.     Accordingly, when Mr. Jordan attempted to bring some of his grievances to Plant Manager Todd. Mr. Jordan was met with derision. On one occasion when Mr. Jordan brought his grievances to Plant Manager Todd, Plant Manager Todd said to Supervisor Fain "What does this fucking nigger expect me to do?" Supervisor Fain replied that Plant Manager Todd should just "ignore the nigger monkey." On another occasion, when Mr. Jordan complained to Plant Manager Todd about one of Supervisor Ben Rodgers' racist remarks, Plant Manager Todd said that he did not realize that Mr. Jordan had heard what Supervisor Ben Rodgers said. Plant Manager Todd then dismissed the issue and said that "all niggers" think they can get their way.

19

84. Mr. Jordan also told Plant Manager Todd he did not feel comfortable working at Super Steel because of all of the racism. Plant Manager Todd told Mr. Jordan that he should be used to it. Plant Manager Todd said that Mr. Jordan should be tougher than he was, that Mr. Jordan was weak, and that Mr. Jordan should be kissing Plant Manager Todd's feet because Mr. Jordan had a job. When Mr. Jordan asked Plant Manager Todd what was being done about the racism and threats to his life, Plant Manager Todd told Mr. Jordan that Super Steel was "still investigating."

85. Mr. Jordan was also rebuffed by his supervisors when he made efforts to improve his employment status at Super Steel. When Mr. Jordan requested that he be considered for a supervisory position that was available in the Sandblaster Department, Supervisor Fain told Mr. Jordan that he would never let a "nigger" take over the department. After Mr. Jordan had requested a number of times that Supervisor Fain let Mr. Jordan demonstrate his painting skills, Supervisor Fain said "you people feel that you can do a whole lot."

86. At Mr. Jordan's ninety-day review, he asked Supervisor Fain about a raise. Supervisor Fain dismissed Mr. Jordan's request by saying that Mr. Jordan had taken too many days off. However, the days off Supervisor Fain was referring to were days that had been approved by Super Steel to allow Mr. Jordan to attend his mother's funeral.

87. Supervisor Fain's perception of Mr. Jordan's proper place in the company was aptly captured in a comment he made to Supervisor Ben Rodgers. When Supervisor Ben Rodgers said that he did not like the fact that he had to work around a "nigger Muslim," Supervisor Fain told Supervisor Ben Rodgers that Supervisor Ben Rodgers should just have Mr. Jordan "sweep the floor" because that "is what they are used to anyway."

88. The threats, comments, and hostility at Super Steel severely diminished Mr. Jordan's well-being. Mr. Jordan had trouble sleeping at night and felt scared and anxious about what might happen to him. Ultimately, the burden of the maltreatment was too heavy, and Mr. Jordan resigned from his position at Super Steel in September 2005.

20

89.     As a result of the racial discrimination at Super Steel, Mr. Jordan has suffered extreme harm.

## C.     ANDINO WARD

90.     **Class Representative Andino Ward** is a resident of Schenectady, New York. Mr. Ward has been employed as an Assembler at Super Steel from approximately July 27, 2005 until the present.

91.     As an employee at Super Steel, Mr. Ward worked, and continues to work, in an environment rife with racial hostility. As an African American employee at Super Steel, this hostility has forced Mr. Jordan to contend with specific challenges, including racist threats and taunts, denial of promotions and other employment opportunities, disparate terms and conditions of employment, and other forms of discrimination.

92.     On February 16, 2006, Mr. Ward received a letter from Gerald J. Nelson ("Director Nelson"), Director of Human Resources at Super Steel, alleging the recent completion of an "investigation" into the more than six months of racial harassment Mr. Ward has experienced as an employee at Super Steel.

93.     The first incident cited in Director Nelson's letter involved a KKK mask that was left on Mr. Ward's bag. In approximately September 2005, Mr. Ward's white co-worker John Kalament ("Mr. Kalament") told Mr. Ward that he had put something on Mr. Ward's bag to help Mr. Ward "keep up" his work ethic. The item Mr. Kalament left was a KKK mask with "Kill Blackie" written on the forehead. Mr. Ward told Mr. Kalament that Mr. Kalament could not do things like that.   Mr. Ward then went to his Supervisor, white male Henry Bendixon ("Supervisor Bendixon") to tell Supervisor Bendixon what had happened.  Supervisor Bendixon, expressing an interest in "keeping the peace," chose not to take any action.

94.     In Director Nelson's letter, Director Nelson claims that both Mr. Kalament and Mr. Ward agreed that Mr. Kalament's actions were performed in jest. This is not accurate. Mr.

21

Ward's decision to report the incident to Supervisor Bendixon accurately reflects Mr. Ward's serious concern about what had happened.

95.     Mr. Ward was also subject to other harassment by his white co-workers. For example, Jason Bombard ("Mr. Bombard") would block Mr. Ward's path when Mr. Ward was trying to walk, look at Mr. Ward in a hostile way, and lose his temper with Mr. Ward. Another co-worker, Mike _____, would move closer to Mr. Ward when he passed him in the hall. Mike would walk until his face was right next to Mr. Ward's, and stare at him in a threatening manner as he passed.

96.     Russ _____, a long-term employee of Super Steel and Supervisor Bendixon's stepson, told Mr. Ward that Mike treated Mr. Ward in such a hostile manner because Mike was part of a white supremacist gang called the Aryan Nation. Russ also told Mr. Ward that there was a lot of racism at Super Steel, and that the company did not like to hire African Americans.

97.     Russ's assertion that Super Steel did not like to hire African Americans accorded with Mr. Ward's experience at the company. After Mr. Ward was hired, he was told that there were two white, female applicants for his position, and that Super Steel had tried to hire, in turn, each of them. However, both women failed their drug tests. When Super Steel ran out of white applicants, the company hired Mr. Ward. To commemorate the conditions of his hiring, one of Mr. Ward's white co-workers, Bill Kohinke ("Mr. Kohinke"), called Mr. Ward "DH": "Default Hire."

98.     When Mr. Ward began his employment at Super Steel, he was the only African American in his department. The white employees in Mr. Ward's department often spoke derisively about another African American employee, Robert Thomas ("Mr. Thomas"), who worked in the department prior to Mr. Ward's arrival, and who had moved to another department to try to escape the constant racism he had found among the employees with whom Mr. Ward was now working. When Mr. Ward met Mr. Thomas, Mr. Thomas told Mr. Ward to

22

be careful. Mr. Thomas warned Mr. Ward that the workers in his department were racist, and would gang up on Mr. Ward to attempt to push him out of the room.

99.     Mr. Ward quickly found that his white co-workers took part in many racially offensive conversations. One such conversation involved Mr. Kohinke and another white worker, Laurie Jones ("Ms. Jones"). In that conversation, Mr. Kohinke and Ms. Jones were discussing slavery. Ms. Jones turned to Mr. Ward and made numerous comments about how all African Americans are the same. She said that African Americans all think that white people owe them something, and that all African Americans are drug dealers. Mr. Ward tried to ignore these conversations and concentrate on his work.

100.    Another of Mr. Ward's white co-workers, Mary _____, had been making things difficult for Mr. Ward since he started in his department by telling Super Steel management that he was not working. As her claims were false, Mr. Ward decided to ignore them.

101.    However, when Mary walked right near Mr. Ward and loudly declared that she "hate[s] negroes," Mr. Ward felt that he needed to say something. He told Supervisor Bendixon about Mary's harassment and about what she had said. Supervisor Bendixon took no steps to reprimand Mary for her hostility.

102.    Director Nelson, in his February 16, 2006 letter, describes Mary's comment as "isolated."

103.    However, even Supervisor Bendixon commented to Mr. Ward that there were many racists at Super Steel. While making this comment, Supervisor Bendixon began to point to the employees that he knew were racist. Supervisor Bendixon said that he even had people in his family that were part of the Aryan Nation.

104.    After incidents of violence between white and African American employees at Super Steel, including one in which Mr. Ward was pushed by Jason Bombard, and after Plaintiff Criss Murphy's locker was covered with racist graffiti, Mr. Ward felt so threatened by his work environment that he started to bring a razor blade into the bathroom with him for self-protection.

23

105.     As an employee at Super Steel, Mr. Ward has also faced discrimination with respect to potential promotions and appropriate salary increases. For example, in December 2005 Mr. Ward expressed interest in a better paying position as a forklift operator. Mr. Ward was told that Super Steel wanted him to have the job. As Mr. Ward prepared for the move, however, he was told that the job had been given to a white employee. Mr. Ward was given no explanation as to why he was dropped in favor of this employee.

106.     More recently, Mr. Ward was offered an appraisal of his salary. Although he was told that this would result in his first pay raise, Mr. Ward never received the appraisal. Again, Mr. Ward was never given an explanation for this oversight.

107.     As a result of the racial discrimination he has experienced at Super Steel, Mr. Ward has suffered, and continues to suffer, extreme harm.

**D.     EDDIE BARNES, JR.**

108.     **Class Representative Eddie Barnes, Jr.** is a resident of Moss Point, Mississippi. Mr. Barnes was contracted from Global Manpower to work at Super Steel from approximately February 2004 until September 2004, and from approximately February 2005 until October 2005. Mr. Barnes was hired in February 2004 to blast and spray trains. Mr. Barnes worked in this capacity for one week, after which he was transferred to another department to build trains. Mr. Barnes built trains until September 2004. When Mr. Barnes returned to Super Steel in February 2005, he blasted and sprayed trains for the remainder of his tenure.

109.     As an employee at Super Steel, Mr. Barnes worked daily in an environment that was rife with racial hostility. As an African American employee at Super Steel, this hostility forced Mr. Barnes to contend with specific challenges, including racist threats and taunts, disparate terms and conditions of employment, and other forms of discrimination.

110.     In February 2004, Mr. Barnes traveled from Moss Point, Mississippi to Schenectady, New York, to blast and spray trains at Super Steel. Upon his arrival at Super Steel, Mr. Barnes was assigned to work with an all-white paint crew. This assignment quickly

24

proved problematic. Mr. Barnes' white co-workers not only ignored him, but would not let him paint. Approximately one week from his starting date, Mr. Barnes was told that he was not needed in his assigned department, and was transferred to a department where trains were being framed and built. This transfer put Mr. Barnes at a significant disadvantage, as he had no experience framing or building trains. In addition, Mr. Barnes' new group of white co-workers was as hostile as the first group.

111.   However, in contrast to his previous department, one other African American employee, Mr. Bill Hall ("Mr. Hall") worked in Mr. Barnes' new department. Mr. Hall taught Mr. Barnes the skills he needed to frame and build trains. With Mr. Hall's assistance, Mr. Barnes was able to continue his employment at Super Steel, and not have to make a financially difficult trek back to Mississippi.

112.   In one of his conversations with Mr. Hall, Mr. Barnes commented about the lack of African American employees at Super Steel. Mr. Hall told Mr. Barnes that racism drove Super Steel's limited hiring of African American employees.

113.   Mr. Barnes saw one reflection of this racism in the derogatory language used by Super Steel's white employees. The day that Mr. Barnes returned to Super Steel in February 2005, Bennie _____, a white employee, approached Mr. Barnes and asked him where contracted employee Kennard Morris ("Mr. Morris"), was. Mr. Barnes told Bennie that Mr. Morris had found another job. Bennie responded, "Well that nigger told me he was coming back." Bennie used this racial slur on multiple occasions.

114.   After one particularly harsh use of the word "nigger," Mr. Barnes raised the issue of Bennie's racist language with Supervisor Woolard. Supervisor Woolard assured Mr. Barnes that he would take care of the problem. However, on information and belief, Bennie received no punishment. Instead, approximately one week after Mr. Barnes lodged his complaint, Bennie was one of a select number of employees chosen to go to Milwaukee for a special job skills training session.

115.    In approximately September 2005, Mr. Barnes and other contract employees had to leave Super Steel to deal with the damage to their homes caused by Hurricane Katrina. Although Mr. Barnes explained that his home was flooded with five feet of water, and that his family needed him, Super Steel tried to pressure Mr. Barnes not to go. Super Steel also initially refused the request of some African American employees for some of the money they had already earned.

116.    Two weeks later, after confronting the physical devastation at home, Mr. Barnes returned to the hostile work environment at Super Steel. Mr. Barnes arrived in New York at 12:00 a.m. and was at work by 9:00 a.m. When Mr. Barnes arrived at work, he was immediately approached by Supervisor Harry _____ ("Supervisor Harry"). Supervisor Harry said that Mr. Barnes could not "walk the floor," as Mr. Barnes did every morning to check in with the contract employees. Instead, Supervisor Harry said Mr. Barnes had two options: to clock in and immediately start working or to go home. Mr. Barnes told Supervisor Harry that he worked very hard at his job, that he worked very long hours, and that the short time he spent walking the floor was one of his job responsibilities. Supervisor Harry responded by repeating himself, speaking loudly and rudely, and pointing and clapping at Mr. Barnes like he was a dog.

117.    Mr. Barnes told Supervisor Harry that Supervisor Harry could not speak to him in that way. Meanwhile, Supervisor Allen and Project Manager Todd stood by and said nothing. Mr. Barnes clocked in and worked for forty minutes. Disgusted with the situation, he then clocked out and went home.

118.    Mr. Barnes reported this incident to the Floor Supervisor, Chris Fain.   On information and belief, no action was taken to discipline Supervisor Harry for his actions.

119.    Soon after, Mr. Barnes' contract was finished and he returned to Mississippi.

120.    As a result of the racial discrimination he experienced at Super Steel, Mr. Barnes suffered extreme harm.

26

## E.   PAUL HANNON

121.   **Class Representative Paul Hannon** is a resident of Jackson, Alabama.  Mr. Hannon was contracted from Global Manpower to work for Super Steel from June 2004 until November 2004, and from February 2005 until October 2005.  Mr. Hannon spent his first six month period at Super Steel as a Spackler in the Paint Department.  When he returned to Super Steel in February 2005, he worked as a Straightener in the Straightening Department until April 2005, and then as a Blaster in the Paint Department until October 2005.

122.   As an employee at Super Steel, Mr. Hannon worked daily in an environment that was rife with racial hostility.  As an African American employee at Super Steel, this hostility forced Mr. Hannon to contend with specific challenges, including racist threats and taunts, disparate terms and conditions of employment, and other forms of discrimination.

123.   When Mr. Hannon entered his new workplace in Schenectady, New York, a recent arrival from Jackson, Alabama, Mr. Hannon immediately noticed how few African American employees worked at Super Steel.  The small proportion of African Americans in Super Steel's permanent workforce contrasted sharply with the ethnic make-up of Mr. Hannon's peer group from Global Manpower, which consisted mainly of African Americans, with one or two white workers among them.

124.   Whereas the few white contract workers from Global Manpower were welcomed by the crowd of white permanent employees at Super Steel, Mr. Hannon and his African American counterparts immediately felt singled out for disparate treatment.

125.   Specifically, Mr. Hannon found that the white supervisors at Super Steel targeted African American workers for longer hours, more strenuous work, and blame and criticism when things went wrong.

126.   The disparate treatment dispensed by white supervisors was amplified by the generally hostile environment in which it took place.  Mr. Hannon found that his workday included using a restroom where "KKK" slogans and other racist graffiti were written on the

27

walls, trying to complete assignments on time when white co-workers locked up the tools that he and other African American employees needed to do their work, and trying to ignore the racial slurs and racially hostile attitudes that permeated the workplace.

127.    Mr. Hannon heard many white employees use racist language at Super Steel. For example, one of the company's Leadmen, Ben Rodgers ("Leadman Rodgers"), used the word "nigger" on multiple occasions.

128.    Following one such occasion, Mr. Hannon reported Leadman Rodger's aggressive, racist language to Supervisor Gary Woolard ("Supervisor Woolard") and Project Manager Todd Thelan ("Project Manager Thelan"). Supervisor Woolard and Project Manager Thelan told Mr. Hannon that they would "take care of it."

129.    The next day, Project Manager Thelan approached Mr. Hannon and assured him that action was being taken with respect to Leadman Rodgers. When Mr. Hannon asked Project Manager Thelan what action, specifically, was being taken, Project Manager Thelan told him that Leadman Rodgers was being written up to the maximum. Project Manager Thelan said that this meant that if Leadman Rodgers had any other write-ups, he would be terminated.

130.    However, Mr. Hannon witnessed Leadman Rodgers get written up for another, non-racial incident consequent to this incident. Leadman Rodgers was not fired. When Mr. Hannon asked a friend in the office about Leadman Rodger's write-ups, Mr. Hannon's friend checked the records and told Mr. Hannon that Leadman Rodgers was never written up for his racial slurs. Moreover, soon after Supervisor Woolard and Project Manager Thelan met with Leadman Rodgers to discuss his racism, Leadman Rodgers was chosen above other employees to attend a special job skills training in Milwaukee.

131.    Mr. Hannon was constantly worried that the racial tension at Super Steel would lead to physical confrontations. He was careful to remain vigilant while working to protect himself from such an eventuality. Given the choice of staying to work at Super Steel and

28

returning home to Alabama to find a new work assignment, Mr. Hannon chose to return to the relative safety of Alabama.

132.     As a result of the racial discrimination he experienced at Super Steel, Mr. Hannon suffered extreme harm.

## F.     CURTIS NELSON

133.     **Class Representative Curtis Nelson** is a resident of Moss Point, Mississippi. Mr. Nelson was contracted to work at Super Steel from approximately June 2004 until August 2004, and from approximately June 2005 until August 2005. Mr. Nelson worked as a Metal Straightener during both of his employment periods at Super Steel.

134.     As an employee at Super Steel, Mr. Nelson worked daily in an environment that was rife with racial hostility. As an African American employee at Super Steel, this hostility forced Mr. Nelson to contend with specific challenges, including racist threats and taunts, disparate terms and conditions of employment, and other forms of discrimination.

135.     Mr. Nelson compares his arrival at Super Steel to that of a slave being sold at market. His white co-workers treated him with such a degree of disrespect and hostility that he felt as though he had been "ordered up" by this group of white New Yorkers from "some small farm" in Mississippi. His white Supervisors gave him orders as if he was a "boy" that was "not supposed to know any better."

136.     During his employment with Super Steel in the summer of 2005, Mr. Nelson was approached by his brother, Vincent Safford ("Mr. Safford"), who appeared upset. Mr. Safford told Mr. Nelson that Mr. Nelson needed to look at the locker that the brothers shared. When Mr. Nelson went to the locker room, he found that someone had drawn a picture of a person with a noose around his neck on the locker door. This was only one day after Plaintiff Norman Jordan filed a police report about a picture that had been drawn on a train that he was working on of someone hanging by a noose.

137.    Mr. Nelson immediately reported the incident to the Plant Manager Todd _____

("Plant Manager Todd"). Plant Manager Todd asked Mr. Nelson to open other lockers to look

for more graffiti. Mr. Nelson is aware that similar graffiti was drawn in the locker of at least one

other African American. Plant Manager Todd took pictures of the drawings and promised Mr.

Nelson that he would "straighten it all out."

138.    However, neither Mr. Nelson nor Mr. Safford was ever informed of any follow-

up. Despite the similarity of the racist graffiti found on that day to the racist graffiti targeted at

Mr. Jordan, Super Steel chose not to involve the police in the matter.

139.    The racist graffiti on Mr. Nelson's locker followed a number of daily, race-based

indignities that Mr. Nelson had been forced to deal with since he was first contracted to work at

Super Steel in 2004. For example, the bathrooms were filled with racist graffiti similar to that

which Mr. Nelson found in his locker.

140.    In addition, Mr. Nelson's white co-workers told the African American employees

that they could not eat at certain tables, and that they could not smoke or take breaks in certain

places. Management did not intervene to prevent the racial segregation.

141.    Mr. Nelson found it difficult to protest the forced segregation at Super Steel

because there were so few African American workers employed by the company. In fact,

throughout Mr. Nelson's tenure at Super Steel, he saw many black applicants walk through the

company, but never saw any of them get hired.

142.    Mr. Nelson was also hesitant to raise his concerns because of racism among

managerial employees at Super Steel. During the summer of 2005, Mr. Nelson's Supervisor was

Ed _____ ("Supervisor Ed"). Supervisor Ed consistently treated Mr. Nelson in a hostile manner.

Supervisor Ed would give Mr. Nelson dirty looks and target him for criticism and harassment.

For example, Supervisor Ed told Mr. Nelson that he could not make telephone calls and could

not smoke during his break, even though Plant Manager Todd had confirmed that Mr. Nelson

could do both of these things. Although Plant Manager Todd was aware of Supervisor Ed's

30

harassment, Plant Manager Todd never took any steps to stop Supervisor Ed from harassing Mr. Nelson.

143.    Near the end of Mr. Nelson's second term at Super Steel, Hurricane Katrina hit the area where many of the African American contractors working at Super Steel lived in Mississippi. When Mr. Nelson and his co-workers told Super Steel that they needed to leave, management insisted that they stay. As the workers needed to return to their families, they repeated their requests to leave. The workers also asked Super Steel to pay them for the work that they had already completed, so that they would have enough money to get home. Super Steel refused on the grounds that it could not get in contact with the company from which the workers had been contracted. Super Steel refused to negotiate even though the contracting company in Mississippi was unavailable because it was flooded during the hurricane. After pleading with different people in management for some small amount of money, Mr. Nelson finally convinced Plant Manager Todd to give him a small amount to cover some of the transportation costs of returning to Mississippi. Although Mr. Nelson received this small advance on his paycheck, he ultimately returned to Mississippi without his earned, final pay.

144.    As a result of the racial discrimination he experienced at Super Steel, Mr. Nelson suffered extreme harm.

## G.    DAVID CHAMBERS

145.    **Class Representative David Chambers** is a resident of Reserve, Louisiana. Mr. Chambers was contracted to work as a welder at Super Steel from approximately February 2005 until September 2005.

146.    As an employee at Super Steel, Mr. Chambers worked daily in an environment that was rife with racial hostility. As an African American employee at Super Steel, this hostility forced Mr. Chambers to contend with specific challenges, including racist threats and taunts, the denial of promotions and other employment opportunities, disparate terms and conditions of employment, and other forms of discrimination.

31

147.    In September 2005, Mr. Chambers was terminated with four other African
American employees that had been contracted to work at Super Steel, including "Slim" and Nick
_____.  Mr. Chambers had no advance notice of his termination, as he had always completed his
job assignments and was never told of any problems with his work.

148.    The African American workers terminated at the same time as Mr. Chambers had
arrived at Super Steel only two weeks prior to their terminations.  The supervisors terminating
these workers claimed that the men did not have the appropriate skills for their jobs.  To verify
this allegation, the supervisors asked the workers questions relating to fitting.  However, fitting
was not part of the job description that had brought these African Americans from the South to
work at Super Steel.  Rather, the terminated employees had been hired as welders.  Accordingly,
they had taken two tests, one given in Mississippi before they came to Super Steel, and the other
given upon arrival at Super Steel, to test their welding skills.  They passed both of these tests.

149.    On information and belief, white contract employees with similar qualifications
as the terminated African American employees were kept on at Super Steel even as the African
American employees were fired.  Super Steel allowed these white employees the time necessary
to learn the skills they needed for the additional responsibilities.  In contrast, the terminated
African American employees were left without employment and with the expenses of traveling
between New York and their home states.

150.    Although caught unawares by his termination at Super Steel, Mr. Chambers had
faced hostility from various supervisors at the company throughout his employment there.  For
example, one day when Mr. Chambers and his cousin, Plaintiff Criss Murphy, arrived at work,
Supervisor Ed _____ ("Supervisor Ed") was distributing job assignments.  Mr. Chambers and
Mr. C. Murphy waited for forty-five minutes while Supervisor Ed assigned jobs to the white
employees.  After Supervisor Ed finished assigning jobs to the white employees, Supervisor Ed
walked away, leaving Mr. Chambers and Mr. C. Murphy in the middle of the plant floor alone.

32

When Mr. Chambers and Mr. C. Murphy realized that Supervisor Ed did not plan to give them work, the two men left.

151.    Mr. Chambers and Mr. C. Murphy returned the next day, though only to collect their checks and to quit.  On the way to get the checks, Mr. Chambers and Mr. C. Murphy ran into Supervisor Wayne Allen ("Supervisor Allen") and Supervisor Kevin Harrington ("Supervisor Harrington").  Mr. Chambers and Mr. C. Murphy told the supervisors what had happened.  Mr. Chambers and Mr. C. Murphy agreed not to quit after Supervisors Allen and Harrington promised they would talk to Supervisor Ed.

152.    However, Supervisor Allen, when distributing job assignments the following day, again left Mr. Chambers standing for thirty-five minutes.  When Supervisor Allen was done distributing job assignments to other workers, he approached Mr. Chambers and asked why Mr. Chambers had not left.  Mr. Chambers said that he believed that Supervisor Allen would eventually give him work.  After this incident, Mr. Chambers was separated from Mr. C. Murphy and transferred to work on the night shift.

153.    While working under the command of Supervisor Allen, Mr. Chambers was subjected to various instances of disparate treatment.  On one occasion, for example, Mr. Chambers was working hard to complete one of his assigned projects when Supervisor Allen called him away from his work.  Supervisor Allen told Mr. Chambers that Mr. Chambers needed to interrupt what he was doing to scrub the paint off of a train that a different group of employees was working on.  Mr. Chambers was forced to leave his assigned project to scrub the paint while the white workers who were assigned to finish the train stood around and watched him work.

154.    This assignment, like many others given to Mr. Chambers during his employment at Super Steel, did not accord with his position as a welder.  Mr. Chambers found that he was often given menial assignments, and often denied opportunities to use and improve his skills as a welder.  For example, when work was slow Mr. Chambers asked if he could do some welding

33

on the stainless steel part of the train, which was more interesting work. Mr. Chambers was told that Super Steel had certified people to do that work. When Mr. Chambers brought attention to his own certification, he was told that his certification was not enough.

155.    Super Steel promised to get Mr. Chambers the training and related certification that management claimed was needed for the stainless steel welding. In the meantime, the employees who completed the stainless steel welding were all white. Mr. Chambers was never given the promised certification.

156.    On another occasion, Mr. Chambers asked to be transferred to the back room, where he would do more welding and less of the fitting and other projects that did not utilize his skills. Most of the employees in the back room were white. Despite Mr. Chambers' extensive training as a welder, Super Steel refused to transfer him.

157.    Mr. Chambers was denied these opportunities, and ultimately terminated, despite his record of good work at Super Steel. Following his termination, Mr. Chambers returned to Louisiana to seek new employment opportunities.

158.    As a result of the racial discrimination he experienced at Super Steel, Mr. Chambers suffered extreme harm.

## H.    HERION MURPHY

159.    **Plaintiff Herion Murphy** is a resident of Marrero, Louisiana. Mr. H. Murphy was hired to work as a Mig Welder at Super Steel in approximately July 2005. Mr. H. Murphy resigned from this position in November 2005.

160.    As an employee at Super Steel, Mr. H. Murphy worked daily in an environment that was rife with racial hostility. As an African American employee at Super Steel, this hostility forced Mr. H. Murphy to contend with specific challenges, including racist threats and taunts, disparate terms and conditions of employment, and other forms of discrimination.

161.    Mr. H. Murphy traveled from New Orleans, Louisiana to Schenectady, New York for a job at Super Steel in July 2005. He traveled to New York with the understanding that he

34

would be paid $17.50 per hour. When Mr. H. Murphy arrived at Super Steel, he was given a test that was supposed to measure his skills. Following this test, Super Steel assigned Mr. H. Murphy to the lowest tier of workers, and said they were only going to pay him $13.00 per hour.

162.    When Mr. H. Murphy asked the managers at Super Steel what the problems with his test were, the managers told him that they would look into it and get back to him. In the meantime, Mr. H. Murphy started work.

163.    When Super Steel's managers finally responded to Mr. H. Murphy, they told him that he was getting paid so little because he could not read blueprints. This was inaccurate. When Mr. H. Murphy demonstrated to the managers that he could read blueprints, he was promised a raise.

164.    Meanwhile, Mr. H. Murphy was performing the same work at the same quality as the top ranked employees at Super Steel. Management at Super Steel demonstrated that they were aware of Mr. H. Murphy's talent by sending the white employees that they hired after and at the same time as Mr. H. Murphy to Mr. H. Murphy for training. While Mr. H. Murphy was training these employees, he was aware that they had been assigned to higher tiers than he was, and, consequently, were getting paid substantially more than he was.

165.    Even Mr. H. Murphy's Foreman, Jim _____ ("Foreman Jim"), supported Mr. H. Murphy in his efforts to get a raise. Foreman Jim expressed disbelief that Mr. H. Murphy was getting paid so little for his work. Mr. H. Murphy raised the issue of his pay with Super Steel at least once a month. Each time, Mr. H. Murphy's requests that he be paid fairly were put off or rebuffed.

166.    Mr. H. Murphy intensified his requests for the promised raise when Hurricane Katrina hit New Orleans during the summer of 2005. Mr. H. Murphy needed money to send home, and the $13.00 per hour he was making was paltry compared to what he could have been making elsewhere.

35

167.    Mr. H. Murphy was willing to stay at Super Steel even if the company only gave him the few extra dollars per hour they had promised, and not the $17.50 that he knew his white trainees were receiving, and which had brought him from Louisiana in the first place. Mr. H. Murphy worked hard and pushed for the money until November, at which time he realized that Super Steel had no intention of paying him the money that he deserved.

168.    During his few months at Super Steel, Mr. H. Murphy experienced and witnessed racism throughout the company. Mr. H. Murphy knew of a number of white employees that were openly hostile to African Americans. Some of them would give Mr. H. Murphy and other African Americans hostile looks as they walked by. On one occasion, Mr. H. Murphy saw that someone had written "KKK" and "nigger" on an African American employee's locker. Similar graffiti was in the bathrooms.

169.    When the contract workers came to Super Steel, they greatly increased the number of African Americans at the company. Without them, there were very few African American employees working at Super Steel.

170.    Accordingly, Mr. H. Murphy saw that the racism was particularly apparent when directed at this African American group of workers. For example, Mr. H. Murphy frequently heard the African American contract employees being criticized and saw their work being much more closely examined than that of their white counterparts. Mr. H. Murphy's impression was that Super Steel would fire the African American contract workers for the smallest mistakes. He saw many African American contract workers terminated accordingly. In contrast, Mr. H. Murphy never heard of any white contract employees being terminated.

171.    As a result of the racial discrimination he experienced at Super Steel, Mr. H. Murphy suffered extreme harm.

## I.      VINCENT SAFFORD

172.     **Plaintiff Vincent Safford** is a resident of Moss Point, Mississippi.  Mr. Safford was contracted from Global Manpower to work at Super Steel as a Heat Straightener in the Integration Department from approximately April 2005 until the end of August 2005.

173.     As an employee of Super Steel, Mr. Safford worked daily in an environment that was rife with racial hostility.  As an African American employee of Super Steel, this hostility as forced Mr. Safford to contend with specific challenges, including racist threats and taunts, disparate terms and conditions of employment, and other forms of discrimination.

174.     As a fifty-year-old African American male, born and raised in Mississippi, Mr. Safford never experienced the type of blatant racism that he found at Super Steel in Schenectady, New York.  Being one of only a limited number of African American employees was not in itself a problem for Mr. Safford; he had attended predominantly white schools in Mississippi as a "test case" in the 1960s, beginning when he was in the fifth grade.

175.     What became a problem for Mr. Safford was the fact that he was one of a small minority of African American employees in an environment permeated by racism.  Racism appeared in the graffiti of nooses and racial slurs about "niggers" in the bathrooms, on the walls in some of the working areas, and in the locker room.  Mr. Safford found racism in the hostile manner of his white co-workers, who made the work of Mr. Safford and his African American peers more difficult and unpleasant.  Mr. Safford confronted racism when his white supervisors treated him and other African American employees more harshly and more critically than their white co-workers.

176.     Recognizing this racism, Mr. Safford made a concerted effort to keep a low profile, not cause any trouble, and stay out of everyone's way.  He wanted to do his work, complete his contract, and return to Mississippi.

37

177. Despite Mr. Safford's efforts to avoid the racism, he was confronted directly by it in July 2005. During this time, Mr. Safford returned from getting a snack to find that someone had drawn a picture on his locker of a black man hanging from a rope around his neck.

178. Mr. Safford went immediately to tell his brother, Plaintiff Curtis Nelson, with whom he shared the locker, about the drawing. Mr. Safford then reported the incident to Plant Manager Todd _____ ("Plant Manager Todd"), who took pictures of the drawing, told everyone to leave the locker room, and then spray-painted over it. Mr. Safford was told that the company was going to investigate to find out who had drawn the graffiti. To Mr. Safford's knowledge, no follow-up action was taken.

179. It was difficult for Mr. Safford to guess who drew the picture of the hanging man. He felt hostility from many of his white co-workers, despite his conscious efforts to avoid trouble. For example, Mr. Safford did not take his breaks near the picnic tables because it was clear that the white workers that were usually there did not want African Americans to come around.

180. Mr. Safford found his instinct to avoid the picnic tables worthwhile when he learned that one African American that did take a break there, Bobby Fairly ("Mr. Fairly"), ended up in a fight with a white worker, Mark _____. Mark punched Mr. Fairly in the face.

181. Following that altercation, Mr. Safford told Supervisor Ed _____ ("Supervisor Ed") that he needed some safety glasses for his work. Supervisor Ed told Mr. Safford to get the glasses that were left on the bench by Mr. Fairly after the fight. The glasses were bent and scratched. Laughing, Supervisor Ed told Mr. Safford that he could use the glasses if he could fix them.

182. Supervisor Ed was close friends with Mark. After Mark and Mr. Fairly were fired, Mr. Safford saw Mark on Super Steel property talking with Ed and other white Super Steel employees, even though Mark was not supposed to be on Super Steel's premises because he had been terminated.

38

183.    Mr. Safford experienced Supervisor Ed being hostile towards African American workers in a number of ways. For example, Supervisor Ed would always nitpick the work of Mr. Safford and other African American employees, and blame them for any problems with production. Supervisor Ed would also try to find extra work to make the African American employees do.

184.    Supervisor Ed's criticisms of the African American employees were echoed by Mr. Safford's white co-workers. These co-workers said that Mr. Safford and his African American co-workers were not doing their work properly, and accused them of not finishing their work. Mr. Safford's white co-workers would say this even though the African American contract employees were working longer hours than the white employees to finish the projects that they were given.

185.    If Mr. Safford had another option, he would have chosen to leave the racism at Super Steel. However, Mr. Safford was far from home and he had to work. He also felt a responsibility to complete his contract. Consequently, Mr. Safford endured the racism at Super Steel until his contract expired in September 2005. At that time, he returned to Mississippi.

186.    As a result of the racial discrimination he experienced at Super Steel, Mr. Safford suffered extreme harm.

## CLASS COUNT

### COUNT I (Class Representatives and Class Members)
### VIOLATIONS OF § 1981
### RACIALLY HOSTILE WORK ENVIRONMENT

#### (African-American Plaintiffs Against Defendant)

187.    African-American Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

188.    This Count is brought on behalf of African-American Class Representatives and African-American members of the class.

39

189.    Defendant has denied African-American Class Representatives and members of the class the same right to make and enforce contracts as enjoyed by white citizens employed by Super Steel, including rights involving the making, performance, modification and termination of contracts with Defendants, as well as the enjoyment of all benefits, privileges, terms and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C § 1981, as amended.

190.    In the employment practices described above, Defendant intentionally engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of African-American Class Representatives and the class, entitling Class Representatives and the class to punitive damages.

191.    By reason of the continuous nature of Defendant's discriminatory conduct persistent throughout the employment of African-American Class Representatives and members of the class, Class Representatives and the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

192.    Defendant's conduct in violation of § 1981 has injured and damaged the African-American Class Representatives and the class.

193.    African-American Class Representatives and the class have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

194.    By reason of Defendant's discrimination, African-American Class Representatives and the class are entitled to all legal and equitable remedies available for violations of § 1981, including an award of punitive damages.

195.    Attorneys' fees should be awarded under § 1981, *et seq*.

196.    The Plaintiffs and the Class Members have no plain, adequate, or complete remedy of law to redress the wrongs alleged herein and this suit for backpay, an injunction, and a declaratory judgment is their only means of securing adequate equitable relief.  The Plaintiffs

40

and the Class Members are now suffering and will continue to suffer irreparable injury from the defendant=s unlawful policies and practices as set forth herein unless enjoined by this Court.

## VI.    PRAYER FOR RELIEF ON CLASS CLAIMS

197.    Wherefore, Plaintiffs, on behalf of themselves and the class members whom they seek to represent, request the following relief:

a.    Acceptance of jurisdiction of this cause;

b.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a) and (b)(2), on behalf of the proposed Plaintiff class, and designation of the Plaintiffs as representatives of the class and their counsel of record as class counsel;

c.    A declaratory judgment that Defendant Super Steel's employment practices challenged herein are illegal and in violation of Section One of the Civil Rights Act of 1866, as amended in 1991, 42 U.S.C. §1981;

d.    A temporary and permanent injunction against Defendant Super Steel and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs and usages by Defendant Super Steel set forth herein;

e.    An Order requiring Defendant Super Steel to initiate and implement programs that (i) remedy the racially hostile work environment at Super Steel; (ii) ensure prompt, remedial action regarding all claims of racial harassment; (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

f.    An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (e) and (f), above, which would provide for (i) the monitoring, reporting and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting

forth information relevant to the determination of the effectiveness of the programs described in

(e) and (f), above;

       g.    Nominal damages;

       h.    Compensatory damages, in an amount not less than $25,000,000.00;

       i.    Punitive damages, in an amount not less than $150,000,000.00;

       j.    An award of litigation costs and expenses, including reasonable attorney's

fees to the Plaintiffs and class members;

       k.    Prejudgment and postjudgment interest; and

       l.    Such other and further relief as the Court may deem just and proper.

## VIII.   JURY TRIAL DEMAND

    198.   Plaintiffs and class demand a trial by jury of all issues.

Respectfully submitted this 18th day of April, 2006.

         S
        David Sanford, D.C. Bar No. 457933
        Laura Fentonmiller, D.C. Bar No. 450813
        Shayna Bloom, MD Bar
        Janette Wipper, D.C. Bar No. 467313
        SANFORD, WITTELS & HEISLER, LLP
        2121 K Street, N.W.
        Suite 700
        Washington, D.C. 20037
        Telephone: (202) 942-9124
        Facsimile:  (202) 628-8189

        Steven Wittels, (SLW-8110)
        Jeremy Heisler, (JH-0145)
        SANFORD, WITTELS & HEISLER, LLP
        950 Third Avenue
        10th Floor
        New York, NY 10022
        Telephone: (646) 723-2947
        Facsimile: (646) 723-2948

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
2121 K Street, N.W.
Suite 700
Washington, D.C. 20037
Telephone: (202) 661-3510
Facsimile: (202) 628-8189

*Attorneys for Plaintiffs*

# Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

| | | |
|---|---|---|
| CRISS MURPHY, NORMAN JORDAN, ANDINO WARD, EDDIE BARNES, JR., PAUL HANNON, CURTIS NELSON, DAVID CHAMBERS, DENNIS COLEMAN, HERION MURPHY, and VINCENT SAFFORD, | ) ) ) ) ) ) | Case File No.: 06-CV-00480-GLS-DRH |
| Individually and on Behalf of Others Similarly Situated, | ) ) ) | |
| PLAINTIFFS, | ) ) ) | |
| - against - | ) ) ) | **CONSENT DECREE** |
| SUPER STEEL SCHENECTADY, INC., | ) ) | |
| DEFENDANT. | ) | |

## I.  INTRODUCTION

This Consent Decree has been entered into by and between Named Plaintiffs, Criss Murphy, Norman Jordan, Andino Ward, Eddie Barnes, Jr., Paul Hannon, Curtis Nelson, David Chambers, Herion Murphy, and Vincent Safford, on behalf of themselves individually and the Settlement Class and Super Steel Schenectady, Inc. ("SSSI" also referred to as the "Company") (collectively the "parties"). This Decree fully and finally resolves in every respect this civil action filed by Named Plaintiffs, individually against SSSI, Civil Action Number 06-CV-00480 (GLS/DRH) ("the Alleged Class Action"). In addition, the provisions of this Decree fully and finally resolve in every respect any and all Charges of Discrimination filed by and/or submitted by Named Plaintiffs, Larry Marshall and Dennis Coleman with the New York State Division of Human Rights and/or the United States Equal Employment Opportunity Commission (the "Charges") bearing Charge Numbers as follows:

| Name | SDHR No. | EEOC No. |
|------|----------|----------|
| Eddie Barnes | 10112612 | 16GA603723 |
| David Chambers | 10112631 | 16GA603738 |
| Dennis Coleman | 10112619 | 16GA603728 |
| Paul Hannon | 10112633 | 16GA603739 |
| Norman Jordan | 10107591 | NONE |
| Larry Marshall | 10112748 | 16GA603825 |
| Criss Murphy | 10112632 | 16GA603736 |
| Herion Murphy | 10112629 | 16GA603735 |
| Vincent Safford | 10112754 | 16GA603829 |
| Curtis Nelson | 10112759 | 16GA603839 |
| Andino Ward | 10112758 | 16GA603838 |

In addition, the provisions of this Decree fully and finally resolve in every respect any and all potential claims that might have been asserted by Wayne Zimmerman and Eddie Stewart, former employees of SSSI.

## II. PURPOSES OF THE CONSENT DECREE

The parties have entered into this Consent Decree for the following purposes:

A.    To resolve all disputes covered by this Consent Decree in such a way as to avoid further expensive and protracted litigation;

B.    To further SSSI's continuing commitment to equal employment opportunity for African-American individuals working at SSSI;

C.    To increase the understanding and awareness of African-Americans working at SSSI concerning internal complaint procedures for handling complaints alleging Race Discrimination.

D.    To create an expedited procedure for distributing a monetary settlement to eligible members of the Settlement Class, and for implementing equitable relief pursuant to the terms of this Decree; and

2

E.     To provide finality to the resolution of all claims and defenses asserted in the Alleged Class Action and the Charges.

## III.  DEFINITIONS

The following terms, when used in this Decree, in addition to the terms defined elsewhere in the Decree, shall have the following meanings:

A.     "Approval Date" means the date upon which the Court signs this Decree, after having determined that it is fair, adequate and reasonable to the Class as a whole, after: (i) notice to the Class; (ii) an opportunity to opt out of the Settlement Class with respect to monetary relief; (iii) an opportunity to submit timely objections to the Decree; (iv) appropriate discovery of the specifics of any such timely objections; and (v) a hearing on the fairness of the settlement.

B.     "Best Efforts" means implementing a plan reasonably designed to comply with the specified objectives to which the best efforts are directed.

C.     "Settlement Class" is defined in Section VII of this Decree.

D.     "Class Counsel" means Sanford, Wittels & Heisler, LLP, and Law Offices of Grant E. Morris.

E.     "Class Representatives" means Eddie Barnes, Jr., David Chambers, Paul Hannon, Norman Jordan, Criss Murphy, Herion Murphy, Curtis Nelson, Vincent Safford, and Andino Ward.

F.     "Court" means the United States District Court for the Northern District of New York.

G.     "Final Approval" means the signing of this Decree on the Approval Date by the United States District Court for the Northern District of New York.

H.     "Final Approval Date" is the date upon which Final Approval of this Decree is attained and any time for appeal of that Decree has expired.

I.     "Race Discrimination" or "Discriminating on the basis of Race" means unlawful discrimination against employees on the basis of their race and/or color, including, but not limited to, retaliation against an employee because he or she has opposed practices he or she believes in good faith to constitute unlawful discrimination on the basis of race and/or color, or has participated in processes designed to obtain relief for alleged unlawful discrimination on the

3

basis of race and/or color. In addition, for all purposes of this Decree, "Race Discrimination" and "Discriminating on the basis of Race" also shall include: (1) racial harassment; (2) retaliation for opposing or complaining about alleged racial harassment; and/or (3) retaliation for participating in a process designed to obtain relief for alleged racial harassment.

J.     "Liability Period" means the period between the Commencement Date for class members and the Preliminary Approval Date.

K.     "Preliminary Approval Date" means the date upon which the Court entered an Order preliminarily approving this Decree, pending notice, setting an opportunity to opt out of the Settlement Class or submit objections to the Decree, and scheduling a fairness hearing thereon. That date is_____, 2007.

L.     "Term of this Consent Decree" is the period from the Final Approval Date until the expiration of the Decree pursuant to Section VI of this Decree.

M.     "Commencement Date" shall mean the date which commences the statute of limitations period for Settlement Class members who reside in New York.

N.     "Individually Identified Recipients" of monetary relief are those members of the Settlement Class, including the Class Representatives.

## IV. LITIGATION BACKGROUND

On April 18, 2006, nine African-American former or current employees of SSSI filed the aforementioned Action, a lawsuit in federal court in the Northern District of New York, brought under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("Section 1981"), asserting individual complaints of allegedly unlawful Discrimination on the basis of Race against them by SSSI.

In September 2005, Named Plaintiff Norman Jordan filed a Charge of Discrimination with the New York State Division of Human Rights ("SDHR"). SSSI responded to this Charge. To date, there has been no Determination by the SDHR regarding said Charge. Subsequently, all other Named Plaintiffs and two putative class members, Dennis Coleman and Larry Marshall, filed Charges of Discrimination with the SDHR, which may have been submitted to the EEOC. These Charges are currently pending and will be withdrawn upon the approval of this Consent Decree.

4

Prior to filing the Alleged Class Action, Class Counsel conducted an extensive investigation of suspected problem areas, as identified to them by the Class Representatives. The Class Representatives, Class Counsel and SSSI believe that the extensive investigation conducted by Class Counsel is sufficient to assess adequately the relative strengths and weaknesses of the respective parties' class certification and merits positions, and to compromise the fundamental issues on a fair and equitable basis. As indicated by the signature of Class Counsel and counsel for SSSI at the end of this document, Named Plaintiffs and SSSI have consented to the entry of this Decree.

## V.  JURISDICTION

The Court has jurisdiction over the parties and the subject matter of this action. Although the Court has no basis upon which to judge the merits of the Alleged Class Action, the Complaint asserts claims that, if proven, would authorize the Court to grant the equitable and monetary relief set forth in this Consent Decree. Venue is proper in the U.S. District Court for the Northern District of New York. This Court shall retain jurisdiction of this action during the duration of the Decree solely for the purpose of entering any orders authorized hereunder which may be necessary to implement the relief provided herein.

## VI.  EFFECTIVE DATES AND DURATION OF CONSENT DECREE

A.     Unless provided otherwise, the equitable provisions in this Decree are effective upon the Final Approval Date, although SSSI has expressed its intent to implement many of the items of equitable relief provided for herein as promptly as reasonably possible, notwithstanding that the approval of this Decree may still be pending.

B.     Except as otherwise provided herein, the provisions of this Decree and the agreements contained herein shall remain in effect for two (2) years following the Final Approval Date. Unless earlier terminated by the Court for good cause shown by SSSI, or extended pursuant to Section IX(C)(2), this Decree shall expire without further action by the parties at midnight on the second anniversary of the Final Approval Date.

5

## VII.     SETTLEMENT CLASS

A.     For purposes of the monetary relief provided in this Decree, the Settlement Class is certified pursuant to Federal Rule of Civil Procedure 23(b)(3) and consists of all African-American individuals who have been employed by or provided contract services to SSSI, at any time, or for any length of time, during the Liability Period. A member of the Settlement Class for purposes of monetary relief shall be entitled to a monetary award hereunder if he or she is either an Individually Identified Recipient of monetary relief or has submitted a verified claim on the form set forth in Appendix I demonstrating that he or she has a valid claim under the procedure and standards set forth in Section XI(A)(8)-(13) hereof.

B.     For purposes of the equitable and declaratory relief provided for under this Decree, the Settlement Class is certified pursuant to Federal Rule of Civil Procedure 23(b)(2) and consists of all African-American individuals who have been employed by SSSI, at any time, and for any length of time, between the Commencement Date and the expiration of this Decree.

C.     The Settlement Class for purposes of monetary relief closes on the Preliminary Approval Date. All African-Americans first hired by SSSI after the Preliminary Approval Date may avail themselves of the equitable relief provided pursuant to the Decree, but shall not be entitled to any portion of the monetary relief provided hereunder.

D.     In the event that Final Approval of this Decree is not attained, nothing herein shall be deemed to waive any of SSSI's objections and defenses, including but not limited to objections to class certification, and neither this Decree nor the Court's preliminary or provisionally final approval hereof shall be admissible in any court regarding the propriety of class certification or regarding any other issue or subject.

## VIII.     RELEASE OF CLAIMS

### A.     Scope of Judicial Release

#### 1.     Release of Claims by Members of the Settlement Class

Upon Final Approval of the Decree, SSSI, Super Steel Products Corp. ("SSP") and all of their respective directors, officers, managers, agents, employees, attorneys, insurers, successors and assigns, and anyone acting in concert with or behalf of any of them, shall be fully released

6

and forever discharged from any and all individual and/or class-wide claims, demands, charges, complaints, rights and causes of action of any kind, known or unknown, by the Class Representatives, by the Settlement Class, and by each member of the Settlement Class, whether seeking monetary and/or equitable relief of any sort, which arise out of or are related to any matter, cause or thing whatsoever based on, arising out of, resulting from, or in any way connected, directly or indirectly with their employment or termination of employment with SSSI, expressly including, but not limited to, the Civil Rights Acts of 1964 and 1991 as amended, 42 U.S.C. §1981, the Equal Protection Clause of the United States Constitution, the New York State Executive Law, the New York City Administrative Code or under any other federal, state or local, civil or human rights law; or in contract, tort or equity, as all such laws may be amended rules and/or regulations, constitutions, ordinances, public policy, and any claim arising under common law, or any claim for costs, fees, or other expenses, including attorney fees, disbursements, and court costs incurred in the above actions. This includes but is not limited to (a) any conduct within the Liability Period allegedly constituting Race Discrimination (as defined above), whether under Title VII, § 1981, the New York State Executive Law, and/or any other law prohibiting such alleged conduct, whether statutory, pursuant to local ordinance, or at common law; (b) any conduct within the Liability Period allegedly constituting negligent misrepresentation, fraud, detrimental reliance, promissory estoppel or breach of contract. This release is final and shall survive the expiration of the Decree's term.

> 2.   **Release of Claims by Class Representatives and Other Individually Identified Recipients**

Upon Final Approval of the Decree, for and in consideration of the mutual promises, terms and conditions by and between SSSI and the Class Representatives and other Individually Identified Recipients of monetary relief pursuant to Section XI(A) hereof, the sufficiency of which consideration is expressly acknowledged, the Class Representatives and all such other Individually Identified Recipients, do hereby fully, finally and forever release and discharge SSSI, SSP, and all of their respective directors, officers, managers, agents, employees, attorneys, insurers, successors and/or assigns, and anyone acting in concert with or on behalf of them, of and from any and all past and/or present claims, demands, actions, causes of action, suits, damages, liabilities, assessments, judgments, costs, losses, debts, obligations and expenses, of any and every nature whatsoever, whether or not known, allegedly incurred by such individual,

7

whether because of allegedly unlawful Race Discrimination (as defined above), or because of any other allegedly unlawful, tortious or wrongful actions by SSSI, SSP, and/or any of the other persons and entities released herein, of any type whatsoever, including but not limited to those arising in any way out of the alleged facts, circumstances and occurrences underlying those allegations of: (a) violations of Title VII and 42 U.S.C. §1981 which were asserted or which might have been asserted by or on behalf of these individuals either in the original complaint or in any and all subsequent amended complaints in the Alleged Class Action, and/or in any and all charges of discrimination filed against SSSI or SSP by some or all of these individuals with the EEOC or any other agency; (b) violations of the New York State Executive Law or any other state laws prohibiting Race Discrimination, or any other law prohibiting such alleged conduct, whether statutory, pursuant to local ordinance, or at common law; and/or (c) negligent misrepresentation, fraud, detrimental reliance, promissory estoppel, or breach of contract which arise out of or are related to any matter, cause or thing whatsoever based on, arising out of, resulting from, or in any way connected, directly or indirectly with their employment or termination of employment with SSSI. This release is final and shall survive the expiration of the Decree's term.

### B.    No Bar to Future Claims

Nothing in the Decree shall be construed to bar any claims of members of the Settlement Class, the Class Representatives or any of the other Individually Identified Recipients of monetary relief based on or arising out of events occurring after the Preliminary Approval Date.

### C.    Opt-Out Process

1.     Pursuant to the Court approval process for this Decree, Settlement Class members shall be provided an opportunity to opt out of the monetary relief provisions of this Decree by submitting to the Court within a specified period of time a "Request to Opt Out." Each Settlement Class member who properly submits a timely Request to Opt Out, or for any other reason is permitted by the Court to opt out of the monetary relief provisions of this Decree, shall be excluded from all monetary relief provisions hereunder, and from the Judicial Release pursuant to Section VIII (A) hereof; all such individuals hereinafter shall be referred to in this Decree as a "Timely Opt Out."

2.     Any Class Representative or other Individually Identified Recipient of monetary relief pursuant to Section XI who becomes a Timely Opt Out shall forfeit his or her

8

identified settlement amount, as set forth on in Section XI(A) hereof, and that amount shall revert immediately to SSSI.

      3.    Any other Settlement Class member who becomes a Timely Opt Out shall receive no monetary relief hereunder. In the event that any Named Plaintiff, Larry Marshall, Dennis Coleman, Wayne Zimmerman or Eddie Stewart become Timely Opt Outs, then SSSI shall have the unilateral right to abrogate this Consent Decree, and the settlement underlying it, by delivering notice of such abrogation to Class Counsel and the Court within thirty days following the Court-established deadline for Settlement Class members to submit a timely Request to Opt Out. (This deadline for SSSI to unilaterally abrogate this Consent Decree will be extended fifteen (15) days further following the fairness hearing established by the Court if the Court permits any Settlement Class member to be deemed a Timely Opt Out even though that Settlement Class member failed to submit a timely Request to Opt Out.) In the event that SSSI exercises its unilateral right to abrogate this Consent Decree, if any such right arises, then all aspects of this Consent Decree and the settlement underlying it, including but not limited to the provisional certification of the Settlement Class for settlement purposes only, shall be altogether null and void, and no aspect thereof shall serve either as any legal precedent or as any basis for legal or factual argument, in this or any other case.

      4.    SSSI shall not be required to pay any sum under this Consent Decree until, at the earliest, the Opt Out period has expired including any additional time allowed by the Court for such Opt Outs.

## IX.    MISCELLANEOUS PROVISIONS

### A.    Calculation of Time

In computing any period of time prescribed or allowed by this Decree, unless otherwise stated, such computation or calculation shall be made consistent with Federal Rule of Civil Procedure 6(a) as it exists at the time at issue.

### B.    No Admission of Liability

This Decree represents the compromise of disputed Claims that the parties recognize would require protracted and costly litigation to determine. SSSI denies it has engaged in any policy, pattern or practice of unlawful Race Discrimination, and SSSI's entry into this Decree is

9

not, and may not be used by any person or entity as, an admission or evidence supporting class certification in any putative class action, and/or an admission or evidence that SSSI has on any occasion engaged in Race Discrimination or any other discriminatory employment practices, such being expressly denied. SSSI has voluntarily entered into this Decree in order to terminate the Alleged Class Action and the Charges and because the actions SSSI has agreed to undertake demonstrate SSSI's strong commitment to equal employment opportunity and diversity.

## C.   Modification and Severability of the Consent Decree

1.     Whenever possible, each provision and term of this Decree shall be interpreted in such a manner as to be valid and enforceable; provided, however, that in the event that after Final Approval hereof any provision or term of this Decree should be determined to be or rendered unenforceable on collateral review, all other provisions and terms of this Decree and the application thereof to all persons and circumstances subject thereto shall remain unaffected to the extent permitted by law.  If any application of any provision or term of this Decree to any specific person or circumstance should be determined to be invalid or unenforceable, the application of such provision or term to other persons or circumstances shall remain unaffected to the extent permitted by law.

2.     Class Counsel and SSSI may jointly agree to modify the Decree, as may be necessary to fully effectuate its purposes while allowing SSSI to appropriately adapt its operations to changing circumstances.  In the event of such a modification, Class Counsel and SSSI shall notify the Court, but formal Court approval of such modifications is not required.

## D.   Duty to Support and Defend the Decree

The Class Representatives, Class Counsel, and SSSI each agree to abide by all of the terms of this Decree in good faith and to support it fully, and shall use their respective Best Efforts to defend this Decree from any legal challenge, whether by appeal, collateral attack or otherwise.

## E.   Waiver of Right to Seek Future Employment

Any individual that is entitled to relief pursuant to this Agreement, whether monetary or injunctive, waives any and all rights or claims which he/she may have to employment or affiliation with SSSI, SSP or any of their related companies, affiliates and/or subsidiaries, and agree that they will not apply for or otherwise seek employment, reinstatement, or affiliation with SSSI, SSP or any of their related companies, affiliates and/or subsidiaries at any time in the

10

future. Nothing in the provision constitutes a waiver of any right to employment by individuals currently employed at SSSI.

**F.   Nondisclosure**

Any individual that is entitled to relief pursuant to this Agreement, whether monetary or injunctive, Class Counsel, and SSSI agrees not to disclose, divulge or otherwise reveal the terms of this Agreement to any third party including, but not limited to, the media. Nothing in this provision prohibits any party from disclosing the terms of this Agreement to their immediate family, financial advisor, insurer, or the individuals at SSSI and/or SSP who are charged with the implementation of this Decree.

## X.     GENERAL EQUITABLE PROVISIONS

### A.   Distribution of Anti-Discrimination Policy Statements

#### 1.     Redistribution of Policies

Within thirty (30) days of the Effective Date, SSSI shall redistribute, to all of its employees, the written policies listed below. Prior to distribution, SSSI shall revise the "Violence in the Workplace" policy and the "Work Rules and Procedures" policy to emphasize SSSI's anti-discrimination policy and complaint procedures. The distribution shall be accompanied by a written statement reiterating the Company's commitment to and support of these policies. The written policies to be distributed in this manner shall include:

- Equal Employment Opportunity
- Harassment Free Workplace
- Violence in the Workplace
- Work Rules and Procedures

#### 2.     Distribution to New Employees

The written policies listed and the written statement described in subsection (1) above, in their then-current or updated form, shall be distributed to all new employees during the term of this Agreement.

11

**B.   Compliance Official**

1.   **Selection of Compliance Official**

SSSI shall designate a Compliance Official who shall be charged with overall responsibility for monitoring and assuring compliance with the terms of this Agreement. The Compliance Official shall be the Vice President of Human Resources who shall report directly to the CEO on this subject.

2.   **Replacement of Compliance Official**

a.   In the event that the Vice President of HR position ceases to exist for any reason, including reassignment of the Vice President of HR's duties to another position, the Company shall designate a successor Compliance Official as soon as practicable but not later than thirty (30) days after the Vice President of HR's position ceases to exist. In the event that the Vice President of Human Resources position ceases to exist, the CEO will perform the duties of the Compliance Official until it is determined which position will assume the duties of the Compliance Official.

b.   SSSI shall use Best Efforts to designate an individual who is qualified to perform and will effectively carry out the duties and responsibilities set forth in subsection (3) below.

3.   **Duties of Compliance Official**

The Compliance Official shall use Best Efforts to ensure SSSI's implementation of, and compliance with, the provisions of this Agreement. The Best Efforts of the Compliance Official shall include the following: (i) monitoring the establishment, implementation, and review of the provisions of Sections X(A) and X(E)(2) of this Agreement; (ii) ensuring the implementation and monitoring of the anti-discrimination, anti-harassment and anti-retaliation policies and training required pursuant to Section X(D); and (iii) providing the internal reports and monitoring required under Sections X(D)(5)-(6).

4.   **Resources for Compliance Official**

SSSI shall provide support staff, funds and other resources to the Compliance Official as may be reasonably necessary to permit him or her to carry out the duties specified in subsection (3) above and to discharge SSSI's obligations under this Agreement.

12

C.   **Accountability of Management Personnel for Equal Employment Opportunity and Diversity**

1.   **Responsibility for EEO Compliance**

It shall be the responsibility of every officer, senior manager and manager with authority over the Glenville facility to use Best Efforts to assure compliance with SSSI's EEO and diversity policies and applicable EEO laws, to carry out his/her duties in conformance with applicable EEO laws, and to assure compliance with the provisions of this Agreement as related to such management personnel's job duties and functions. All such management personnel shall be informed in writing by a higher level of SSSI's management of this specific responsibility, and shall be further informed of what this Agreement specifically requires with respect to the discharge of their own duties.

2.   **Evaluation of Performance on EEO Compliance**

Commencing with the first annual performance appraisal following the Effective Date of the management personnel with responsibility under subsection (1) above, the performance appraisal forms used to evaluate the performance of those employees shall include a professionally-designed performance competency regarding compliance with that responsibility ("EEO performance competency").

3.   **Consideration of Performance on EEO Competency in Promotion and Compensation Decisions**

Evaluation of all management personnel within the scope of this Agreement on EEO performance competency as provided in subsection (2) above shall be taken into account, along with other aspects of performance evaluations, and shall be given significant weight in all compensation decisions and in considering such personnel for promotions or training to enhance their prospects for promotion. All current management personnel shall be informed in writing within thirty (30) days after the Effective Date that EEO performance competency shall be a factor in all such decisions, and all persons newly hired or promoted into management positions shall be so informed at the time they assume such positions.

4.   **EEO Violations**

a.   Any manager who is found to have personally violated SSSI's policies concerning unlawful retaliation, discrimination or harassment on the basis of race or

13

national origin will continue, like all employees, to be subject to appropriate discipline, up to and including termination of employment.

          b.       Managers who fail to respond appropriately to any substantiated complaints of racial discrimination, harassment or retaliation within their area of responsibility or who fail to take appropriate actions to prevent or correct practices or instances of substantiated discrimination, harassment or retaliation shall be counseled with respect to the appropriate execution of his or her responsibility to insure compliance with the Company's EEO Harassment Free Workplace, Violence in the Workplace and Work Rules and Procedures (together "EEO-related responsibilities"); and the cause and substance of such counseling and by whom it was provided shall be documented, including but not limited to, in the manager's annual performance assessment and shall be considered for any purposes for which SSSI uses such performance assessments, including but not limited to determination of eligibility for compensation adjustments and promotions.

          c.       Managers who fail to execute their EEO-related responsibilities appropriately on a second or subsequent occasion, after counseling, shall be subject to appropriate discipline, up to and including termination.

### D.   Training of Managers and Human Resources Personnel

All managers and officers of the Company who possess the authority to hire, promote, select for training leading to advancement, or discharge employees within the scope of this Agreement shall receive training as specified in this Section. To the extent that SSSI has provided training within the nine (9) months prior to the Effective Date to employees who would otherwise be required to receive training under the provisions of this Section, such training need not be repeated and the requirements of this Section may be satisfied by an appropriate "refresher" training supplemented by training on subjects specified in subsection (2)(a)-(b) below that were not included in the prior training.

        1.       **Timing**

The training of personnel provided for in this Section shall be commenced within one hundred eighty (180) days after the Effective Date, and shall be completed by the first anniversary of the Effective Date, for all such managers, and officers employed by the Company as of the Effective Date. All employees hired, promoted, or transferred into positions subject to the training requirements of this Section after the Effective Date shall complete their training

14

within the period provided for above or within ninety (90) days after they assume such positions, whichever is later.

        2.    **Content**

The training provided under this Section shall include at least the following subjects, and any other subjects included in such training shall specifically incorporate EEO/diversity goals and fair employment practices considerations into their presentation in the training:

        a.    The prohibition of discrimination and harassment on the basis of race in the workplace.

        b.    The prohibition and avoidance of retaliation and harassment on the basis of race, including the protection required to be afforded to individuals who bring a discrimination complaint or participate in its investigation or resolution; the nature of and unacceptability of actions constituting prohibited harassment; the consequences of engaging in such retaliation or harassment, including mandatory discipline up to and including termination; and the remedies required to be made available to persons found to be victims of such retaliation or harassment.

        c.    The content of the training provided for in this Section shall be developed by one or more professionally qualified consultants, such as industrial/organizational psychologists, personnel management and/or EEO/diversity practice consultants, etc.

        3.   **Conduct of Training**

The training may, at SSSI's option, be conducted or presented to employees by such professionally qualified consultants or SSSI's own qualified HR personnel. However, any such personnel of the Company who conduct such training or make such presentations to other employees shall first be trained in conducting such training or making such presentations by the consultants who design the training programs for SSSI.

        4.   **Duration of Training**

The training provided pursuant to this Section shall last a minimum of one full day for HR personnel and a minimum of three (3) hours for managers and officers required to receive such training.

        5.   **Review of Training Effectiveness by SSSI**

On an ongoing basis, SSSI shall assess and evaluate the effectiveness of its training programs and the designers and presenters of the training, in light of the purposes and other

15

substantive provisions of this Agreement. SSSI shall make such adjustments or modifications of, or additions to its selections of consultants or trainers, and the training programs themselves, as are necessary and appropriate to effectuate those purposes and other substantive provisions.

### 6. Documentation of Completion of Training

SSSI shall maintain records of attendance at the trainings provided for in this Section, including the name and job titles of attendees and the date(s) and subject(s) of training provided to them, during the term of this Agreement.

## E. Recordkeeping, Reporting and Review of Implementation of the Agreement

### 1. Recordkeeping

During the Term of this Agreement, SSSI shall preserve and maintain documents pertaining to the administration of this Agreement and the policies and practices provided for it. For purposes of this provision, "document" shall include both hard copy and electronically recorded materials (where available), reports and information. The recordkeeping and reporting requirements provided for in this subsection shall apply to the Company's Glenville facility.

### 2. Internal Monitoring and Audits

The Compliance Official appointed pursuant to this Agreement shall review and evaluate data and other information used to compile the reports and shall review and evaluate all record keeping maintained pursuant to $X(E)(1)$, above, and shall produce a report evaluating compliance with this Agreement on a yearly basis to Class Counsel. This report shall be produced to Class Counsel for inspection no later than midnight before the anniversary date of the Final Approval Date for each of two years following the execution of this Agreement. The Compliance Official shall determine from the reports, data and other information so reviewed whether there is any reason to believe that discrimination on the basis of race or any conduct prohibited by this Agreement may have occurred, or that SSSI or any employees of SSSI may not have complied with the provisions of this Agreement. In the event the Compliance Official determines that such discriminatory or non-compliant actions or conduct may have occurred, the Compliance Official shall conduct an audit of the potentially discriminatory or non-compliant activity; reach a final determination with respect to whether any employee engaged in such activity; and if so, propose to responsible Company officials, remedial actions for persons affected by discrimination or non-compliant activity and appropriate disciplinary actions for persons responsible for engaging in or failing to control or report such activity.

16

### F.  Informal Dispute Resolution

#### 1.  Informal Dispute Resolution

##### a.  Initiation

If Class Counsel or SSSI has good reason to believe that a legitimate dispute exists as to the interpretation, application, or enforcement of any provisions of this Agreement, the initiating party shall promptly give written notice to the other party, including: (a) a reference to all specific provisions of the Agreement that are involved; (b) a statement of the issue; (c) a statement of the remedial action sought by the initiating party; and (d) a brief statement of the specific facts, circumstances and any other arguments supporting the position of the initiating party.

##### b.  Response

Within twenty (20) calendar days after receiving such notice, the non-initiating party shall respond in writing to the statement of facts and arguments set forth in the notice and shall provide its written position, including the facts and arguments upon which it relies in support of its position.

##### c.  Parties' Discussions

Class Counsel and representatives of SSSI shall undertake good-faith negotiations, which should include a meeting or meetings by telephone or in person and the exchange of relevant documents and/or other information, to attempt to resolve the issue in dispute or alleged noncompliance.

#### 2.  Mediation

##### a.  Initiation

Both Class Counsel and SSSI agree to attempt mediation of any disputes not resolved through the Informal Dispute Resolution procedure above, and any such mediation shall be exhausted before either party resorts to Arbitration.  Either party's counsel may invoke such mediation, and the other party shall participate in mediation appropriate in duration to the nature and complexity of the matter in dispute.  The parties shall cooperate in scheduling and expediting any such mediation in the interest of efficiency, economy, and resolution, by any appropriate means such as conducting the mediation by telephone where feasible and appropriate.

17

#### b.   Selection of Mediator

The parties shall cooperate to select a mutually acceptable mediator, who shall be an attorney or retired judge who is knowledgeable in the areas of employment discrimination law, personnel policies, and contract interpretation, without delay when a dispute requiring mediation arises.

#### c.   Mediation Procedure and Duration

The parties shall make Best Efforts to conclude any mediation initiated under this Section within thirty (30) days after the initiating party gives notice invoking mediation. In order to do this, and to conduct the mediation efficiently and economically, the parties and the Mediator shall use informal mediation procedures to the greatest extent possible. Unless the parties agree to extend the period for mediation, any dispute not resolved within forty-five (45) days after one party gives notice invoking mediation shall be considered to have failed to resolve the dispute between the parties.

### 3.   Binding Arbitration

#### a.   Prerequisites to Arbitration

Prior to seeking Arbitration, a party wishing to invoke arbitration must first follow the procedures in subsections (1) and (2) above for informal dispute resolution and mediation of the specific matter to be submitted to arbitration. A matter not submitted to such prior procedures or pursued to impasse in those procedures shall not be submitted to or heard by any Arbitrator under this provision.

#### b.   Initiation

Upon the conditions set out in subsection (a) above, and within thirty (30) days after the end of any mediation proceeding on the disputed matter, either Class Counsel or SSSI may request final and binding arbitration before a single arbitrator who shall to the extent practicable in the circumstances, and without incurring undue delay or expense, apply the Commercial Arbitration Rules of the American Arbitration Association ("AAA") subject to the specific provisions set out below. However, the Arbitrator need not be appointed by, and the arbitration need not be administered by, the AAA. Failure to submit such a dispute to arbitration within thirty (30) days of the end of mediation shall operate as a waiver of the issue(s) raised at mediation and acceptance of the status quo as of the end of mediation.

18

### c. Selection of Arbitrator

The parties shall cooperate to select a mutually acceptable arbitrator, who shall be an attorney or retired judge who is knowledgeable in the areas of employment discrimination law, personnel policies, and contract interpretation, without delay when a dispute requiring arbitration arises.

### d. Arbitration Procedures and Duration

The parties may present written and oral argument to the arbitrator, as well as documents and the testimony of witnesses if deemed necessary and permitted by the Arbitrator. The Arbitrator shall have the power to require any party to produce such documents and information prior to or at the arbitration hearing as the arbitrator may believe are necessary to determine fairly the disputed issue. The Arbitrator and the parties shall use Best Efforts to resolve the dispute within ninety (90) days after its submission to arbitration, or the appointment of the arbitrator, whichever is later.

### e. Arbitration Costs

Class Counsel and SSSI shall each be responsible for one-half of the Arbitrator's fees and costs.

### f. Award Final, Non-Appealable and Enforceable

In his or her award, the arbitrator may interpret the Agreement and decide whether SSSI is in material non-compliance with the Agreement. The Arbitrator's decision shall be final and binding. In the event the Arbitrator finds material non-compliance with the Agreement, the Arbitrator may order SSSI to comply with the provision or provisions of the Settlement Agreement, by their own terms, with which there is found to be non-compliance. The Arbitrator may not add to, subtract from, amend or alter the Agreement, and may not order SSSI to perform any act not provided for in this Agreement. The Arbitrator may not award monetary damages. Any award which exceeds the Arbitrator's authority as stated herein shall be null and void. The party prevailing in arbitration may bring a court action to enforce compliance with the Arbitrator's decision. Such action may be brought only in state court in New York. In the event of such an action, the party resisting the arbitration award may defend by, *inter alia*, showing that the Arbitrator acted outside the scope of his or her authority; added to, subtracted from, or altered the Agreement; ignored its terms; or acted arbitrarily or capriciously. The prevailing party in such an action shall recover its court costs. A court that enters an order enforcing an

19

arbitration award shall further award to the prevailing party its litigation costs including attorney's fees.

        4.   **Conclusion of Dispute Resolution Procedure Outside Term of Agreement**

In the event that there is an ongoing dispute between the parties subject to the Dispute Resolution Procedure provided for in this Section at the time the Term of this Agreement ends, the party that submitted that dispute pursuant to the Dispute Resolution Procedure may continue to invoke the procedures provided for in this Section, and the opposing party shall comply with such Procedures, notwithstanding the expiration of the Term of this Agreement before the dispute is fully resolved. Any party prevailing in such a Dispute Resolution Procedure, including mediation, arbitration, or a judicial enforcement action, is entitled to the rights and remedies resulting from prevailing on the disputed issues, as provided for in this Section, notwithstanding the expiration of the Term of the Agreement.

## XI. MONETARY AWARDS AND CREDITED DECREE EXPENSES

### A.   Monetary Awards to Class Members

        1.   After the Final Approval Date, SSSI agrees to distribute in monetary awards to class members a total of $1,250,000.00 ("Total Class Award"). This distribution shall be made as follows: (1) $1 million within ten (10) days after the Final Approval Date; (2) $75,000 on July 1, 2007; (3) $75,000 on January 1, 2008; (4) $100,000 on July 1, 2008. Distributions from the Total Class Award shall be utilized to provide individual monetary awards to members of the Settlement Class in accordance with the provisions of this Section. The Total Class Award includes all attorney's fees and costs. SSSI will make payment in accordance with the schedule above to an escrow account designated by Class Counsel for that purpose. Class Counsel will be responsible for distribution of those funds to any individual recipient. Class Counsel will seek Court Approval of fees and costs incurred and defendant will not object to Class Counsel's seeking same. Subject to Court Approval, those fees and costs, up to a maximum of 37% of the Total Class Award or $444,000 ("Class Counsel Fees and Costs"), will be deducted from the Total Class Award and paid to Class Counsel. Class Counsel Fees and Costs will be deducted from each individual award in proportionate shares.

2.     SSSI shall pay Criss Murphy and Norman Jordan $250,000, less an amount representing their proportionate share of attorney's fees after receipt of an executed release in the form attached as Appendix II. Payment will be made in accordance with the Payment Schedule set forth above in Section XI (A)(1) proportionately.

3.     The other Named Plaintiffs, Larry Marshall, Dennis Coleman, Wayne Zimmerman and Eddie Stewart shall receive the following amounts, less an amount representing their proportionate share of attorney's fees after receipt of an executed release in the form attached as Appendix II. Payment will be made in accordance with the Payment Schedule set forth above in Section XI (A)(1) proportionately.

| Name | Monetary Amount |
| --- | --- |
| Larry Marshall | $35,000 |
| Dennis Coleman | $35,000 |
| Andino Ward | $75,000 |
| Eddie Barnes, Jr. | $75,000 |
| Paul Hannon | $75,000 |
| Curtis Nelson | $75,000 |
| David Chambers | $75,000 |
| Herion Murphy | $75,000 |
| Vincent Safford | $75,000 |
| Wayne Zimmerman | $25,000 |
| Eddie Stewart | $25,000 |

4.     SSSI shall establish an interest bearing account for a Claims Fund and shall deposit $55,000 into the account for the benefit of additional Claimants qualified for monetary relief. Any interest on the account shall become part of the Claims Fund. SSSI shall appoint a Fund Administrator, an SSSI employee, who shall administer the fund and make payments from the fund in accordance with the terms of this Consent Decree and at the instructions of Class Counsel.

5.     Upon five days notice, Class Counsel may inspect the records of the Claims Fund.

21

6.      SSSI shall pay all costs associated with distributing and administering the Fund and no costs shall be deducted from the fund.

7.      For purposes of this Decree, Potential Claimants are defined as African-American employees of SSSI or contract workers who worked for SSSI in its Glenville facility from the Commencement Date up to the date of entry of this Decree, except Class Representatives, Larry Marshall, Dennis Coleman, Wayne Zimmerman or Eddie Stewart.

8.      Within ten days after Preliminary Approval, SSSI will send all Potential Claimants a Notice of Settlement in the form attached as Appendix III, together with a Claim Form attached as Appendix I. The Claim Form will explicitly advise Potential Claimants of their responsibility to fully respond to each question in the Claim Form and to supply all of the requested information before the expiration of the deadlines set forth herein, and to keep Class Counsel advised of any change in name, address or telephone number, in order to preserve any rights they may have under the Decree. The deadline for returning the Claim Form will be prominently displayed at the top of the Claim Form. All Claim Forms submitted must be postmarked by the 90th day from the date of entry of this Decree.

10.     The Notice of Settlement and Claim Form shall be sent to all Potential Claimants at their last known address both by regular First Class U.S. mail and by certified mail, return receipt requested. A list of Potential Claimants, their address, telephone number and Social Security number shall be provided simultaneously to Class Counsel. SSSI will provide Class Counsel with mail tracking information.

11.     Each Potential Claimant will be offered an opportunity to submit a claim to Class Counsel. Any Potential Claimant wishing to file a claim must submit to Class Counsel a completed Claim Form within ninety (90) days of the date of entry of this Decree, together with all relevant information the Potential Claimant wishes to submit with his/her claim. Class Counsel, in its discretion, may request additional information. If a Potential Claimant fails to provide Class Counsel with a completed Claim Form and all relevant information the Potential Claimant wishes to submit with his/her claim by the deadline stated in this Decree, the Claim will be denied as untimely. If a Potential Claimant fails to timely provide other information which may be requested by Class Counsel, Class Counsel, in its discretion may deny the claim for failure to cooperate.

22

12.     Class Counsel will review the Claims Forms and other relevant information timely received by Class Counsel in order to make a determination of the distribution of the Claims Fund. Class Counsel shall make all determinations as to eligibility for monetary relief which may include compensatory damages, back pay and/or front pay. Class Counsel will have sole discretion to deny any claims submitted to it. For purposes of this Consent Decree, an eligible Claimant is a person who Class Counsel has determined is eligible for relief from the Claims Fund in this matter. Class Counsel shall divide the Claims Fund among eligible Claimants in amounts to be determined by Class Counsel. Class Counsel retains sole discretion to determine the amounts to be awarded from the Claims Fund. No person or party has a right to object to Class Counsel's determination.

13.     Upon Class Counsel's determination regarding the distribution of the Claims Fund, Class Counsel will notify SSSI in writing of the eligible Claimants and the amounts to be paid to each eligible Claimant. Class Counsel will also furnish SSSI with any updated information which has been received by Class Counsel from a Claimant regarding the Claimant's name, address, or telephone number. Class Counsel shall also furnish to SSSI a Release in the form attached as Appendix II, executed by each Claimant for whom payment is required. Within thirty (30) days of the date Class Counsel provides the notice and properly executed Release to SSSI regarding distribution of the Claims Fund, SSSI will issue and send checks to the eligible Claimants in the amounts directed by Class Counsel, together with a notice to the eligible Claimant that the check must be cashed within 90 days of the date of the check, or the check will be void and the claim will be denied. SSSI will supply Class Counsel a copy of the checks and with mail tracking information. SSSI will pay all costs associated with mailing and distributing the funds.

14.     If a Claimant has not cashed a check within 90 days after the date of the check, the check will be voided and the claim will be deemed denied.

15.     On August 1, 2008, the Fund Administrator will advise Class Counsel in writing of the amount of any funds remaining in the Claims Fund account, including any funds which remain because checks were not cashed, funds which could not be distributed after diligent efforts by SSSI to locate a Claimant, and interest which has accrued. Class Counsel shall then instruct SSSI in writing to issue a check for the remaining balance in the Claims Fund account to an organization in New York selected by Class Counsel which promotes equal

23

employment opportunities for African-Americans, and qualifies for Section 501(c)(3) status under the Internal Revenue Code. SSSI shall issue a check to such organization within thirty (30) days of mailing of Class Counsel's instruction regarding final distribution of the funds to such organization, and will send Class Counsel a copy of the check and cover letter. The Claims Fund account may then be closed.

16.     SSSI will provide Class Counsel with copies of transmittal letters and checks sent to Claimants within thirty (30) days of issuance.

17.     SSSI will issue Form 1099 to all eligible Claimants who have received funds from the Claims Fund.

## B.     Allocation of Monetary Awards

All distributions of individual monetary awards to the Settlement Class members who are entitled to receive awards under this Decree shall be allocated as follows:  95% compensatory damages and 5% backpay and front pay, which is warranted by the facts and the law.  Before submitting settlement funds to Class Counsel: SSSI shall calculate and withhold from each Settlement Class member's total gross award the amount due for federal, state and local income taxes on the entire gross award, and the amount due for the employee's share of F.I.C.A. on the back pay and front pay portion of the distribution.  SSSI shall also determine the employer's share of F.I.C.A., F.U.T.A. and S.U.T.A. and be responsible for making those payments, which, unlike the Settlement Class members' share of these withholding taxes, will not be deducted from the Total Class Award.  SSSI shall also be responsible for producing and submitting to Class Counsel, for distribution by them to each Settlement Class member who receives a monetary award, the respective W-2 and 1099 tax reporting forms, and SSSI shall also make the necessary tax reporting to the IRS or other appropriate agency.

Any individual entitled to monetary relief under this Agreement shall be solely responsible for the payment of any and all taxes on the aforesaid amounts paid under this Consent Decree, and shall make no claim against SSSI for payment of any such taxes, or any interest or penalties, except as otherwise provided in this Consent Decree. In the event the Internal Revenue Service, or any other taxing entity, including, but not limited to, the State of New York or any court or other tribunal of competent jurisdiction, ultimately determines that the foregoing payments, or any portion thereof, constitute wages or other remuneration for which any taxes are due and owing, the individuals entitled to monetary relief shall be solely responsible for the payment of such taxes,

24

and shall make no claim against SSSI for payment of any such taxes, or for the payment of any applicable interest or penalties. The validity of this Consent Decree shall not be affected in any way by any tax liability individuals may have with respect to these payments.

IT IS SO ORDERED, ADJUDGED AND DECREED this _____ day of _____, 2007.

_____

Hon. Gary L. Sharpe
United States District Judge

[signatures on next page]

25

**STIPULATED, ACKNOWLEDGED AND AGREED TO BY:**


  s/ David Sanford
David Sanford
**SANFORD, WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W.
Suite 310
Washington, D.C.  20009
(202) 742-7780


  s/ Steven Wittels
Steven Wittels, (SLW-8110)
Jeremy Heisler, (JH-0145)
**SANFORD, WITTELS & HEISLER, LLP**
950 Third Avenue
10th Floor
New York, NY  10022
(646) 723-2947


  s/ Grant Morris
Grant Morris, D.C. Bar No. 926253
**LAW OFFICE OF GRANT E. MORRIS**
1666 Connecticut Avenue, N.W.
Suite 310
Washington, D.C.  20009
(202) 742-7783

**CLASS COUNSEL**


  s/ Joan Gilbride
Joan M. Gilbride
**KAUFMAN BORGEEST & RYAN LLP**
99 Park Avenue
New York, New York  10016
(212) 980-9600

**COUNSEL FOR SUPER STEEL
SCHENECTADY, INC.**

LEXSEE 53 FSUPP2D 846

## JOSEPH TALBOTT, on behalf of himself and all others similarly situated, Plaintiff, v. GC SERVICES LIMITED PARTNERSHIP, Defendant.

### Civil Action No. 97-CV-00010-D

### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA, DANVILLE DIVISION

*53 F. Supp. 2d 846; 1999 U.S. Dist. LEXIS 8254*

**May 26, 1999, Decided
May 26, 1999, Filed**

**DISPOSITION:** [**1] Defendant's motion for summary judgment on the issue of the 35% fee GRANTED; defendant's motion for summary judgment on the overshadowing issue DENIED; and the plaintiff's motion for summary judgment on the overshadowing issue GRANTED.

**COUNSEL:** For JOSEPH TALBOTT, plaintiff: Dale Wood Pittman, PETERSBURG, VA.

For GC SERVICES LIMITED PARTNERSHIP, defendant: James C. Skilling, CHERRY, SEYMOUR & SKILLING, RICHMOND, VA.

**JUDGES:** By: Jackson L. Kiser, Senior United States District Court Judge

**OPINION BY:** Jackson L. Kiser

**OPINION:**

#### [*848] MEMORANDUM OPINION

By: Jackson L. Kiser, Senior United States District Court Judge

Before me now are two motions for summary judgment by the defendant GC Services Limited Partnership ("GC Services"). The defendant seeks summary judgment on two of plaintiff's claims brought under the Fair Debt Collection Practices Act, *15 U.S.C. § 1692 et seq.* ("FDCPA"): (1) that the collection letter sent by the defendant to plaintiff Talbott violated *15 U.S.C. §*

*1692g* by containing language that contradicted and overshadowed the required validation notice; and (2) that the defendant unlawfully sought to collect an unauthorized fee of 35% of the plaintiff's underlying debt in [**2] violation of *15 U.S.C. §§ 1692e*(2)(A) and f(1). Also before me is plaintiff's cross motion for summary judgment on the overshadowing issue.

Both parties have fully briefed the issues involved and have been heard at oral argument. The motions are therefore ripe for disposition. For the reasons set forth herein, the defendant's motion for summary judgment on the issue of the 35% fee is **GRANTED**; the defendant's motion for summary judgment on the overshadowing issue is **DENIED**; and the plaintiff's motion for summary judgment on the overshadowing issue is **GRANTED**.

### I. FACTUAL BACKGROUND

This case concerns an overdue debt incurred by plaintiff Joseph Talbott for long-distance telephone service provided by MCI and MCI's subsequent employment of an outside collection agency, GC Services, to collect that debt. Plaintiff claims that the collection charges MCI and its agents sought to recover, and the manner in which recovery was sought, were illegal under federal law.

The factual background in this case is fairly straight forward. On April 4, 1996, on the letterhead of GC Services, Mr. Talbott received a dunning letter in connection with his residual residential account [**3] with MCI. The letter sought to collect $ 125.49 on behalf of the long distance company. The letter stated, in part:

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 78 of 123

Page 2

53 F. Supp. 2d 846, *848; 1999 U.S. Dist. LEXIS 8254, **3

IN AN EFFORT TO RESOLVE THIS ACCOUNT, MCI HAS AUTHORIZED US TO WAIVE THE COLLECTION FEE OF $ 32.53 UPON RECEIPT OF YOUR PAYMENT OF $ 92.96 WITHIN TEN (10) DAYS.

THIS WILL BE YOUR ONLY OPPORTUNITY TO AVOID COLLECTION CHARGES. YOUR PROMPT PAYMENT IS NECESSARY TO PREVENT ADDITIONAL COSTS. MAIL [*849] YOUR CHECK OR MONEY ORDER FOR $ 92.96. IF PROMPT PAYMENT IS NOT RECEIVED WITHIN TEN (10) DAYS OF THE DATE OF THIS LETTER, THIS OFFER IS RESCINDED.

The reverse side of the letter provided the 30-day validation notice required under *15 U.S.C. § 1692g* informing the consumer of his right to dispute the debt, or any portion thereof, in writing, within thirty days after receipt of the initial collection communication.

## II. PROCEDURAL BACKGROUND

The procedural background of this action is somewhat complicated. The case is part of an on-going multi-district litigation ("MDL") proceeding. This MDL proceeding involved five cases. Talbott v. Dunn & Bradstreet (4:97CV0007). Talbott v. GC Services Ltd. (4:97CV0010), Van Hattum v. Dunn & Bradstreet (4:97CV0064), [**4] Hahn v. MCI (4:97CV0065), and Cavaliere v. GC Services Ltd. (4:98CV0052). Three of these cases were brought in other jurisdictions and transferred here pursuant to a December 17, 1997 transfer order from the Judicial Panel on Multidistrict Litigation, creating MDL 1198. The remaining two actions, brought by Mr. Talbott, were originally filed in this district. In addition to his individual claims, Mr. Talbott also sought Virginia class certification in both actions. The instant case was filed in this Court on March 21, 1997. It was not specifically addressed by the Judicial Panel. I later consolidated it with the transferred cases.

Before I joined this case in the MDL procedure in February of 1998, it had progressed steadily. The defendant had filed a motion to dismiss which was denied

by this Court on November 28, 1997. The defendant then filed a motion for summary judgment on January 14, 1998. The motion was limited to two issues: (1) whether plaintiff timely filed a motion for class certification, and (2) whether plaintiff is an adequate class representative. On January 21, 1998, plaintiff filed its opposition to defendant's motion for summary judgment and also a cross-motion [**5] for partial summary judgment on the overshadowing issue. The defendant has responded. Defendant has also responded to the plaintiff's motion for class certification. Then on February 5, 1998, I continued proceedings in this individual case pending the outcome of an MDL pretrial conference. It was after this conference that I consolidated this case with the MDL. Following the transfer and consolidation of all five cases, I sought proposed pre-trial schedules and discovery plans from all plaintiffs and defendants. On March 27, 1998, I issued Pretrial Order No.2 setting forth a discovery and briefing schedule. I decided, in the interest of judicial economy, to hear and decide the substantive issues of the case (the authorization of the 35% charge and the overshadowing issue) before the parties engage in further discovery or briefing regarding the class certification.

This course of action obviously altered the progression of Mr. Talbott's case against GC Services, putting on the back-burner several motions that had been previously filed. Since I set forth this litigation schedule, the other cases in the MDL have been resolved and are no longer before me. The parties in this case, however, [**6] have continued, correctly, to adhere to the MDL schedule. These cross-motions for summary judgment present only the two substantive issues and this opinion will address only those issues, reserving judgment on any remaining issues, specifically regarding class certification.

## III. SUMMARY JUDGMENT STANDARD

Pursuant to *Federal Rule of Civil Procedure 56(c)*, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* When the record taken as a whole [*850] could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate, *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348*

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 79 of 123

53 F. Supp. 2d 846, *850; 1999 U.S. Dist. LEXIS 8254, **6

Page 3

*(1986)*. In considering a motion for summary judgment, the court is required to view the evidence in a light most favorable to the nonmoving party and resolve all reasonable doubts against the moving party. *Anderson, 477 U.S. at 255; Shaw v. Stroud, 13 F.3d 791, 798* (4th Cir.) (citations [**7] omitted), cert. denied, *513 U.S. 813, 513 U.S. 814, 130 L. Ed. 2d 24, 115 S. Ct. 67 (1994)*. Once the movant has met its burden, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial" in order to defeat the summary judgment motion. *Matsushita Electric, 475 U.S. at 587*.

## IV. FDCPA AND THE LEAST SOPHISTICATED CONSUMER STANDARD

The FDCPA protects consumers from abusive debt collection practices by prohibiting the use of "false, deceptive, or misleading representation or means in connection with the collection of any debt." *15 U.S.C. § 1692* (e). To show a violation of the FDCPA, the plaintiff must show (1) that the plaintiff is a "consumer" within the meaning of the statute; (2) that the defendant collecting the debt is a "debt collector" within the meaning of the statute; and (3) that the defendant has violated the FDCPA by act or omission.

The defendant does not contest that the first two elements are met in this case. Only the twin issues of violation under § 1692(e) (the 35% collection fee) and § 1692(g)(overshadowing) are in dispute. To analyze the existence of a FDCPA violation, the Fourth Circuit has adopted a [**8] "least sophisticated consumer" standard. *U.S. v. National Finan. Servs., Inc., 98 F.3d 131, 135-36 (4th Cir. 1996)*. "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Id. at 136* (quoting *Clomon v. Jackson, 988 F.2d 1314, 1318 (2nd Cir. 1993)*).

I now address each of the alleged violations in turn.

## A. The 35% Collection Fee Charge

MCI provides its long-distance telephone services pursuant to a federally filed tariff known as "MCI Telecommunications Corporation Tariff FCC No. 1 (the "tariff"). The plaintiff challenges the addition of a collection fee of 35% of the debts owed MCI on accounts requiring referral to an outside agency for collection on the grounds that such a fee is not authorized by MCI's

tariff, and therefore a demand for such a fee is a false or deceptive statement in violation of sections 1692e(2)(B), 1692e(10), and 1692f(1). n1 I disagree.

> n1 The plaintiff also makes the argument that MCI's F.C.C. tariff provisions do not apply to residential long distance service, and therefore there is no authorization for any recoupment of expenses expended in collection permitted under the tariff. In support of this argument, plaintiff relies principally upon the fact that the tariff is ostensibly labeled (at the top of each page) "Customized Business Communications Service." I find this argument thoroughly unpersuasive. First, it would be nonsensical if MCI's controlling tariff failed to cover its residential long distance services. In addition, the defendant has submitted the undisputed affidavit of Kenneth A. Fox, a former FCC Commission and MCI's Vice-President for Regulatory Affairs at the time MCI filed the tariff to refute the plaintiff's interpretation of the tariff's application to residential accounts. Mr. Fox testifies that when MCI originally filed the tariff, the heading read "Customized Business Communication" because at that time MCI did not provide residential long-distance. When MCI later began to provide residential service, it simply revised the original tariff, thus the heading remains on the pages of the tariff but carries no legal significance.

[**9]

The tariff specifically provides that

> In the event the Company incurs fees or expenses, including attorney's fees, in collecting, or attempting to collect, any charges owed the Company, the customer [*851] will be liable to the Company for the payment of all such fees and expenses reasonably incurred.

Therefore, if MCI actually incurs these expenses in the collection of a debt, and if they are "reasonable," then MCI is specifically authorized by the tariff to collect them from the debtor.

As described by the affidavit of Kathleen M. Rivet, director of Receivables Management for MCI, MCI's fees

53 F. Supp. 2d 846, *851; 1999 U.S. Dist. LEXIS 8254, **9

Page 4

and expenses are primarily made up of 1) the overhead MCI incurs in its efforts to collect a past-due account up to the time it is written off, and 2) the cost of primary outside debt collectors. The plaintiff here contends that the tariff does not allow the defendant to recoup its own internal collection expenses. This position is defeated by the language of the tariff. The tariff provides recovery for "all such fees" related to collection, merely citing attorney's fees as one type of fee that is included in the permitted fee calculation.

MCI has presented detailed testimony about [**10] the origination and calculation of its internal costs. For each overdue account, MCI makes two and a quarter telephone calls per month, and sends out different MCI dunning letters at the various stages of delinquency culminating with a cancellation notice. The expenses incurred for these operations consist of the telephone charges for both outbound and inbound calls, the cost of personnel to place and receive calls, and the cost of the letters. Expenses also include general overhead. The costs are broken down for each month in the three-year period at issue in this action in the affidavit of Ms. Rivet. The defendant calculates that the average internal cost to MCI per workable account (accounts with balances of more than $ 20) is $ 27.07.

The second principle cost to MCI is the cost of the primary outside debt collector. If MCI is unable to collect the consumer debt after trying for about four months, MCI forwards it to one of a handful of primary outside debt collectors. It is at this point that MCI adds the 35% charge to the amount due from the consumer. Furthermore, even if the debt collector is successful in getting the debtor to pay off all of the charges due for the telephone [**11] service as well as 35% collection charge, MCI generally pays the debt collector a dollar amount that by itself is greater than the dollar amount of the 35% charge. (Rivet Aff. PP 10-16).

After considering MCI's internal costs and the costs of a primary outside debt collector, it is plain that MCI necessarily incurs fees and expenses in excess of 35% of the underlying debt when other accounts like plaintiffs are written off and forwarded to an outside agency for collection. First, the $ 27 in MCI's internal collection costs is by itself greater than the 35% charge for all accounts of $ 75 or less. Second, the cost of the outside debt collector is by itself greater than the 35% charge whenever the cost of the agency is 26% or more of the

collected amount (assuming recovery of all of the original amount and all of the 35% charge). This is because, when one adds the original balance and the 35% charge together, the 35% charge represents 26% of that new balance. Therefore, whenever MCI pays a primary agency 26% or more of what is collected, MCI does not net 100% of the underlying debt, even if the agency collects 100% of the original balance and 100% of the 35% charge. Further, when MCI [**12] pays an agency 25% of what is collected, there is only 1% of the collected amount not accounted for by the agency's fee alone, which is more than offset by the $ 27.07 associated with internal collection costs.

More compelling however, than this general analysis of the actual occurrence of these fees, is the fact that there is no doubt that MCI actually incurred fees in excess of 35% of the underlying debt owed by Mr. Talbott. Mr. Talbott owed MCI $ 92.96 and MCI wrote off this debt and referred it to the defendant GC Services, adding the 35% collection charge of $ 32.54 [*852] for a total of $ 125.50. If Talbott had paid GC Services the entire $ 125.50 (he actually paid nothing), MCI would have been contractually obligated under its agreement with GC Services to pay 35% of the *collected amount*, or $ 43.93, an amount $ 11.39 more than the 35% collection charge imposed on Mr. Talbott. When added to the cost of MCI's internal collection efforts ($ 27.07), the total fees and expenses of collecting Talbott's debt would be $ 70.39. This amount is almost twice the 35% collection charge.

The plaintiff also makes an argument that even if the collection fee imposed represents actual costs incurred, [**13] they are unreasonable. I disagree. The 35% charge is reasonable within the meaning of the Collection Charge Provision of MCI's tariff. MCI negotiated its contract with an outside vendor providing support for MCI's internal collection activities. MCI had every economic incentive to obtain the lowest rate possible. It is not conceivable that MCI would want to expend any more than necessary in its collection attempts, or the amount paid to outside agencies in their collection attempts, especially given the frequency with which many accounts are never collected at all.

I find the imposition of a 35% collection fee reasonable, thereby authorized by the tariff and not in violation of the FDCPA.

**B. Overshadowing Issue**

Page 5

53 F. Supp. 2d 846, *852; 1999 U.S. Dist. LEXIS 8254, **13

Plaintiff Talbott alleges that the April 4, 1996 correspondence sent by GC Services contained language which contradicted or overshadowed the validation notice in violation of *15 U.S.C. § 1692g.* n2 Section 1692g of the FDCPA provides that debt collectors must inform consumers of their rights in connection with the collection of a debt. Within five days of the initial communication from the party collecting the debt, the collector must send a written notice to the [**14] debtor informing him of the amount and nature of the debt, and of his right to dispute the validity of the debt or any portion thereof within 30 days after receipt of the notice. To meet the requirements of § 1692g, the validation notice must be effectively conveyed to the consumer:

> To be adequate, the "validation notice" must be placed in such a way to be easily readable, and must be prominent enough to be noticed by an unsophisticated consumer. The notice also must not be overshadowed or contradicted by other messages.

*United States v. National Finan. Servs., 98 F.3d 131, 139 (4th Cir. 1996); See also Miller v. Payco-General American Credits, Inc., 943 F.2d 482, 484 (4th Cir. 1991).* This standard is a stringent one. The analysis is not an objective inquiry into whether the language of the demand letter does overshadow and contradict the validation notice. I must instead decide whether the least sophisticated consumer would find the language contradictory or inconsistent so as to leave him confused about his right to dispute the debt.

> n2 The plaintiff also briefly makes the argument that a violation under § 1692g is also *per se* a violation under § 1692e(10) which prohibits the use of false or misleading representation in the collection of a debt. I don't think this is an accurate statement of the law. Cases where the courts have found § 1692e(10) in addition to § 1692g violations have generally been where the letter issued falsely threatened legal action or threatened to make immediate credit reports where none was to be made for at least 60 days. *National Financial, 98 F.3d at 135; Creighton, 981 F. Supp. 411 at 415.* In this case, where there is no substantively false

information, there is no concomitant § 1692e(10) violation.

[**15]

A survey of the law in this jurisdiction reveals that courts have been quick to find overshadowing in violation of § 1692g where a demand letter requested "immediate payment" or payment by any deadline falling before the expiration of the thirty days allowed by the validation notice for disputing the debt. In National Financial Services, a district court held that the collecting agency's notices demanding immediate payment or payment within ten days from the date of the notice overshadowed [*853] the thirty days allowed by the validation notice itself. *98 F.3d at 138.* The Court of Appeals upheld the lower court's decision, stating that such a decision "was compelled" by Miller v. Payco-General. Id. In Miller, the court held that a form letter demanding "immediate full payment" and commanding the consumer to "phone us now" overshadowed the validation notice on the back of the letter. The court stated:

> The emphasis on immediate action also stands in contradiction to the FDCPA, which provides consumers a thirty day period to decide to request validation. A consumer who received Payco's form could easily be confused between the commands to respond "immediately," "now," and [**16] "today," and the thirty day response time contemplated by the statute. . . Payco need not cease its collection efforts in order to abide by the statute, it simply needs to convey effectively the validation notice without contradicting it.

*Miller, 943 F.2d at 484.*

Guided by Miller and National Financial, district courts have held similar language in demand letters contradictory in violation of § 1692g. In *Morgan v. Credit Adjustment Board, 999 F. Supp. 803 (E.D. Va. 1998),* that court held that language demanding "immediate attention" and directing the consumer to contact the office within seven days could confuse the least sophisticated consumer. Slip Op. 8. In *Withers v.*

*H.R. Eveland, 988 F. Supp. 942, 946 (E.D. Va. 1997)*, a demand that the consumer telephone or pay in full within five days was found to be overshadowing even where the validation provision was contained in the body of the letter immediately following the initial demand.

Generally, a notice is "overshadowing and contradictory if it would make the least sophisticated consumer uncertain as to her rights." *Creighton v. Emporia Credit Service, Inc., 981 F. Supp. 411, 416 (E.D. Va. 1997).* [**17] This principle has consistently been applied in most other jurisdictions that have examined the issue as well. Where a demand letter asks for immediate payment or payment within thirty days, courts have overwhelmingly found that language overshadowing. *See. Savino v. Computer Credit, 164 F.3d 81, 1998 WL 887049 (2nd Cir. 1998)* (a demand for immediate payment was a violation where the letter did not explain that the demand did not override the consumer's right to dispute the debt); *Russell v. Equifax, 74 F.3d 30 (2nd Cir. 1996)* (the contradictory language need not be threatening, just inconsistent, to be overshadowing); *Graziano v. Harrison, 950 F.2d 107 (3rd Cir. 1991)* (a demand coupled with the threat of legal action could induce an unsophisticated debtor into overlooking their right to dispute the debt); *Bartlett v. Heibl, 128 F.3d 497 (7th Cir. 1997)* (even if the demand language is not in direct contradiction to the validation notice, it would easily be confusing to the debtor, "turning the required disclosure into legal gibberish"); *Swanson v. Southern Oregon Credit Service, 869 F.2d 1222 (9th Cir. 1989)* (invoking a shorter response time for collection than thirty days [**18] was an attempt on the part of the collection agent to evade the spirit of the FDCPA).

In the case before me, Talbott concedes that the proper validation language required by the FDCPA was provided by GC Services on the back page of the correspondence. Nevertheless, Talbott contends that the 30 day validation notice was overshadowed by paragraphs 2 & 3 on the front page which inform Talbott that unless he pays within ten days, he will be assessed a collection fee of $ 32.53. The letter states that payment within ten days "will be your only opportunity to avoid collection charges. If payment is not received within ten days of the date of this letter, this offer is rescinded." I think this is exactly the kind of language that, while not directly contradictory to or irreconcilable with the validation notice, could easily confuse the least sophisticated consumer and leave him unsure about his right to [*854] dispute the debt. The defendant argues that the letter at issue here is distinguishable from others in which courts have found overshadowing because this letter does not "demand" payment. The defendant contends that the language merely conveys an offer of settlement and specifically states [**19] that if payment was not received within ten days, the offer would be rescinded. The defendant maintains that reasonable construction of this language is that there is no demand for immediate payment, no threat of legal action, and no threat of credit reporting. I think the defendant is arguing semantics here. While I agree that an average consumer might not find the letter a demand for immediate payment, there is little doubt that the *least* sophisticated consumer could easily believe that he had to choose between exercising his right to contest the debt and paying within ten days or he could face adverse action in the form of additional charges. The least sophisticated consumer might be induced to forgo his rights under the validation provision in order to foreclose the possibility of eventually being held responsible for both the underlying debt and the 35% collection fee. I find that the defendant has failed to raise a genuine issue of material fact on the issue of overshadowing and the plaintiff is therefore entitled to summary judgment.

## V. CONCLUSION

In accordance with this memorandum opinion, I find that the 35% collection fee imposed by MCI was reasonable and [**20] not a violation of the FDCPA. I further find, however, that the collection letter issued by GC Services contained language that could mislead or confuse the least sophisticated debtor as to his right to contest the debt. Therefore, the defendant's motion for summary judgment on the issue of the 35% fee is **GRANTED**; the defendant's motion for summary judgment on the overshadowing issue is **DENIED**; and the plaintiff's motion for summary judgment on the overshadowing issue is **GRANTED**.

An appropriate order shall issue.

Jackson L. Kiser

Senior United States District Judge

**ORDER**

In accordance with the written Memorandum

Page 7

53 F. Supp. 2d 846, *854; 1999 U.S. Dist. LEXIS 8254, **20

Opinion entered this day, it is hereby **ADJUDGED AND ORDERED** that the plaintiff's motion for summary judgment on the overshadowing issue is **GRANTED** and the defendant's motion for summary judgment on the overshadowing issue is **DENIED**. The defendant's motion for summary judgment on the issue of the 35% collection fee is **GRANTED**.

The Clerk is directed to strike these motions from the active docket of this Court and send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record.

Entered [**21] this 26Th day of May, 1999.

Jackson L. Kiser

Senior United States District Judge

102RP5

********** Print Completed **********

Time of Request: Tuesday, April 17, 2007  18:26:57 EST

Print Number:    2822:23258579
Number of Lines: 286
Number of Pages: 7

Send To:  SCALI, ANTHONY
          NEW YORK LAW SCHOOL
          57 WORTH ST
          NEW YORK, NY 10013-2960

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*††
JONATHAN B. BRUNO‡
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON††
ROCCO P. MATRA◊
JOHN B. MULLAHY*

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN¤

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEWER*
CAROL S. DOTY*††
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES†
JEFFREY S. WHITTINGTON¤
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
GINA M. HOGUE*
MICHAEL R. JANES
R. EVON HOWARD*▫
LEONARD B. COOPER†‡
REBECCA GOODMAN

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW R. JONES
JAMES T. DE SILVA
KEITH L. KAPLAN††
VINCENT C. ANSALDI††
DAVID J. VARRALE*††
DOUGLAS J. DOMSKY
KIMBERLY CRESPO
TIMOTHY E. MCCARTHY*
JEFFREY A. GRALNICK
TRACEY REISER-PERTOSO††
KATHERINE J. O'BRIEN††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◆
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA¤
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*

PAIGE E. COOPERMAN
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
BARRY S. COHEN††
THOMAS L. GALLIVAN
EILEEN R. FULLERTON††
CORRIE A. HURM
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*
JOSEPH P. DiPAOLA

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
††ALSO ADMITTED IN CT
◊ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
* ALSO ADMITTED IN FL
◦ ALSO ADMITTED IN CA
¤ ADMITTED IN NJ ONLY
▫ ADMITTED IN CA ONLY
* ADMITTED IN CA, VA, DC ONLY
◆ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 19, 2007

**VIA FACSIMILE / FEDERAL EXPRESS**

Chambers of Hon. Gary L. Sharpe
James T. Foley U.S. Courthouse
445 Broadway, Room 441
Albany, New York 12207

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

MAR 2 1 2007

LAWRENCE K. BAERMAN, CLERK
ALBANY

*Re:*    **Murphy v. Super Steel Schenectady Inc. No. 06-CV-480 (GLS/DRH)**

Dear Judge Sharpe:

We write to inform the Court that it has come to the parties' attention that the Consent Decree in the above-referenced matter, dated January 19, 2007, contains a mathematical error. The parties have reviewed the error, and jointly propose the following amendment to the Consent Decree for the approval of the Court.

Section XI titled "Monetary Awards and Credited Decree Expenses" sets forth the terms concerning the monetary relief under the Consent Decree. A copy of the relevant section of the Consent Decree is annexed hereto for the convenience of the Court. The Total Class Award provided for in this section is $1.25 million. The distribution of the monetary relief is set forth in Section XI (A), Paragraphs (1)-(4). In the previously submitted Consent Decree, the total amount of money distributed among the Settlement Class members amounts to $1.2 million. Accordingly, $50,000.00 of the $1.25 million award was not distributed.

The parties have conferred and respectfully request leave to amend the Consent Decree by allocating the remaining $50,000.00 to the Claims Fund described in Section XI (A), Paragraph (4) of the Decree. The revised Paragraph (4) would read as follows:

4. SSSI shall establish an interest bearing account for a Claims Fund and shall deposit $105,000.00 into the account for the benefit of additional Claimants qualified for monetary relief. Any interest on the account shall become part of the Claims Fund. SSSI shall appoint a Fund Administrator, an SSSI employee, who shall administer the fund and make payments from the fund in accordance with the terms of this Consent Decree and at the instructions of Class Counsel.

The parties respectfully request that the Court approve the amendment to the Consent Decree.

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride

cc:     David Sanford

SO ORDERED:

U.S. District Judge
Date:   3|4|07

KAUFMAN BORGEEST & RYAN LLP

# Exhibit D



Slip Copy
Slip Copy, 2007 WL 927583 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 1

H

Banyai v. Mazur
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Edward BANYAI and Judith A. Zinn, on behalf of
themselves and a class of similarly situated individu-
als, Plaintiffs,

v.

Jay MAZUR, Ronald Alman, Edgar Romney, the In-
ternational Ladies' Garment Workers' Union, the
ILGWU Death Benefit Fund, and the 21st Century
ILGWU Heritage Fund, Defendants.
**No. 00 Civ. 9806(SHS).**

March 27, 2007.

*OPINION*

SIDNEY H. STEIN, U.S. District Judge.

*1 This class action litigation arises from the al-
legedly improper dissolution of the ILGWU Death
Benefit Fund-a benefit fund of the International
Ladies' Garment Workers' Union ("ILGWU" or "the
Union")-the simultaneous transfer of $77.5 million in
actuarial surplus from the Death Benefit Fund to an
ILGWU escrow account, and, approximately one
year later, the transfer of $12.5 million from that es-
crow account to a newly formed not-for-profit cor-
poration, the 21st Century ILGWU Heritage Fund
("Heritage Fund"). Class Counsel, on behalf of the
plaintiff Class, and defendants Jay Mazur, Ronald Al-
man, Edgar Romney, the Union,[FN1] and the ILGWU
Death Benefit Fund (together, the "Settling Defend-
ants") have moved jointly pursuant to Fed.R.Civ.P.
23(e) for final approval of the partial settlement of
this class action on the terms set forth in the Settle-
ment Agreement executed by the parties on Septem-
ber 26, 2003, as amended on January 12, 2004 (the
"Settlement Agreement").

> FN1. In 1995, the ILGWU was consolidated
> with the Amalgamated Clothing and Textile
> Workers Union to form the Union of Need-
> letrades Industrial and Textile Employees,
> which the Union styles as "UNITE!". Since
> that merger, UNITE! has in turn merged

with the Hotel Employees and Restaurant
Employees International Union, forming
UNITE HERE. For purposes of this Opin-
ion, the Court refers to the "Union" when re-
ferring to the ILGWU, UNITE!, or UNITE
HERE, as the case may be.

By Orders dated September 7, 2004 and September
12, 2005, this Court granted its preliminary approval
of the Settlement Agreement and scheduled a hearing
for December 14, 2005 on whether the terms of the
Settlement Agreement were fair, reasonable, and ad-
equate and directed Class Counsel to provide notice
to the Class. In October 2005, 97,443 members of the
Class-including 26,950 then current active parti-
cipants-were sent notice by first-class mail (or by no-
tice provided to their employer) of the terms of the
proposed Settlement Agreement and the date and pur-
pose of the fairness hearing. (Affidavit of Michael
Hirsch dated Dec. 7, 2005, at ¶¶ 3, 8 attached to Class
Counsel's and Settling Defendants' Joint Memor-
andum of Law In Support of Motion For Final Ap-
proval of Partial Settlement ("Joint Mem.").) [FN2]
Notice was also provided by newspaper publication.
As of November 25, 2005, ten objections were filed
by members of the Class. At the fairness hearing on
December 14, 2005, testimony was taken and the
Court heard legal argument. The Court also received
several additional written objections from members
of the Class after the fairness hearing was concluded.

> FN2. Out of the 26,950 then active parti-
> cipants, 637 were inadvertently not mailed
> the notice in October 2005. The Court direc-
> ted that those 637 participants be sent notice
> by overnight mail by Order dated November
> 2, 2005. (*Id.* ¶ 5.)

As explained below, the Court has examined the sub-
stantive fairness of the proposed settlement and the
procedural integrity of its negotiation. Based on,
among other factors, the substantial risks faced by
plaintiffs to prevailing in this litigation and the poten-
tial for additional expense and delay, the Court con-
cludes that the compromise embodied by the pro-
posed settlement is fair, reasonable, and adequate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Accordingly the partial settlement of this action is approved pursuant to Fed.R.Civ.P. 23(e).

## I. FACTS

The following facts, which were also set forth in this Court's August 30, 2005 decision granting in part and denying in part plaintiffs' motion for summary judgment against the Heritage Fund, are taken from the parties' agreed upon Joint Statement of Undisputed Facts ("J.Stat.").

### A. *The Parties*

**\*2** Plaintiff Edward Banyai is a retired employee of defendant Union and a participant in the Death Benefit Fund. (J. Stat.¶¶ 6-8.) Plaintiff Judith Zinn is the wife of Harris Zinn, who is also a retired employee of the Union. (*Id.* ¶¶ 9-10.) Harris Zinn designated Judith Zinn as his beneficiary and as such she is entitled to receive any monies paid out of the Death Benefit Fund upon Harris Zinn's death. (*Id.* ¶ 9.) Banyai and Judith Zinn are the named representatives of the plaintiff Class who commenced this litigation, although they oppose approval of the settlement, as described below.

Defendants Ronald Alman, Jay Mazur, and Edgar Romney are trustees of the Death Benefit Fund, members of the Union's Death Benefit Committee, members of the Union's General Executive Board, and "fiduciaries" with respect to the Death Benefit Fund within the meaning of ERISA. (*Id.* ¶¶ 11-13.) Together, these defendants had "authority and control over the investment and disbursement" of the Death Benefit Fund. (*Id.*) In addition, these defendants all were members of the Heritage Fund's board of directors. (*Id.*) Mazur also was President of both the Union and the Heritage Fund, as well as the chairman of the Heritage Fund's board of directors; Romney also was Vice President of the Heritage Fund. (*Id.* ¶ 11, 13.)

ILGWU was a collective bargaining organization representing garment workers, and was governed by its General Executive Board. (*Id.* ¶ 2.) The Heritage Fund is a not-for-profit corporation organized in December of 1997 pursuant to the laws of Delaware. (*Id.* ¶ 17.) Finally, the Death Benefit Fund is a fund that provides death benefits to members and retired

members of ILGWU, and is a "welfare plan" within the meaning of ERISA. (*Id.* ¶ 1.)

### B. *The Documents that Governed the Death Benefit Fund*

In 1953, the Union merged two pre-existing funds to form the Death Benefit Fund that is the subject of this litigation. (*Id.* ¶ 29.) Article 13 of the Union's constitution governed the Death Benefit Fund and set forth several noteworthy provisions. (*Id.*) First, that the Death Benefit Fund was funded through a combination of contributions from the union members personally, assessments imposed upon the member by his local union, the local union itself, or other benefit funds established by the union members' employers. (*Id.*) Second, that no "funds or property of the [Union] shall be liable" for the payment of benefits. (*Id.*) Third, that "[n]o withdrawals shall be made from [the Death Benefit] Fund except for the payment of death benefits and the cost of administering the same." (*Id.*) Last, that the Union's General Executive Board had the power to "adopt and amend from time to time rules and regulations for the administration of the [Death Benefit] Fund, not inconsistent with the provisions" set forth above, and that any amendments thus made would be "incorporated in and a part of" the Union constitution. (*Id.*)

**\*3** In 1965 the Union constitution underwent significant amendment. Article 13's provisions governing the Death Benefit Fund were removed and amended, and became the initial Rules and Regulations of the Death Benefit Fund (the "Rules"). (*Id.* ¶¶ 33, 38). In addition, two important provisions were added to Article 29 of the Union constitution. First, section two of Article 29 provided that, "All moneys received by the [Union] ... as contributions to a fund for the benefit of workers ... shall be kept in a bank account separately maintained under the name of such fund. The monies in such account shall be used only for the specific purposes of such fund ... and shall not be used for any other purpose." (*Id.* ¶ 38.) Second, section five set forth that, "The death benefit fund, as heretofore established and supplemented and as consolidated in 1953, is continued as a single and irrevocable trust fund to be administered by the [General Executive Board] and its designees in accordance with the

fund's rules and regulations." (*Id.*) The Rules of the Death Benefit Fund contained a provision substantially similar to section five of Article 29 that referred to the Death Benefit Fund as an "irrevocable trust." (*Id.* ¶ 46.)

The Rules also set forth, as had former Article 13 of the Union constitution, that no "funds or property of the [Union] shall be liable" for the payment of benefits and "[n]o withdrawals shall be made from [the Death Benefit] Fund except for the payment of death benefits and the cost of administering the same." (*Id.*) The Rules further set forth that the Death Benefit Fund would be funded through contributions from other benefit funds established by union members' employers, the general revenues of local unions, or assessments levied by local unions upon their members. (*Id.* ¶¶ 46, 51.) Last, the Rules provided that the General Executive Board was "authorized and empowered to adopt and amend from time to time rules and regulations for the administration of the Fund." (*Id.* ¶ 46.) However, in order to amend the Union constitution, "a majority vote of the delegates ... at any triennial convention" of the Union was required. (*Id.* ¶ 45.)

In 1976, the Union's General Executive Board amended the Rules to add provisions concerning the termination of the Death Benefit Fund. (*Id.* ¶ 52.) Specifically, the amendments provided that, "This Plan shall cease and terminate ... in the event of termination by action of the General Executive Board." (*Id.*) Moreover, the amended Rules set forth that in the event of termination, the committee administering the Death Benefit Fund shall "apply the Plan's assets to pay any and all obligations of the Plan and distribute and apply any remaining surplus as will, in [its] opinion, best effectuate the purposes of the Plan and the requirements of law." (*Id.*) The amended Rules also provided that,

No part of the principal or income [of the Plan] shall be used for, or diverted to, purposes other than the exclusive benefit of active and retired participants under the Plan ... before the satisfaction of all liabilities for benefits under the Plan. No ... participant ... shall have any interest in or right to any part of the earnings of the Trust ... or any part of the assets thereof, except to the extent expressly provided in this Plan.

*Id.* ¶ 53.)

\*4 Last, the amended Rules set forth that upon approval of the General Executive Board, the Death Benefit Committee could amend the Rules. (*Id.* ¶ 60.)

Notwithstanding the addition of the termination provision, the 1976 amendments left intact the provision of the Rules describing the Death Benefit Fund as an "irrevocable trust." (*Id.* ¶ 48). Similarly, the Summary Annual Reports of the Death Benefit Fund published in February and November of 1977 and December of the following year provided that the Death Benefit Fund was "a single and irrevocable trust established under" Article 29 of the Union constitution. (*Id.* ¶ 50.) In all material aspects, the Union constitution and the Rules remained as set forth above for twenty one years-until 1997, when the Rules were again amended in advance of the transaction that gave rise to this litigation.

### C. *The 1997 Amendments, the Dissolution of the Death Benefit Fund, and the Transfer of Money to the Heritage Fund*

In February of 1997, the Rules were amended to eliminate any reference to the Death Benefit Fund as an "irrevocable trust." (*Id.* ¶ 59.) In June the Death Benefit Committee passed a resolution setting forth that it had determined that a benefit increase would be in the best interests of the Death Benefit Fund's participants but that the General Executive Board had "indicated that it would approve a benefit increase only if the Fund is terminated and its remaining surplus is used .... to further other interests of the participants and beneficiaries of the Plan." (*Id.* ¶ 61.)

Accordingly, the Death Benefit Committee proposed an amendment that provided that in the event of termination, the Death Benefit Committee shall "apply any remaining surplus ... to promote the charitable interests and other labor related endeavors of the [Union] ... [and] for any other purpose deemed appropriate or desirable by the [General Executive Board] in its sole and absolute discretion." (*Id.*) Six days later the General Executive Board adopted that amendment. At this time, the Death Benefit Fund had an actuarial surplus of approximately \$77.5

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3 (*Id.* ¶ 66.)

> FN3. An "actuarial surplus" is that sum by
> which the Fund exceeds the amount needed
> to continue paying indefinitely the level of
> benefits then in effect, based on the interest
> rate assumptions of the actuary. (*Id.* ¶ 66.)

In December 1997 the Heritage Fund was formed as
a not-for-profit corporation. That same month the
General Executive Board passed a resolution provid-
ing for both the termination of the Death Benefit
Fund at the end of December and the near-
simultaneous creation of a new Death Benefit Fund
on January 1, 1998 to absorb all of the terminated
fund's liabilities. (*Id.* ¶ 63.) The resolution also
provided for an increase in benefits to participants.
(*Id.*)

Pursuant to this resolution, $77.5 million was trans-
ferred from the Death Benefit Fund to a Union es-
crow account. (*Id.* ¶¶ 63, 66.) Roughly one year later,
$12.5 million from that escrow account was trans-
ferred to the Heritage Fund. (*Id.* ¶ 71.) In his depos-
ition, Mazur was asked whether "the governing board
of the Heritage Fund [was] aware" that the "source"
of the $12.5 million was the Death Benefit Fund, and
he replied, "Yes." (*Id.* ¶ 72.) In Alman's deposition,
he stated that the reason for terminating the Death
Benefit Fund was to provide money to be transferred
"[t]o a Heritage Fund, that was being set up." (*Id.* ¶
74.) Mazur testified that such a transfer was his idea
(*id.* ¶ 73), which he set forth at a meeting of the Gen-
eral Executive Board in December of 1997. (Minutes
of ILGWU General Executive Board Meeting dated
Dec. 11, 1997 at 1, Ex. 52 to Joint Statement of Un-
disputed Facts.)

*5 In 1998, retired participants of the terminated
Death Benefit Fund were sent a "Summary of Materi-
al Modification" which advised them that "the Death
Benefit Fund was terminated on December 31, 1997"
and that a "new Death Benefit Fund has been estab-
lished ...." (J. Stat.¶ 77.) This document also was
published in UNITE! Magazine in July of 1998, re-
ceived by Banyai and Judith Zinn, but did not set
forth that any of the terminated Death Benefit Fund's
assets had been transferred. (*Id.*) However, in

November of 1998, a Summary Annual Report was
published in UNITE! Magazine, which Banyai and
Judith Zinn received; that report described the trans-
fer of assets from the terminated Death Benefit Fund
to the Union. (*Id.* ¶ 78.) Banyai and Judith Zinn
maintain that they did not "see" this document and
that "they first heard of the transfer of assets" in the
spring of 1999. (*Id.*)

### D. *Procedural History*

On December 27, 2000, plaintiffs filed this action
and alleged violations of ERISA sections 403, 404,
and 406, contending that the termination of the Death
Benefit Fund and the transfer of the $77.5 million to
the Union was a sham, ineffective, and inconsistent
with the Death Benefit Fund's governing documents.
Plaintiffs also contend that the Heritage Fund know-
ingly participated in the alleged ERISA violations by
accepting the $12.5 million that had been transferred
out of the Death Benefit Fund. Plaintiffs have sub-
sequently filed a First and Second Amended Com-
plaint. In response to plaintiffs' allegations, defend-
ants contend that the termination of the Death Benefit
Fund was lawful and beneficial to ILGWU members
because the $77.5 million that was transferred to the
Union constituted surplus funds that were going to be
used by the Union to strengthen organization and
strike funds, to promote charitable interests, and to
combat discrimination, among other goals. Defend-
ants further contend that even after the transfer of the
$77.5 million, the newly established Death Benefit
Fund remained overfunded by between $70 and $80
million.

On January 8, 2002, the Court certified a plaintiff
class pursuant to Fed.R.Civ.P. 23 consisting of "[a]ll
persons who were participants or beneficiaries of the
[Death Benefit] Fund on the date this action was
commenced, or who became participants or benefi-
ciaries of the [Death Benefit] Fund prior to the final
termination of this action ...." *Banyai v. Mazur*, 205
F.R.D. 160, 162 (S.D.N.Y.2002). In that Order, the
Court appointed Banyai and Zinn as Class Represent-
atives and appointed Marc I. Machiz of Cohen, Mil-
stein, Hausfeld & Toll, P.L.L.C. and David S. Prem-
inger of Rosen, Preminger & Bloom as Class Coun-
sel. *Id.* at 165.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The parties then engaged in discovery, motion practice, and extensive, lengthy, and difficult settlement negotiations under the supervision of Magistrate Judge Frank Maas. That process ultimately yielded the proposed partial settlement now before the Court, which the Heritage Fund has not joined. As noted above, the Court preliminarily approved the proposed settlement on September 7, 2004, and a fairness hearing was held-after due notice to the Class-on December 14, 2005. The Settlement Agreement resolves this action as against all defendants, with the exception of plaintiffs' claim for equitable relief as against the Heritage Fund.

### E. *The Terms of the Proposed Settlement*

\*6 As described above, this litigation arises from the termination of the original Death Benefit Fund and the transfer of approximately \$77.5 million of the Fund's actuarial surplus to the Union, \$12.5 million of which was subsequently in turn transferred to the Heritage Fund. In brief, the Settlement Agreement provides that \$59 .5 million of the \$77.5 million that was transferred out of the original Death Benefit Fund will remain the Union's money-and will not be returned to the Death Benefit Fund. (*See* Settlement Agreement ¶ 3(a).) In exchange for plaintiffs giving up their right to seek a recovery from the Settling Defendants on behalf of the Fund of all or any part of the \$77.5 million that was from transferred from the Death Benefit Fund, beneficiaries of Death Benefit Fund participants who died or die after December 1, 2002 will receive an initial benefit increase expected to be approximately \$825.00, a 33% increase over the current death benefit. (*Id.* ¶ 4(a).) That initial benefit increase-which is expected to cost approximately \$40 million-will be paid for out of the approximately \$57 million actuarial surplus that remains in the new Death Benefit Fund.[FN4] (*Id.*) The Settlement Agreement further provides, importantly, that the majority of any newly developed surplus over the next seven years will be used to provide future benefit increases. (*Id.* ¶ 4(c).) As set forth in greater detail in the Settlement Agreement, the Death Benefit Fund's actuary will determine upon each of the first seven anniversaries of the settlement's "effective date"[FN5] whether the Death Benefit Fund's assets exceed 120% of the then actuarial present value of benefits; if so, 60% of those assets that are in excess of 110% of the then actuarial present value of benefits will be used to fund increased benefits for Death Benefit Fund participants who die on or after the relevant anniversary date. *Id.* Furthermore, the participant population of the Death Benefit Fund will be "frozen" to assure that benefits are not diluted by the inclusion of new participants. (*Id.* ¶ 4(f).) The remaining 40% of "excess assets" will revert to the Union at such time or times as the Union shall determine.[FN6] (*Id.* ¶ 4(c).) If the Death Benefit Fund has assets in excess of 110% of the actuarial present value of benefits after the seventh anniversary of the Settlement Agreement's effective date, those excess funds will then revert to the Union. (*Id.* ¶ 4(h).)

> FN4. The actuarial cost of the initial benefit increase includes a "cushion" such that the Death Benefit Fund remains funded at 110% of the actuarial present value, taking into account the increased benefits. (*Id.*)

> FN5. The settlement's "effective date" will be the later of the date by which this Court issues an order of final approval of the Settlement Agreement and either (i) the time to appeal or otherwise seek review of that decision expires or (ii) in the event that appeal or review is sought, this Court's judgment is affirmed and not subject to further judicial review. (*Id.* ¶ 2.)

> FN6. Assets in the Death Benefit Fund to which the Union is entitled pursuant to the Settlement Agreement, but which remain unredeemed, will not be taken into account by the actuary when determining the level of any actuarial surplus. (*Id.* ¶ 4(c).)

The Settlement Agreement also requires Federal Insurance Company-the fiduciary liability insurance carrier for defendants Mazur, Alman, and Romney-to make a \$2 million payment, of which at least \$1 million will be transferred to the Death Benefit Fund. (*Id.* ¶ 3(b).) The remaining portion of the payment will be allocated to cover unpaid fees, expenses, and costs related to the action. (*Id.*)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In addition, the Class preserves its right to proceed against the Heritage Fund for restitution of the $12.5 million transferred to it, with the assurance that any funds recovered for the Death Benefit Fund will be dedicated to future benefit increases for the Class and will neither be taken into account when determining actuarial surplus nor revert to the Union. (*Id.* ¶ 14(a).) However, any judgment against the Heritage Fund in this action, or any settlement amount paid by the Heritage Fund to settle plaintiffs' claims in this action, will be reduced by the amount of the liability of any of the Settling Defendants to the Heritage Fund. (*Id.*)

**\*7** Finally, the Settlement Agreement provides safeguards to assure that Death Benefit Fund assets cannot in the future be used in any way that would threaten existing benefits, the initial benefit increase, or the subsequent increases provided for in the Settlement Agreement. The Settlement Agreement also attempts to assure the prudent management of the Death Benefit Fund's assets in the future by replacing the current members of the Death Benefit Committee by three trustees, two of whom will be appointed by the President of the Union and a third-the Class Trustee-who will be appointed by Class Counsel. (*Id.* ¶ 6(a).) The Settlement Agreement sets forth specific rules regarding meetings of the trustees, voting structure, and their compensation and termination. (*Id.* ¶ 6.) The Class Trustee holds veto power, but the other trustees may seek arbitration where a veto has been exercised. (*Id.* ¶ 6(g).) Any changes to the actuarial assumptions-including those assumptions that underlie the determination of actuarial surplus at the effective date and during the following seven-year period-must be approved by the Class Trustee, and notice of any change must be published in the UNITE! newsletter and brought to the attention of Class Counsel. (*Id.* ¶ 4(b).)

## II. DISCUSSION

### A. *The Standard for Approving a Proposed Class Action Settlement*

Fed.R.Civ.P. 23(e) provides that "the court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." Fed.R.Civ.P. 23(e). In turn, a court may

only approve "a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.' " *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir.2006) (quoting *Joel A. v. Giuliani,* 218 F.3d 132, 138 (2d Cir.2000)). The discretion to grant or deny such approval should be exercised in light of the general judicial policy favoring settlement. *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982). *See also Wal-Mart Stores, Inc.,* 396 F.3d at 1167-17 (citing *In re PaineWebber Ltd. P'ships Litig.,* 147 F.3d 132, 138 (2d Cir.1998). Ultimately, the Court, as protector of the interests of absent class members, must determine whether the proposed settlement is "fair, reasonable, and adequate." *Weinberger,* 698 F.2d at 73.

The determination of fairness, reasonableness, and adequacy "involves consideration of two types of evidence." *Id.* at 73. The Court's primary focus is on the "substantive terms of the settlement compared to the likely result of a trial," *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983), and to that end "the trial judge must 'apprise[ ] himself of all the facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim[s] be litigated.' " *Weinberger,* 698 F.2d at 74 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)). The Court's second focus is on "the negotiating process by which the settlement was reached," *Weinberger,* 698 F.2d at 74, which must be examined "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman,* 706 F.2d at 433 (citing *Weinberger,* 698 F.2d at 73). The Court has the duty to ensure that the settlement is not the product of collusion, *In re Warner Commc'ns Sec. Litig.,* 798 F.2d 35, 37 (2d Cir.1986), but "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc.,* 396 F.3d at 116 (internal citation omitted).

### B. *Substantive Fairness*
**\*8** The analytical framework for evaluating the sub-

stantive fairness of a class action settlement was set forth by the U.S. Court of Appeals for the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974), more than three decades ago, and is now well established. In determining whether to approve a proposed settlement, a district court should consider the following nine factors:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all attendant risks of litigation.

*Id.* at 463 (internal citations omitted). In its consideration of these factors, "the Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Id.* at 462.

## 1. *The complexity, expense and likely duration of the litigation*

Discovery in this case is complete-including depositions of the only people with personal knowledge of the adoption of the intervening amendments to the Death Benefit Fund's governing documents. Nonetheless, there are important issues of material fact in dispute, including the crucial question of whether the governing documents permitted the Death Benefit Fund to be terminated. This Court has previously decided that the plan documents are ambiguous on this point and that the issue cannot be resolved as a matter of law. *See* Order dated Aug. 30, 2005 denying in part and granting in part plaintiffs' motion for summary judgment and denying Heritage Fund's cross-motion for summary judgment. A trial would drain additional resources from all the parties and, of course, any final determination after trial would be appealable, further draining resources and delaying a final resolution of this litigation. The potential ex-

pense and delay of continuing to litigate weighs in favor of approving the Settlement Agreement. This conclusion is bolstered by the view of the Court and the parties-discussed in greater detail below-that even were plaintiffs to prevail at trial, they would not be entitled to require an increase in benefits, and therefore will obtain relief pursuant to the proposed settlement that is potentially superior to any relief that a victory on the merits would provide, since the settlement provides an immediate benefit increase and the possibility of additional benefit increases annually over the next seven years.

## 2. *The reaction of the class to the settlement*

\*9 The second factor to be considered by the Court is the reaction of the Class to the proposed settlement. A favorable reception by the Class constitutes "strong evidence" of the fairness of a proposed settlement and supports judicial approval. *Grinnell*, 495 F.2d at 462. Similarly, a small number of objections received when compared to the number of notices sent weighs in favor of approval. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir.2001). Specific objections raised by members of the Class and the Heritage Fund are addressed below, but the Court notes that out of a class estimated at the time of class certification to exceed 100,000 members, and to which around 97,000 notices were mailed, approximately one dozen Class members filed objections to the proposed settlement and the fact that the Class as a whole appears to have reacted favorably to the proposed settlement weighs in favor of its approval. This is in no way meant to diminish the sincerity or fervor with which the objectors press their objections upon the Court.

## 3. *The stage of the proceedings and the amount of discovery completed*

"If all discovery has been completed and the case is ready to go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement." *See Wal-Mart Stores, Inc.*, 396 F.3d at 118 (citation omitted). Here, the parties have pursued and completed extensive discovery over a period of several years. That exercise included the review of thousands of pages of documents and depositions of the key

witnesses in the case, including the trustees who approved the challenged $77.5 million transfer. After completing discovery, plaintiffs and defendants fully briefed their respective positions on cross-motions for summary judgment. Furthermore, the parties engaged in extensive negotiations under the supervision of Magistrate Judge Frank Maas for approximately six months before reaching a settlement-in-principle and another eight additional months before the initial proposed settlement was executed and submitted to the Court. There were additional months spent by the parties in an unavailing effort to forge a settlement that would also include the Heritage Fund. The history of this case leads the Court to find that Class Counsel understand the merits-and pitfalls-of their positions and adequately developed those claims before agreeing to the proposed settlement, and the Court has adequate factual information upon which to evaluate the fairness, reasonableness, and adequacy of the proposed settlement. Accordingly, this third *Grinnell* factor also weighs in favor of approval.

#### 4. *The risks of establishing liability*

Litigation inherently involves risks. *See In re Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 126 (S.D.N.Y.1997).* Indeed, "if settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *In re Ira Haupt & Co., 304 F.Supp. 917, 934 (S.D.N.Y.1969).* Because there is substantial uncertainty as to whether plaintiffs would prevail on the merits, this fourth *Grinnell* factor weighs heavily in favor of approving the settlement.

*10 Plaintiffs' theories of liability depend in significant part upon whether the initial termination of the Death Benefit Fund was proper. This determination is to be made on the basis of the Death Benefit Fund's governing plan documents. *See Devlin v. Blue Cross & Blue Shield, 274 F.3d 76, 83 (2d Cir.2001)* (while employers or plan sponsors are generally free under ERISA to adopt, modify or terminate welfare plans for any reason at any time, if a plan document "unambiguously indicates whether [retirement] benefits are vested, the unambiguous language should be enforced") (citing *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976, 980 (2d Cir.1997)).*

In its August 30, 2005 decision granting in part and denying in part plaintiff's motion for summary judgment against the Heritage Fund, the Court found the governing plan documents to be ambiguous on this question. For that reason, the Court found the question as to whether the termination of the Death Benefit Fund was proper to be a question of fact that could not be resolved on a motion for summary judgment. The Death Benefit Fund's governing documents contain language characterizing it as an "irrevocable trust," but also contain a provision expressly providing for termination of the fund and the distribution of its surplus assets in the event of termination. Moreover, while the documents contain an exclusive purpose provision providing that withdrawals from the Death Benefit Fund shall only be for the purpose of paying death benefits and fund administration, that provision is limited by another provision suggesting, the Court found, "that after the Death Benefit Fund's liabilities were satisfied the Union could use the surplus for purposes apart from funding benefits." *See* Transcript dated Sept. 28, 2005 at 12.

Because the plan documents are ambiguous as to whether termination was proper, the Court could not determine on motions for summary judgment whether the transfer of funds to the Union and the Heritage Fund violated ERISA's exclusive purpose provision or fiduciary duty provisions. As a general matter, ERISA provides that the residual assets of an employee benefit plan can be distributed to an employer when the following conditions have been met: "(A) all liabilities of the plan to participants and their beneficiaries have been satisfied, (B) the distribution does not contravene any provision of law, and (C) the plan provides for such a distribution in these circumstances." *29 U.S.C. § 1344(d)(1). See also Shepley v. New Coleman Holdings Inc., 174 F.3d 65, 69 (2d Cir.1999).* While the first condition is satisfied in this case, whether the other two conditions were satisfied is disputed by the parties. If it turns out at trial that the remaining two conditions are met, plaintiffs will not prevail.

In addition, all parties-including plaintiffs-agree that even if the plaintiff Class were to prevail at trial, the Class members would not-as a matter of law-be able to *require* a death benefit increase or any other in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

creased monetary benefit. (Joint Mem. at 28-29.) This conclusion is based on the determination of the U.S. Supreme Court in *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), where the Court found that ERISA's fiduciary duty requirement "is not implicated where ... the Plan's settlor[ ] makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Id.* at 444 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The Second Circuit clarified that for defined benefit plans-plans, such as the Death Benefit Fund, in which employees are paid predetermined benefits from a common pool of funds, regardless of the performance of the plan's assets-participants "have no entitlement to share in a plan's surplus-even if it is partially attributable to the investment growth of their contributions." *Shepley*, 174 F.3d at 68 (quoting *Hughes*, 525 U.S. at 444). The Class therefore has no legal right to increase their benefits out of the surplus, and this makes clear why this action is aimed at restoring the transferred assets to the Death Benefit Fund-not to increasing the amount of death benefits.

\*11 Based on that analysis, a realistic possibility exists that plaintiffs would not be able to establish liability against the Settling Defendants at trial. The Settlement Agreement eliminates that risk and, furthermore, directs that a substantial portion of the remaining actuarial surplus will be used to fund benefit increases-a direct monetary benefit to the Class and a form of relief not sought-for the reasons explained above-in the underlying complaint. Indeed, the benefit increases will not only commence upon the effective date of the settlement, but the settlement provides for the possibility of additional increases over the next seven years. Accordingly, the risk of establishing liability at trial is not insubstantial and weighs in favor of approving the settlement, particularly where the settlement provides concrete, immediate, additional benefits to the Class.

### 5. The risks of establishing damages

This is not a case in which the risk or difficulty of establishing damages weighs in favor of settlement,

since it is specifically the return of the $77.5 million transfer that plaintiffs seek.

### 6. The risks of maintaining the class action through the trial

Because the class certification itself does not appear to be challenged, the risk of maintaining the class action through trial is not an operative factor in considering the proposed settlement.

### 7. The ability of the defendants to withstand a greater judgment

Evidence that a defendant will not be able to pay a greater judgment at trial than the amount offered in settlement tends to weigh in favor of approval of settlement, since the "prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures." *In re Warner Comm'cns Sec. Litig.*, 618 F. Supp 735, 746 (S.D.N.Y.1985) (quoting *Grinnell Corp.*, 356 F.Supp. at 1389. "However, the converse is not necessarily true; i.e., the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. at 129.

The Court sees no reason to believe that the Settling Defendants as a whole would be unable to withstand a greater judgment, but that factor is not directly relevant to approval *vel non* of this settlement since the relief sought is the return of the $77.5 million, with any increase in death benefits funded by the available surplus in the Death Benefit Fund, rather than the independent assets of the Settling Defendants.

### 8, 9. The range of reasonableness of the settlement fund in light of the best possible recovery and in light of all attendant risks of litigation

Fundamental to analyzing a settlement's fairness is "the need to compare the terms of the compromise with the likely rewards of litigation." *Weinberger*, 698 F.2d at 73 (quoting *TMT Trailer Ferry*, 390 U.S. at 424-25). Class Counsel and the Settling Defendants emphasize that the Settlement Agreement:
\*12 is well within the range of reasonableness ... be-

cause it achieves something which the best possible outcome-Plaintiffs' successful adjudication of the case-could never achieve: the earmarking of over $40 million ... for the purpose of providing an initial 33 percent benefit increase to the Class to which the Class would otherwise have no legal entitlement and appropriate safeguards to assure that Fund assets will be available in the future to provide for these initial increases as well as future increases in the event the Fund exceeds its present actuarial earnings projections.

(Joint Mem. at 29.) As described above in relation to the fourth *Grinnell* factor, the Court is mindful of the attendant risks of litigation, which include not only the possibility of failure to recover the $77.5 million transfer, but the added risk that the remaining $57 million actuarial surplus will be transferred out of the Death Benefit Fund or used for other purposes. Indeed, these risks-combined with the Court's view that success on the merits of this action would not entitle the Class to a court order mandating increased benefits-strongly weighs in favor of approving the Settlement Agreement, which is squarely within the "range of reasonableness." The Court does not mean to suggest that the next seven years will constitute the biblical seven years of plenty for the Class participants. Indeed, that is far from the case, since the initial benefit increase will be approximately $825 per participant. (*See* Settlement Agreement at ¶ 4(a).) However, given the immediate increase and possibility of additional increases, balanced against the fact that the Court cannot mandate a benefit increase even if the Class ultimately prevails at trial, the proposed settlement is fair, reasonable, and adequate.

Accordingly, the Court finds that the Settlement Agreement meets the requirements of substantive fairness required of a class action settlement agreement.

### C. *Procedural Integrity*

The second fundamental indicator of fairness of the proposed settlement is whether it was properly negotiated at arm's length by the parties. "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest

and vigorous advocacy will of their own accord produce the best possible result for all sides." *In re Painewebber, Ltd. P'ships Litig.*, 171 F.R.D. at 132. That enquiry revolves around whether the settlement process has been corrupted and whether Class Counsel has adequately represented the Class. *See Weinberger*, 698 F.2d at 74.

As noted above, the Court, by its Order dated January 8, 2002, appointed Banyai and Zinn as Class Representatives and appointed Marc I. Machiz of Cohen, Milstein, Hausfield & Toll, P.L.L.C. and David S. Preminger of Rosen, Preminger & Bloom as Class Counsel and subsequently referred the parties to the supervision of Magistrate Judge Frank Maas for settlement discussions. Those discussions began in August 2002 and extended over many months, eventually leading to an agreement-in-principle among Class Counsel and the Settling Defendants. Notably, however, the parties failed to reach a global settlement that would also resolve plaintiffs' claims against Heritage Fund. After the proposed partial settlement had been reached, the Court granted a motion by Schulte Roth & Zabel-counsel for the Settling Defendants-to withdraw as attorneys for the Heritage Fund, which had previously retained separate counsel in Perlman & Perlman, LLP. *See* Order dated Apr. 10, 2003.

**\*13** The history of settlement talks in this action was anything but smooth. Specifically, the Class Representatives moved on October 31, 2003 for the removal of Class Counsel on the grounds that Class Counsel was not representing the best interests of the Class.FN7 The Court denied that motion, finding that Banyai and Zinn failed to "proffer[ ] any concrete evidence of an actual conflict of interest or act of misconduct on Class Counsel's part." *Banyai v. Mazur*, No. 00 Civ. 9806, 2004 U.S. Dist. LEXIS 17572, at \*3 (S.D.N.Y. Sept. 1, 2004). The Court further noted that Class Counsel on the one hand and Banyai and Zinn on the other apparently hold "divergent views as to what outcome is in the best interest of class members." *Id.* "Those disagreements embody reasonable differences in evaluating alternative courses of action. They do not, however, evidence any conflict of interest or wrongdoing on [Class Counsel's] part." *Id.* The Court is not aware of any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E



Slip Copy
Slip Copy, 2006 WL 3681138 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 1



Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Ann READE-ALVAREZ and Ann R. Studen, on be-
half of themselves and all others similarly situated,
Plaintiffs,

v.

ELTMAN, ELTMAN, & COOPER, P.C., Erin Capit-
al Management, LLC, James Brian Boyle, William
Nolan, Robert A. Russon, Paul Renaghan, Carl Fon,
Manuel Brad Moses, William Cortellessa, Peter
Cooper and Milton Rawle, Defendants.
**No. CV-04-2195 (CPS).**

Dec. 11, 2006.

Robert Louis Arleo, New York, NY, for Plaintiffs.
Thomas A. Leghorn, Wilson, Elser, Moskowitz,
Edelman & Dicker, White Plains, NY, for Defend-
ants.

MEMORANDUM OPINION AND ORDER
SIFTON, Senior Judge.
*1 This is a class action brought by Ann Reade-Al-
varez ("Alvarez") and Ann R. Studen ("Studen")
against defendants Eltman, Eltman & Cooper, P.C.
("EEC"), Erin Capital Management, LLC ("ECM")
and several of their officers and directors
(collectively, "defendants"), for alleged violations of
the Fair Debt Collection Practices Act, 15 U.S.C. §
1692 et seq. ("FDCPA" or the "Act"). By memor-
andum opinion and order dated May 18, 2006, this
Court granted the following motions: (1) to certify a
settlement class; (2) for preliminary approval of a
proposed settlement agreement; (3) for an order dir-
ecting notice to the class; and (4) for an order setting
dates for optouts, objections, and a hearing pursuant
to Federal Rule of Civil Procedure 23(b)(3).
Presently before the Court is plaintiffs' motion for fi-
nal approval of the proposed class action settlement
agreement pursuant to Rule 23(e) of the Federal
Rules of Civil Procedure. For the reasons that follow,
the motion is granted, subject to the parties' modifica-
tion of the Settlement Agreement in accordance with

this opinion.

### BACKGROUND

The following facts are drawn from the parties' sub-
missions in connection with this motion, as well as
from prior opinions in connection with this case. *See*
*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.,*
*369 F.Supp.2d 353 (E.D.N.Y. May 10, 2005); Reade-*
*Alvarez v. Eltman, Eltman & Cooper, P.C., No.*
*04-2195, 2006 WL 1367414 (E.D.N.Y. May 18,*
*2006).*

EEC is a law firm incorporated under the laws of the
State of New York with its principal place of busi-
ness in Manhattan. (Compl.¶ 5).[FN1] ECM is a debt
collection agency with its principal place of business
in the same office as EEC. (*Id.* ¶ 6). Plaintiffs allege
that in correspondence they received from EEC, the
telephone number and office address for EEC is the
same as ECM. (*Id.* ¶ ¶ 47, 48). ECM is purportedly
"sending letters and alleged legal pleadings under the
name of the defendant EEC" and ECM' s agents are,
according to plaintiffs, engaged in the unauthorized
practice of law. (*Id.* ¶ 49).

> FN1. Although plaintiffs filed a second
> amended complaint on January 3, 2005,
> Judge Glasser, in his May 10, 2005 Memor-
> andum and Order granting in part and deny-
> ing in part defendants' motion to dismiss,
> stated that plaintiffs never received permis-
> sion from the Court to file the second
> amended complaint, and plaintiffs had not
> submitted evidence that defendants provided
> written consent to its filing. Accordingly,
> Judge Glasser declined to consider the
> second amended complaint, and considered
> only the first amended complaint, in decid-
> ing the motion to dismiss. As was the case in
> Judge Glasser's Memorandum and Order,
> references to the complaint in this Memor-
> andum Opinion and Order are to the first
> amended complaint.

*Facts Relating to Plaintiff Ann Reade-Alvarez*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3681138 (E.D.N.Y.)
(Cite as: Slip Copy)

Reade-Alvarez allegedly incurred a debt to Providian, a company in the financial services industry, in the amount of $1,737.03. (Comp.¶ 16). Providian assigned the debt to ECM. EEC, on behalf of its client, ECM, sent a letter dated November 26, 2003 to Reade-Alvarez. (Compl.¶ 18). That letter, in addition to specifying the amount of the debt and the name of the creditor to whom the debt is alledly owed, states as follows:

Please be advised that our firm has been retained by [ ECM], purchaser of the above account, for the collection of this debt.

Please call us to discuss this matter.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

*2 This is an attempt to collect a debt by a debt collector and any information obtained will be used for that purpose.

Affidavit of Thomas A. Leghorn sworn to on January 20, 2005 ("Leghorn Aff.").

EEC sent Reade-Alvarez a second letter dated December 31, 2003, more than thirty days after the first, stating in relevant part, "[y]ou have ignored our previous correspondence, and therefore, we assume that this is a valid debt and that you have an obligation to pay." (Compl. ¶ 20; Leghorn Aff.). After Reade-Alvarez failed to respond, EEC sent her a third letter dated January 14, 2004, stating in relevant part, "[w]e have attempted on numerous occasions to settle the above debt to no avail. It is imperative that you contact this office as soon as possible to discuss this matter. If we do not hear from you we will have no alternative but to advise our client of your failure to cooperate and request authority to commence legal action against you for the full amount of the outstanding debt." (Compl. ¶ 22; Leghorn Aff.). Among other

things, Reade-Alvarez asserts that this letter is "deceptive and misleading in that" it "falsely implies that ... EEC would have no alternative but to request authority from their client ECM to commence legal action against" her, when "[i]n fact, the letter was sent by ECM [on] EEC letterhead." (Compl.¶ 24).

EEC sent Reade-Alvarez a fourth letter dated January 28, 2004, stating in relevant part:

We want to help you clear your credit with our client. To help you do this we take a friendly approach to working out problems. We offer **AFFORDABLE PAYMENT PLANS** and courteous professional service. No matter your experience in the past we are here to resolve this debt now. *THIS OFFER IS GOOD FOR 10 DAYS ONLY!* TEN days after the date of this letter our client reserves the right to seek the full amount. **BY ACTING NOW YOU MAY SAVE HUNDREDS OF DOLLARS.**

(Compl. ¶ 25; Leghorn Aff.) (emphasis in original). Reade-Alvarez asserts that this letter is, among other things, "false, deceptive and misleading in that [EEC] claims to take a friendly approach to working out problems. In fact, this letter was sent fourteen (14) days after the letter defendant ECM had sent threatening to gain authority to commence legal action against the plaintiff ... and 14 days before the letter defendant ECM sent notifying the plaintiff ... that EEC had been authorized to commence legal action." (Compl. ¶ 27; Leghorn Aff.). Reade-Alvarez also asserts that this letter is misleading because it "falsely impl[ies] that [she] may not enter into a payment plan after the ten days have passed" and thus also "create[s][a] false sense of urgency." (Compl.¶¶ 28, 29).

EEC sent Reade-Alvarez a fifth letter, dated February 11, 2004, stating in relevant part, "[o]ur client has authorized us to commence legal action against you to recover the above balance. We would, of course, prefer to resolve the debt without recourse to litigation which is costly and a burden on all concerned. Please contact our office as soon as possible so that we may discuss this matter. If we do not hear from you we can only assume that we have no choice but to bring suit against you for the full balance due." (Compl. ¶ 30; Leghorn Aff.). Reade-Alvarez con-

tends that this letter is "false, deceptive and misleading" because, among other reasons, it "implies that ... EEC has gained authority from ECM to commence legal action" against her when, in fact, "the letter has been sent from ECM and not EEC." (Compl.¶ 32).

### Facts Relating to Plaintiff Ann R. Studen

\*3 Studen allegedly incurred a debt to Discover, a credit card company, in the amount of $5,879.30. (Compl.¶ 33). Thereafter, Discover assigned the debt to ECM. (*Id.* ¶ 34). In an effort to collect the debt, EEC forwarded a letter dated July 23, 2004 to Studen, which is substantially the same as the first letter sent to Reade-Alvarez. (*Id.* ¶ 35; Leghorn Aff.). More than 30 days later, by letter dated August 27, 2004, EEC forwarded a second letter to Studen, stating in relevant part as follows:

We want to help you clear your credit with our client. To help you do this we take a friendly approach to work out problems. We offer **AFFORDABLE PAYMENT PLANS** and courteous professional service. No matter your experience in the past we are here to resolve this debt now. *THIS OFFER IS GOOD FOR 10 DAYS ONLY!* TEN days after the date of this letter our client reserves the right to seek the full amount. **BY ACTING NOW YOU MAY SAVE HUNDREDS OF DOLLARS.**

(Compl. ¶ 37; Leghorn Aff.) (emphasis in original). Studen claims this letter is "deceptive and misleading" because, among other reasons, it "falsely implies that the plaintiff may not enter into a payment plan after the ten days have passed from" August 27, 2004 and therefore "create[s][a] false sense of urgency." (Compl.¶¶ 39, 40).

Plaintiffs allege that all of the above-referenced letters sent to them were "computer generated and w[ere] submitted ... without any meaningful attorney review." (Compl.¶¶ 19, 21, 23, 26, 31, 36, 38). They therefore assert that the letters are "false, deceptive and misleading because the least sophisticated consumer would believe the letter[s], and all documents concerning the alleged debt referenced therein, were reviewed by an attorney prior to" the time when they were mailed. (*Id.*).

ECM, by its attorneys EEC, filed a summons and verified complaint dated August 27, 2004 against Studen in the Civil Court of the City of New York, County of Queens, to recover the debt. (Leghorn Aff.). No attorney signed the complaint. (*Id.*). Studen alleges that no attorney from EEC, including the two individuals identified on the summons and complaint, "generated" these documents. (Compl.¶ 42). The complaint was verified by Carl Fon, assistant secretary of ECM who signed under oath that he read the summons and complaint, knows "the contents thereof and the same are true to [his] knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true." (*Id.*). Mr. Fon's personal knowledge is based on his review of records maintained by ECM. (*Id.*). Studen asserts, however, that a "false implication" exists that Mr. Fon executed the verification. (*Id.*).

Plaintiffs do not allege any actual damages; however, they seek statutory damages pursuant to 15 U.S.C. 1692k.[FN2]

> FN2. 15 U.S.C. 1692k(a) provides, in relevant part:
> [A]ny debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of-
> (1) any actual damage sustained by such person as a result of such failure;
> (2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or
> (B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and
> (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court."

Slip Copy
Slip Copy, 2006 WL 3681138 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 4

### Defendant's Motion to Dismiss

*4 On December 17, 2004, defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). By written Memorandum and Order, dated May 10, 2005, Judge Glasser of this Court granted in part and denied in part the motion to dismiss. Judge Glasser denied defendants' motion to dismiss plaintiffs' claims that defendants violated the FDCPA when they sent plaintiffs computer generated letters which would cause the least sophisticated consumer to believe that the letters were reviewed by an attorney, when, in fact, they were not. Judge Glasser granted defendants' motion to dismiss plaintiffs' claims that the letters created a false sense of urgency and were therefore "false, misleading or deceptive" in violation of the FDCPA. Finally, Judge Glasser denied the individual defendants' motion to dismiss the FDCPA claims against them. Plaintiffs subsequently filed a notice of appeal of that decision with the Court of Appeals.[FN3]

> FN3. The parties have since stipulated to withdraw the appeal without prejudice to its renewal.

### Motion for Preliminary Approval of Class Settlement

After the parties moved for preliminary approval of the class settlement, I issued a memorandum opinion and order ("Preliminary Approval Order"): (1) certifying a settlement class;[FN4] (2) preliminarily approving the proposed settlement agreement; (3) directing notice to the class;[FN5] and (4) setting dates for optouts, objections, and a hearing pursuant to Federal Rule of Civil Procedure 23(b)(3). Fifteen requests for exclusion, two of which included objections, were received. The fairness hearing was held on July 20, 2006.

> FN4. The settlement class is defined as follows: "All persons who were sent letters by the defendant Eltman, Eltman & Cooper, P.C. at addresses within the State of New York for the period May 27, 2003 (one year prior to the filing of the complaint) to the effective date of the order signed by the Court approving this class settlement through

which said defendant attempted to collect from said persons personal debts alleged to be owed Erin Capital Management, LLC."

> FN5. The parties initially intended to provide notice to the class using solely newspaper publication; however, I concluded that individual notice to all putative class members was required and denied the motion for preliminary approval on that ground. The parties subsequently agreed to provide individual notice.

### DISCUSSION

Plaintiffs move for final approval of the settlement agreement under Rule 23(e) of the Federal Rules of Civil Procedure, which states that class actions "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e).

The parties propose the following settlement:

[ T] he Defendant Eltman, Eltman & Cooper, P.C. agrees that attorneys must exercise supervision and control over non-attorney staff in compliance with the FDCPA and state bar ethics rules, and further agrees to adhere to the law of this circuit as most recently set forth in *Greco v. Trauner, Cohen & Thomas, LLP,* 412 F.3d 360 (2d Cir.2005).

[T]he Defendants will tender $15,000.00 as a Cy Pres payment to the Queens County Legal Aid Society for use defending consumers against lawsuits brought by debt collectors. Statutory damages of $1,000.00 each will be paid to Ann Reade-Alvarez and Ann R. Studen. An additional payment of $1,000.00 each will be paid to Ann Reade-Alvarez and Ann R. Studen for their services as class representatives herein. $50,000.00 will be paid to Plaintiffs' counsel, Robert L. Arleo, said amount representing payment for attorney's fees and costs advanced in conjunction with the herein action.

The parties further agree that if more than 10% of the class members decide to opt out of the class, Defendants may revoke the Settlement Agreement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3681138 (E.D.N.Y.)
(Cite as: Slip Copy)

### Notice

**\*5** "[N]otices to class members can practicably contain only a limited amount of information." _Weinberger v. Kendrick_, 698 F.2d 61, 70 (2d Cir.1982). "Although no rigid standards govern the contents of notice to class members, the notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." _Id._ (internal citations and quotation marks omitted).

In the Preliminary Approval Order, the Court directed the parties to make minor changes to the proposed form of notice, but concluded that the form notice was otherwise adequate. The parties were directed to complete mailing of the notices by June 2, 2006. In response, fifteen persons opted out, of which two individuals objected to the proposed settlement.

### Substantive and Procedural Fairness

"The central question raised by [a] proposed settlement of a class action is whether the compromise is fair, reasonable, and adequate. _Weinberger_, 698 F.2d at 73. To determine whether this standard has been met, the court must "compare the terms of the compromise with the likely rewards of litigation." _In re Warner Communications Securities Litigation_, 618 F.Supp. 735, 741 (S.D.N .Y.1985) (citations omitted). In evaluating the substantive fairness of a proposed settlement, the Court is guided by the nine factors initially enumerated in _City of Detroit v. Grinnell Corp._, 495 F .2d 448, 463 (2d Cir.1974): (1) the complexity and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

_D'Amato v. Deutsche Bank_, 236 F.3d 78, 86 (2d Cir.2001) (citations omitted); see also In re Gulf Oil/ Cities Service Tender Offer Litigation, 142 F.R.D. 588, 590 (S.D.N.Y.1992)(applying Grinnell factors); In re Warner Communications, 618 F.Supp. at 740-741(same). The court must also examine the negotiating process that gave rise to the settlement to determine if it was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests. See id. at 741; see also D'Amato, 236 F.3d at 85 ("The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms.").

### 1) The complexity, expense and likely duration of the litigation

As the Court noted in its preliminary approval of the proposed settlement, the litigation poses a series of complex logistical problems that will likely be expensive to manage through trial, given that the class is so large and diffuse. Defendants have already moved to dismiss the case; if the case does not settle, protracted discovery and litigation will likely ensue. Accordingly, this factor weighs in favor of approving the settlement.

### 2) The reaction of the class to the settlement

**\*6** Class action notices were mailed to more than 40,000 individuals. In response, fifteen individuals requested exclusion from the class,[FN6] and of those, only two stated objections to the settlement. One member at the fairness hearing also objected on the grounds that the settlement notice was not clear. This small number of objectors favors approval. See _D'Amato v. Deutsche Bank_, 236 F.3d 78, 86-87 (2d Cir.2001) (where 18 objections received out of 27,883 class notices weighed in favor of settlement); see also In re Visa Check/Mastermoney Antitrust Litig., 297 F.Supp.2d 503, 511 (E.D.N.Y.2003) ("the extremely small number of objectors ... heavily favors approval"); In re Mexico Money Transfer Litigation (Western Union and Valuta) 164 F.Supp.2d 1002, 1021 (N.D.Ill.2000) (99.9% of class members having neither opted out nor filed objections indicated strong circumstantial evidence in favor of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

similar settlement proposal.)

> FN6. Written requests for exclusion were received from the following class members: Sola Iroko, Peter J. Zito, Robert S. Mendenhall, Gwen Irizarry, Vivian de los Santos, Susan Spinosa, Kevon L. Chisholm, Joyce McElwee, Keiko Arakawa, Eros A. Pheonix, Johnny Cummings, Louis Fuldman, Callista Bessellieu, John Guerriere, and Robert Forrest. In addition, at the fairness hearing, the following individuals indicated that they wished to be excluded: Mr. Zhoxha, Marilyn Pinckney, and Tusiant Venande.

### 3) The stage of the proceedings and the amount of discovery completed

The stage of the proceedings and the amount of discovery the parties have conducted is "relevant to the parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's fairness." In re Painewebber Ltd. Pshps. Litig., 171 F.R.D. 104, 126 (S.D.N.Y., 1997). As the docket for this case reveals, since defendant's motion to dismiss was decided on May 10, 2005, the parties have engaged in extensive discovery and had several discovery disputes. Discovery was scheduled to be completed on January 30, 2006; however, counsel for plaintiffs informed the court on January 18, 2006 that the parties had reached a settlement. Because the parties engaged in extensive discovery and because discovery was near completion when the parties reached a settlement, this factor weighs in favor of approving the settlement.

### 4) The risks of establishing liability and (5) The risks of establishing damages

"In assessing the adequacy of a settlement, a court must balance the benefits of a certain and immediate recovery against the inherent risks of litigation." In re Medical X-Ray, 1998 U.S. Dist. LEXIS 14888, at *11 (E.D.N.Y.1998). Although risks associated with establishing damages in this case are low, since plaintiffs are only seeking statutory damages, the risks associated with establishing liability are real. In

this case, defendant has already prevailed as to some of plaintiffs' claims, and it is possible that the remaining claims would also be dismissed on motions for summary judgment or at trial. Moreover, as explained below, given the small amount of damages available in this type of case, the benefits of immediate recovery outweigh the risks associated with future litigation.

### 6) The risks of maintaining the class action through the trial

The parties stipulated to class certification for settlement purposes only. If the class action were litigated, however, it is likely that defendants would oppose certification. See In re Medical X-Ray, 1998 U.S. Dist. LEXIS 14888, at *14 (possibility that defendants would challenge maintenance of class in absence of settlement was considered risk to the class and potential recovery). Furthermore, this Court has noted litigation will likely be expensive to manage, and is logistically complex. Accordingly, this factor weighs in favor of approving the settlement.

### 7) The ability of the defendants to withstand a greater judgment

*7 No argument is advanced that defendants cannot withstand greater judgment; however, as explained below, the amount of damages available under the present claim is relatively low. Accordingly, this factor neither supports nor weighs against the proposed settlement.

### 8) The range of reasonableness of the settlement fund in light of the best possible recovery and 9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation

15 U.S.C. 1692k(a) provides, in relevant part:

[A]ny debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of ... (A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or (B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector....

As I noted at the preliminary approval stage, defendants have agreed to furnish a cy pres payment of $15,000 as the portion of the settlement payable to the class. Were the case to proceed to trial, the distribution to the class could not exceed $10,000, representing 1% of EEC's net worth of $1,000,000. With a class of over 45,000 persons, this recovery would be de minimus. [FN7]

> FN7. Cy pres remedies are typically sought in the trust context. Specifically, "where the funds in a charitable trust can no longer be devoted to the purpose for which the trust was created, they may be diverted to a related purpose." *Mirsafihi v. Fleet Mortgage Corp., 356 F.3d 781, 784 (7th Cir.2004).* However, in class actions, cy pres payments may be made "to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement ... to the class members." *Id. See also Six (6) Mexican Mine Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1305 (9th Cir.1990)* (noting that "[f]ederal courts have frequently approved [the cy pres] remedy in the settlement of class actions where the proof of individual claims would be burdensome or the distribution of damages costly"); *In Re Agent Orange Product Liability Litigation, 818 F.2d 179, 185 (2d Cir.1987)* (noting the availability of cy pres remedies or "fluid class recovery" where individual payment to class members would otherwise be unmanageable).

In light of the risks of litigation and the best possible recovery in this case, I find the settlement to be reasonable. [FN8]

> FN8. Many courts have concluded that injunctive relief is not available to private lit-

igants under the FDCPA. *See, e.g., Petrolito v. Arrow Financial Services, LLC, 221 F.R.D. 303, 312 (D .Conn. Apr. 8, 2004); In re Risk Management Alternatives, Inc., 208 F.R.D. 493, 503 (S.D.N.Y. Jun. 14, 2002); Sokolski v. Trans Union Corp.,* 178 F.R.D. 292, 299 (E.D.N.Y. Mar. 24, 1998); *see also Weiss v. Regal Collections, 385 F.3d 337, 342 (3d Cir.2004); Sibley v. Fulton DeKalb Collection Service, 677 F.2d 830, 834 (11th Cir.1982)* ("Indeed, equitable relief is not available to an individual under the civil liability section of the Act."). Thus, the proposed settlement provision that EEC attorneys exercise supervision over non-attorney staff in compliance with the FDCPA and state bar ethics rules affords the class members more than they could have obtained under the FDCPA. Such an outcome supports the reasonableness of the proposed settlement.

### 10) Arms-Length Negotiations

In the Preliminary Approval Order, the Court concluded that the Settlement Agreement was both substantively and procedurally fair. "It is not for this Court to substitute its judgment as to a proper settlement for that of such competent counsel in view of the fairness of the settlement to the class members." *In re Warner Communications Sec. Litig., 618 F.Supp. at 746.* The proposed settlement does not appear to be collusive, taking into account the lengthy and detailed negotiations that the parties have undertaken. The parties have not only litigated a motion to dismiss and engaged in discovery disputes, but as explained below, the parties have also disagreed over the terms of the settlement agreement. Accordingly, I find that the parties have engaged in "arms-length negotiations."

### Objections to the Proposed Settlement

As stated above, of the over 40,000 class members that were sent settlement notices, only two, John Guerriere and Robert Forrest, submitted objections in writing. Both also chose to exclude themselves from the class. Their objections are addressed below.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 106 of 123

Slip Copy
Slip Copy, 2006 WL 3681138 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 8

### Objections Regarding Attorney's Fees

Both Guerriere and Forrest object to the settlement
on the grounds that it unfairly compensates plaintiffs'
attorney and the class representatives to the detriment
of the class. The attorney's fee proposed in the settle-
ment agreement is $50,000. "Attorney's fees included
in a class action settlement are, like every other as-
pect of such agreements, subject to the determination
whether the settlement is fundamentally 'fair, ad-
equate, and reasonable' " *Staton v. Boeing Co.*, 327
F.3d 938, 963 (9th Cir.2002) (quoting Fed. R. Civ.
Proc. 23(e)); *see also U.S. Trust Co. of New York v.
Shapiro*, 835 F.2d 1007, 1009 (2d Cir.1987); *In re
Johns-Manville Corp.*, 2004 WL 1876046, at *37
(S.D.N.Y. Aug. 17, 2004).[FN9] "That the defendant
in form agrees to pay the fees independently of any
monetary award or injunctive relief provided to the
class in the agreement does not detract from the need
carefully to scrutinize the fee award." *Id. See also
Prandini v. National Tea Co.*, 557 F.2d 1015, 1020
(3d Cir.1977) (noting that "a defendant is interested
only in disposing of the total claim asserted against it
... the allocation between the class payment and the
attorney's fees is of little or no interest to the de-
fense...."); *Charles v. Goodyear Tire & Rubber Co.*,
976 F.Supp. 321, 323 (D.N.J. Sept. 5, 1997) (stating
that "even when the parties have agreed on an attor-
neys' fee award, the danger exists that the lawyers
might urge a class settlement at a low figure or on a
less-than-optimal basis in exchange for red-carpet
treatment for fees."). Scrutiny is particularly import-
ant where the proposed attorney's fee is substantially
greater than the proposed class settlement or where
the class settlement is non-pecuniary. *See Polar In-
ternational Brokerage Corp. v. Reeve*, 187 F.R.D.
108, 119 (S.D.N.Y. May 17, 1999).[FN10]

> FN9. Class counsel must apply to the court
> for an award of attorney's fees after approval
> of the settlement. *See Vizcaino v. Microsoft
> Corp.*, 290 F.3d 1043, 1046 (9th Cir.2002).
> In this case, however, because attorney's
> fees form part of the settlement agreement
> itself, I consider the proposed attorney's fee
> along with the rest of the agreement. *See
> Hanlon v. Chrysler Corp.*, 150 F.3d 1011,
> 1026 (9 Cir.1998) ("It is the settlement taken

as a whole, rather than the individual com-
ponent parts, that must be examined for
overall fairness.... The settlement must stand
or fall in its entirety."); *see also see also
U.S. Trust Co. of New York*, 835 F.2d at
1009 (remanding to district court to determ-
ine whether attorney fee in settlement was
fair and reasonable under Rule 23(e)); *In re
Johns-Manville Corp.*, 2004 WL 1876046,
at *37 (reviewing fairness and reasonable-
ness of attorney's fees as part of settlement
agreement).

> FN10. In that case, the district court ob-
> served that
> [t]hrough the use of a non-pecuniary settle-
> ment coupled with an application for attor-
> ney's fees, defendants benefit by receiving
> release from suit, plaintiff's counsel benefits
> in the most tangible form-cash-and unless
> the non-monetary settlement offers
> something of real value to class members,
> they have relinquished their legal rights to
> maintain a suit in exchange for very little.
> *Polar*, 187 F.R.D. at 119.

*8 In this case, while the attorney's fee substantially
exceeds the cy pres payment award to the class, the
class members have not been disadvantaged by the
attorney or representatives receiving compensation,
because, as stated above, the class as a whole in any
event could only receive $10,000 under the statute.
Courts have consistently upheld class action settle-
ments notwithstanding differences in the economic
interests of class counsel and class members. *See
Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d
1072, 1078-79 (2d Cir.1995) (disparity in compensa-
tion between class counsel and class members exists
"without any conflict of interest in many class ac-
tions"); *In re Mexico Money Transfer*, 164 F.Supp.2d
at 1033 (no conflict where attorney fees negotiated
separately and compensation to class members is sig-
nificant).

In determining a reasonable fee, the Supreme Court
has held that the "most useful starting point ... is the
number of hours reasonably expended on the litiga-
tion multiplied by a reasonable hourly rate." *Hensley*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

v. Eckerhart, 461 U.S. 424, 433 (1983); see also Blum v. Stenson, 465 U.S. 886, 888 (1984). This approach is known as the lodestar method. In re Sterling Foster & Co., Inc., 2006 WL 3193744, at *7 (E.D.N.Y. Oct. 31, 2006); see also Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir.2000); Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir.1999). If the attorney's proposed fee is greater than the lodestar, he has "the burden of showing that 'such an adjustment is necessary to the determination of a reasonable fee.' " City of Burlington v. Dague, 505 U.S. 557, 562 (1992) (citing Blum v. Stenson, 468 U.S. 886, 898 (1984)) (emphasis in original). In its discretion, the court may then apply a multiplier based on other factors such as "(1) the time expended and expertise of counsel, (2) the magnitude and complexities of the litigation, (3) the risks involved in the litigation, (4) the quality of the representation, (5) the requested fee in relation to the settlement, (6) and public policy considerations." In re Sterling Foster at *7; see also Savoie, 166 F.3d at 460 (identifying multiplier factors such as risk of litigation, complexity of the issues, and skill of attorneys); City of Detroit v. Grinnell Corp., 495 F.2d 448, 470 (2d Cir.1974) (identifying similar factors).FN11 "What constitutes a reasonable fee is properly committed to the sound discretion of the district court." Goldberger, 209 F.3d at 47.

> FN11. Courts may also employ a "percentage of the fund" approach, in which "the courts sets some percentage of the recovery as the fee." Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir.2000) (holding that "both the lodestar and the percentage of the fund are available to district courts in calculating attorneys' fees in common fund cases"). In this approach, courts consider the same additional multiplier factors as they do under the lodestar approach. Id. I adopt the lodestar approach in this case because, after crosschecking all possible percentages of the fund with the amount the attorney would receive under a reasonable hourly rate (as he would receive under the lodestar method), I find that the disparity would be unreason-

ably large. See Goldberger, 209 F.3d at 50 (when considering percentage approach, recommending cross-checking reasonableness of requested percentage with documentation of hours worked), cited in In Re Sterling Foster & Co., Inc., 2006 WL 3193744, at *7; see also Savoie, 166 F.3d at 461 (affirming use of lodestar approach because "percentage-of-the-fund method would have accomplished none of its anticipated benefits").

The first consideration is whether the time spent on the litigation and the proposed hourly rates are reasonable. Counsel has submitted detailed time records showing that he expended approximately 132 hours on this litigation. These records establish that much of his time was spent preparing and filing motion papers, communicating with other counsel about settlement, and participating in hearings in the Eastern District of New York. Counsel also personally communicated with more than 100 class members, many of whom are not fluent in English, explaining the litigation and settlement of this case and addressing members' questions regarding their underlying debts that had been purchased by defendant Erin Capital Management. Given the range of activity required by this case, I conclude that counsel expended a reasonable number of hours on the litigation.

*9 In determining a reasonable hourly rate, the court considers the attorney's "normal billing rate," Lindy Brothers Builders, Inc., 487 F.2d at 167, as well as his "legal representation and status (partner, associate)." Id. Counsel billed his hours at a rate of $420 per hour, amounting to a total bill of $55,398 for time worked. In addition, he has advanced $725.49 in costs. Counsel states in his Affirmation that he has previously billed $420 per hour for his legal services. He has over 15 years experience litigating FDCPA matters and teaches the FDCPA as an Adjunct Professor of Law at Thomas Jefferson Law School, an A.B.A. approved law school in San Diego, California. Given these circumstances, an hourly rate of $420 is reasonable. The lodestar would thus equate to counsel's total bill of $55,398. Because the proposed fee of $50,000 is actually lower than the lodestar, that proposed amount is justifiable. Since the proposed

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 108 of 123

fee does not exceed the lodestar, I need not address the additional multiplier factors that might justify an upward adjustment.

*Objections Regarding Class Representatives*
With respect to the objection that the class representatives are receiving an award to the detriment of other class members, I note that courts have approved such awards "to compensate named plaintiffs for the risk they have incurred by pursuing the class action and the extra effort they have expended." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 94-CV-5587, 2003 U.S. Dist. LEXIS 8239, at *7, (S.D.N.Y. May 15, 2003). In another case, plaintiffs cited a study that found the average payment between $1,000 and $5,000. *Shepard et al. v. Consolidated Edison Co. of New* York, 94-CV-0403, 2002 U.S. Dist. LEXIS 16314, at *22, n. 10 (E.D.N.Y. August 1, 2002). The Court noted that:

Courts in this circuit generally make these awards based upon 'the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by the plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery.¹

*Id.* at *16-17 (citing *Roberts v. Texaco, Inc., 979 F.Supp. 185, 200 (S.D.N.Y.1997)*). Here, the class representatives are to receive $1000 each for their services. Considering this case is over two years old, I find that this compensation is not excessive.

Robert Forrest also objects to the settlement because the class representatives do not adequately represent his interests. He states that defendant Erin Capital Management has instituted legal proceedings against him, whereas there is no indication that the class representatives have experienced the same. I note that Forrest's objection can be cured by opting out of the settlement, which Forrest has done. Accordingly, this objection does not weigh against approval.

*10 Finally, and most importantly, Forrest objects to the release contained in the settlement agreement as

being overbroad. The release states:
The named Plaintiffs and each of the class members not opting out shall, as of the Effective Date, be deemed to release and discharge forever Defendants and its [sic] heirs, the current and former officers, directors, successors, predecessors, executors, administrators, assigns, shareholders, affiliated companies, and employees ("Released Parties"), from all claims, controversies, actions, causes of actions, demands, torts, damages, costs, attorneys' fees, moneys due on account, obligations, judgements, alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. section 1692 et. seq. or liabilities of any kind whatsoever in law or equity, arising out of agreement or imposed by federal or state statute, common law or otherwise, from the beginning of time to the date this Agreement is signed, whether or not known now, anticipated, suspected or claimed, fixed or contingent, whether yet accrued or not and whether damage has resulted from such or not. This release is conditioned upon the performance by Defendants of their obligations towards the class members set forth in this settlement agreement.

Plaintiff responds that the release "should be modified to indicate that the settlement agreement is limited only to claims and defenses related to allegations of violation of the Fair Debt Collection Practices Act (FDCPA) as set forth in the amended complaint herein." Defendants object to plaintiff's proposed modification, stating, "if the release is modified such that the release pertains only to claims brought pursuant to FDCPA, the defendants face the possibility of exposing themselves to a myriad of different state law claims."

I conclude that modification of the release is warranted; however, the modification warranted is not that which plaintiff proposes. Courts have routinely held that releases in class action lawsuits can be worded so that class members are prevented from bringing subsequent suits based on legal theories different from those in the class action complaint; however, only claims based on "identical factual predicate" may be released. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 107 (2d Cir.2005)* ("The law is well established in this Circuit and others that class action releases may include claims not presented and even

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3681138 (E.D.N.Y.)

(Cite as: Slip Copy)

Page 11

those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct"); *National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9, 18 n. 7 (2d Cir.1981)* ("settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts"); *TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 460 (2d Cir.1982)* ("We therefore conclude that in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action").

*11 Defendant is therefore correct that the release need not be modified to be limited to FDCPA claims; however, the release must be modified to be limited to claims involving "identical factual predicate." The release as it is currently worded does not contain this necessary limit. Accordingly, the settlement can only be approved subject to the parties' modification of the release.

### CONCLUSION

The settlement is approved provided the parties consent in writing to the modification of the settlement on or before January 5, 2007. Following the submission of such consent, the parties shall settle a final order on five (5) days notice.

The Clerk is directed to transmit a copy of the within to all parties and to the magistrate judge.

SO ORDERED.

E.D.N.Y.,2006.

Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.

Slip Copy, 2006 WL 3681138 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

LEXSEE 2007 U.S. DIST. LEXIS 14635

**LOUVENIA ARMSTRONG, et al., Plaintiffs, v. WHIRLPOOL CORPORATION, Defendant.**

**Case No. 3:03-1250**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION**

*2007 U.S. Dist. LEXIS 14635; 99 Fair Empl. Prac. Cas. (BNA) 1682*

**March 1, 2007, Decided
March 1, 2007, Filed**

**PRIOR HISTORY:** *Armstrong v. Whirlpool Corp., 2006 U.S. Dist. LEXIS 30368 (M.D. Tenn., May 5, 2006)*

**COUNSEL:** [*1] For Louvenia Armstrong, individually and on behalf of a class of all other African American persons similarly situated, Henry Beasley, individually and on behalf of a class of all other African American persons similarly situated, Betty Talley, George Obi, Walter Brown, Vincent Beauregard, Larsen Cash, Lillian Harris, Marilyn McNeill, Tim Swader, Floyd Woodley, Geraldine Thomas, Plaintiffs: David W. Sanford, LEAD ATTORNEY, Sanford, Wittels & Heisler, LLP, Washington, DC; Kevin H. Sharp, LEAD ATTORNEY, Drescher & Sharp, P.C., Nashville, TN; Martha M. McBrayer, LEAD ATTORNEY, Morelli Ratner, P.C., New York, NY, US; Benedict P. Morelli, Morelli Ratner, P.C., New York, NY, US; David Ratner, Morelli Ratner, P.C., New York, NY, US; Grant Morris, Law Offices of Grant Morris, Washington, DC, US; Lisa A. Goldblatt, Sanford, Wittels & Heisler, LLP, Washington, DC; Rory Lancman, Morelli Ratner, P.C., New York, NY, US.

For Whirlpool Corporation, Defendant: Jeffrey S. Hiller, LEAD ATTORNEY, Littler Mendelson, P.C., Columbus, OH, US; Keith C. Hult, LEAD ATTORNEY, Littler, Mendelson, P.C., Chicago, IL; Garrison L. Phillips, Littler, Mendelson, P.C., Chicago, IL; Rachel F. Barner, Littler, Mendelson, [*2] P.C., Chicago, IL; Timothy K. Garrett, Bass, Berry & Sims, Nashville, TN.

**JUDGES:** ALETA A. TRAUGER, United States District Judge.

**OPINION BY:** ALETA A. TRAUGER

**OPINION:**

**MEMORANDUM**

Pending before the court is the Plaintiffs' Motion for Class Certification (Docket No. 248), to which the defendant has responded (Docket No. 280) and the plaintiffs have replied (Docket No. 286). For the reasons discussed herein, the plaintiffs' motion will be denied.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Each of the named plaintiffs in this case currently is, or formerly was, employed at the defendant's manufacturing facility in LaVergne, Tennessee. (*See* Docket No. 242 P 2.) All African-Americans, the plaintiffs claim that the defendants subjected them to racial harassment in violation of both *42 U.S.C. § 1981 (2000)*("*Section 1981*") and *42 U.S.C. § 2000e (2000)*("Title VII"). (*See* Docket No. 250 at 46.)

Specifically, the plaintiffs allege that they were exposed to "a gauntlet of racial discrimination, verbal abuse, racist graffiti and hostile treatment." (*See* Docket No. 242 P 3.; *see also* Docket No. 250 [*3] at 22-43 (complaining about, among other things, racial slurs, discriminatory comments, and racially offensive graffiti).) They strenuously assert that the racial harassment that they allegedly experienced was due to the defendant's lack of appropriate policies prohibiting racial harassment and discrimination. (*See* Docket No. 250 at 7.)

The plaintiffs now move to certify their claims as a

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 112 of 123

Page 2

2007 U.S. Dist. LEXIS 14635, *3; 99 Fair Empl. Prac. Cas. (BNA) 1682

class action under *Rule 23(b)(2)* and *Rule 23(b)(3)*. (*See id.* at 56, 62.)

## ANALYSIS

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *See Gen. Tel. Co. v. Falcon, 457 U.S. 147, 159, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).* The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id. at 155* (quoting *Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979)).* The Court directs that, [*4] before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of *Rule 23 of the Federal Rules of Civil Procedure. See Falcon, 457 U.S. at 161.* The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts must exercise that discretion within the framework of *Rule 23. Coleman v. GMAC, 296 F.3d 443, 446 (6th Cir. 2002); In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996).*

Although a court considering class certification may not inquire into the merits of the underlying claim, a class action may not be certified merely on the basis of its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974); In re Am. Med. Sys., Inc., 75 F.3d at 1079.* In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings. . . ." *Falcon, 457 U.S. at 160; see also In re Am. Med. Sys., Inc., 75 F.3d at 1079; Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200 (6th Cir. 1974).* [*5] Moreover, the party seeking class certification bears the burden of establishing its right to it. *See Alkire v. Irving, 330 F.3d 802, 820 (6th Cir. 2003); Senter v. Gen. Motors Corp., 532 F.2d 511, 522 (6th Cir. 1976).*

## I. The plaintiffs have demonstrated that they meet the requirements of *Rule 23(a)*.

Any party seeking class certification must meet all four prerequisites of *Rule 23(a)* -- numerosity, commonality, typicality, and adequacy of representation -- before a class can be certified. *See Fed. R. Civ. P.*

*23(a)*; *In re Am. Med. Sys., Inc., 75 F.3d at 1079.* The court will discuss each of these prerequisites in turn.

### A. The plaintiffs have demonstrated numerosity.

*Rule 23(a)(1)* requires that the class be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1).* In *Senter*, the Sixth Circuit explained that there is "no specific number below which class action relief is automatically precluded" and that it is the circumstances of the case, not a strict numerical test, that determines impracticability [*6] of joinder. *See Senter v. Gen. Motors Corp., 532 F.2d 511, 523 n.24 (6th Cir. 1976).* When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone. *In re Am. Med. Sys., Inc., 75 F.3d at 1079.*

Apart from class size, factors that courts should consider in determining whether joinder is impracticable include the geographical dispersion of class members, the injunctive nature of the action, how easily class members can be identified, judicial efficiency, fear of harassment, and the relatively small size of individual claims. *See* Alba Conte & Herbert Newberg, 1 Newberg on Class Actions § 3:6 (4th ed. 2003)(hereinafter "Newberg"); *see also Saur v. Snappy Apple Farms, Inc., 203 F.R.D. 281, 286 (W.D. Mich. 2001).*

The plaintiffs base their assertions that they meet the numerosity requirement on statistics garnered from "a sampling of Whirlpool's EEO-1 reports from the years 2000 to 20006." (*See* Docket No. 250 at 48.) According to these statistics, claim the plaintiffs, the defendant's LaVergne facility employs between 192 and 242 African-American employees at [*7] any given time. (*See id.*) Given this estimate, they assert, "one can reasonably infer that the proposed class, which includes present and former employees at the plant, would include over 300 individuals." (*See id.*) To the plaintiffs, this large number of putative class members itself demonstrates that joinder is impracticable. (*See id.*)

Relying on a recent Sixth Circuit case, the defendant contests the plaintiffs' claims about numerosity on the grounds that the plaintiffs have not linked the gravamen of their claims, *i.e.*, racial harassment, to the class of individuals they hope to represent, *i.e.*, all non-managerial, hourly African-Americans employed at the defendant's LaVergne facility. (*See* Docket No. 280 at 46-48 (citing *Golden v. City of Columbus, 404 F.3d 950,*

2007 U.S. Dist. LEXIS 14635, *7; 99 Fair Empl. Prac. Cas. (BNA) 1682

Page 3

*966 (6th Cir. 2005)*(indicating that a plaintiff seeking to establish numerosity "must offer something more than bare speculation to link the gravamen of her claim for liability to the class of individuals she purports to represent")).) It also alleges that joinder is not appropriate here because most, if not all, of the plaintiffs likely live in an area of Tennessee that is convenient [*8] to LaVergne, given that they all either currently work at the defendant's LaVergne facility or did so at some time during the class period. (*See id.* at 49-50.) The plaintiffs do not contest the fact that most putative class members live in the LaVergne area.

In *Golden*, the Sixth Circuit upheld a finding that a plaintiff had not demonstrated numerosity where the putative class encompassed all tenants in Columbus, but the plaintiff did not allege that the injury of which she was complaining could potentially apply to each tenant. *See Golden, 404 F.3d at 966.* Instead, the plaintiff claimed only that the injury could impact tenants whose predecessors or landlords were indebted to the city. *See id.* In contrast, that court found that numerosity existed in the context of an employment discrimination lawsuit where a plaintiff proposed a class that included all African-African employees at a particular automotive plant, which amounted to an estimated fourteen percent of the plant's total workforce. *See Senter, 532 F.2d at 523.* In so finding, the court determined that "it would be reasonable to infer that a substantial number of these individuals [*9] are includable in the class eligible for relief on the basis of the [plaintiff's] action and that joinder would be impracticable." *Id.; see also Bacon v. Honda of Am. Mfg. Co., 370 F.3d 565, 570 (6th Cir. 2002)*(finding numerosity in an employment discrimination case where the plaintiff proposed a class of "some 800 current and former . . . employees, a number well beyond the point that joiner would be feasible").

Unlike in *Golden*, where the wrong about which the plaintiffs complained could not possibly apply to each individual in their class, here, as in *Senter*, the court may reasonably infer that a substantial number of the plaintiffs are "includable in the class eligible for relief." *Compare Golden, 404 F.3d at 966, with Senter, 532 F.2d at 523.* Given that the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy *Rule 23(a)(1)*" and that the plaintiffs here allege a potential class of over 300 individuals, the plaintiffs have demonstrated that

numerosity exists. *See Bacon, 370 F.3d at 570.*

**B. The plaintiffs have demonstrated [*10] commonality.**

In order to establish commonality, the plaintiffs must demonstrate that "there are questions of law or fact common to the class" under *Rule 23(a)(2). See Fed. R. Civ. P. 23(a)(2).* One leading treatise characterizes the commonality prerequisite as interdependent with the numerosity prerequisite. *See* Newberg § 3:10. It notes that these two factors form the conceptual basis for determining whether a class action is the appropriate vehicle for the resolution of a particular matter. *See id.*

The Sixth Circuit has characterized the commonality requirement as "qualitative rather than quantitative" and has observed that "[v]ariations in the circumstances of class members are acceptable, as long as they have at least one issue in common." *See Bacon, 370 F.3d at 570; In re Am. Med. Sys., Inc., 75 F.3d at 1080.* However, that court has also observed that "[c]onclusory allegations and general assertions of discrimination are not sufficient to establish commonality." *See Bacon, 370 F.3d at 571.* It has also noted that not every common issue will satisfy this requirement but [*11] rather that "[w]hat we are looking for is a common issue the resolution of which will advance the litigation." *See Sprague v. Gen. Motors Corp., 133 F.3d 388, 397(6th Cir. 1998).*

In *Bacon*, the Sixth Circuit listed a number of "concerns" that are appropriately addressed in an employment discrimination context when considering commonality: (1) whether the nature of the alleged unlawful employment practice genuinely had a class-wide impact; (2) whether the employment practices affecting the class were uniform or diverse, given factors such as, among others, the size of the work force and the range of employment conditions; (3) whether class members' treatment would be likely to involve common questions; (4) whether the relevant employment and personnel policies and practices were centralized and uniform; and (5) whether similar conditions prevailed throughout the time period covered by the allegations. *Bacon, 370 F.3d at 570.*

Here, the plaintiffs argue that questions of law and fact that are common to the entire class predominate over questions that affect only individual class members. Their depictions of the issues surrounding the common policies [*12] and practices to which they were purportedly

Case 1:06-cv-00480-GLS-DRH    Document 18-2    Filed 04/19/07    Page 114 of 123

Page 4

2007 U.S. Dist. LEXIS 14635, *12; 99 Fair Empl. Prac. Cas. (BNA) 1682

subjected range from the fairly broad, *e.g.*, whether the defendant "maintain[ed] a racially hostile work environment during the liability period," to the relatively narrow, *e.g.*, whether the defendant "subjected all of them to [a hostile work] environment because of [its] . . . fail[ure] to properly address racial harassment, including both verbal abuse and pervasive graffiti" and whether this failure was perpetuated by the defendant's delegation to its supervisors of discretionary authority to discipline employees who had allegedly engaged in racial harassment or its lack of policies that prohibited racial harassment. (*See* Docket No. 286 at 14; Docket No. 250 at 49-52.)

The defendant, in response, claims that "the varying frequency and degrees of severity between purported class members' allegations of harassment highlights the individualized nature of these claims, thereby defeating commonality." (*See* Docket No. 280 at 53.) It also challenges the plaintiffs' assertions about its anti-harassment policies or lack thereof. (*See id.* at 53-55.) In addition, it notes that the policies and practices under which each [*13] plaintiff worked vary depending on the time frame in which he or she was employed, as its policies and practices have significantly changed over time. (*See id.* at 55.)

The more tailored version of the plaintiffs' assertions provides a question that is common to each member of the putative class. The plaintiffs have adduced evidence that the defendant, acting though its managers, failed to promptly and appropriately respond to their allegations of racial harassment at the hands of coworkers and supervisors alike.

For instance, plaintiff Louvenia Armstrong testified that, in the summer of 2003, she complained to her immediate supervisor, Steve Tidwell, and to another supervisor, Bill Westberry, about "the racial slurs and cursing and jokes that [white employee] Dale Travis was doing all day long." (*See* Docket No. 276, Ex. 58, Armstrong Dep. 61.) According to Armstrong, the two supervisors asked Travis to repeat his comments and, upon hearing them, laughed and joked about them and failed to address the matter further. (*See id.*) Armstrong further alleges that she complained to Tidwell about Travis's racial harassment two or three times every week, but that Travis was never [*14] disciplined for his conduct. (*See* Docket No. 250 at 22-23.)

Similarly, plaintiff Betty Talley alleges that she complained to supervisors Bob Cypress and Jack Ethridge about racist jokes that her white coworker, Robert Quiggle, told prior to his 2005 transfer "to the plant." (*See* Docket No. 250 at 33; Docket No. 242 at 20.) Talley asserts that, despite her complaints, Quiggle appears to never have been disciplined for his jokes, and his racist remarks continued. (*See* Docket No. 250 at 33.) Additionally, she alleges that, at various times, she witnessed Cypress, Ethridge, and floor supervisor Susie Powell laughing at Quiggle's racist jokes. (*See id.*)

The plaintiffs claim that managerial failures such as these stemmed, in part, from the defendant's lack of (1) policies that prohibited racial harassment; and (2) practices that allowed employees to enter complaints of racial harassment and advised supervisors about how to appropriately address such allegations. (*See id.* at 49-50 (describing in detail the plaintiffs' grounds for believing that the defendant lacked anti-harassment policies and practices).) The defendant contests the plaintiffs' assertions and notes that [*15] its policies and practices varied throughout the class period, particularly after 2005, when it implemented an updated anti discrimination policy. (*See* Docket No. 280 at 54-55.)

It is not the court's place, at this stage of the proceedings, to judge the relative merits of the plaintiffs' assertions when compared to the defendant's. *See Eisen, 417 U.S. at 177* ("We find nothing in either the language or history of *Rule 23* that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."). Moreover, the fact that the defendant allegedly revamped its anti-harassment policies in 2005, long after the institution of the instant lawsuit, cannot defeat the plaintiffs' assertions that they all suffered under the common practices of the defendant. *See Senter, 532 F.2d at 524* ("[W]hen [personnel] decision[s are] made as part of class-wide discriminatory practices, courts bear a special responsibility to vindicate the polices of [Title VII]. . . .").

In its attempts to defeat commonality, the defendant relies, in part, on *Elkins v. Am. Showa, Inc., 219 F.R.D. 414, 424 (S.D. Ohio 2002).* [*16] The plaintiffs in *Elkins* alleged that the defendant subjected each of them to a sexually hostile work environment, which it knew about but failed to remedy. *See id. at 423.* The court in *Elkins* found that the plaintiffs' claims lacked commonality because they could not show that, "as to the class

2007 U.S. Dist. LEXIS 14635, *16; 99 Fair Empl. Prac. Cas. (BNA) 1682

Page 5

generally, defendant had a practice of not effectively responding to complaints of sexual harassment." *See id. at 424.* As indicated above, however, the plaintiffs in this case have offered evidence that the defendant subjected them to a general practice of not responding to their complaints of a hostile work environment that was created, or at least tolerated, by their supervisors. *(See* Docket No. 250 at 49-50); *see also Eisen, 417 U.S. at 177* (reminding courts not to improperly delve into the merits of a case at the class-certification stage).

Thus, like other cases in which the plaintiffs have put forth such evidence, the plaintiffs here have demonstrated that commonality exists. n1 *See Cervantes v. Sugar Creek Packing Co., 210 F.R.D. 611, 624 (S.D. Ohio 2002)*("The testimony of the plaintiffs supports the complaint's [*17] assertion that [the defendant's] practice was to discriminate against Hispanic employees and create, or at least tolerate, a hostile work environment."); *Bremiller v. Cleveland Psychiatric Inst., 195 F.R.D. 1, 21 (N.D. Ohio 2000)*(finding that, while "some facts concerning alleged incidents of . . . harassment in this action differ from one another and appear to be more severe than others," such is "insufficient to defeat the commonality requirement" where "the questions common to all members of Plaintiff's class will relate to the allegedly hostile environment caused by . . . harassment at [the plaintiffs' place of employment] and Defendants' liability for such harassment"); *see also Senter, 532 F.2d at 523* (finding that commonality existed where "the obvious thrust of the [plaintiff employee's] complaint is that [the defendant] has engaged in a general pattern and practice of discriminating against minority employees in making promotions").

> n1 A brief review of some of the concerns highlighted by the Sixth Circuit in *Bacon* leads to the same conclusion. *Bacon, 370 F.3d at 570.* For instance, if the plaintiffs' allegations about the defendant's practices at its LaVergne facility are true, such practices had a class-wide impact, as they affected every LaVergne employee. *(See id.* (listing as a factor for consideration "whether the nature of the alleged unlawful employment practice genuinely had a class-wide impact").) As such, the class members' treatment under these practices would be likely to involve common questions. *(See id.* (listing as a factor for consideration "whether members' treatment would

be likely to involve common questions").) If the defendant's practices, as the plaintiffs allege, stemmed in part from its lack of an anti-racial harassment policy, the lack of such a policy could be considered to be "centralized and uniform." *(See id.* (listing as a factor for consideration "whether the relevant employment and personnel policies and practices were centralized and uniform").)

[*18]

## C. The plaintiffs have demonstrated typicality.

*Rule 23(a)(3)* requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3).* Together with *Rule 23(a)(4)*'s requirement that the representative party adequately protect the interests of the class, this typicality requirement focuses on the characteristics of the class representatives. *See* Newberg § 3:13. The Sixth Circuit has adopted Newberg's characterization of the typicality requirement. As depicted in this characterization, typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, such that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong done to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his [*19] or her claims are based on the same legal theory. *See In re Am. Med. Sys., Inc., 75 F.3d at 1082* (citing 1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 3:13 (3d ed. 1992)).

In *Sprague, 133 F.3d at 399*, the Sixth Circuit succinctly framed the typicality requirement: "as goes the claim of the plaintiff, so go the claims of the class." In other words, typicality cannot be established where a named plaintiff who proves his own claim does not necessarily prove anyone else's claim.

The plaintiffs assert that typicality exists in their case because their claims "arise from the same employment practices that give rise to the claims of the other class members . . . and rest on the same legal theory as those of the class." (Docket No. 250 at 54.) They note that "class

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 116 of 123

2007 U.S. Dist. LEXIS 14635, *19; 99 Fair Empl. Prac. Cas. (BNA) 1682

Page 6

members will not allege any wrongs other than those the plaintiffs allege." (Docket No. 286 at 14.) To the defendant, typicality is lacking in this case because the plaintiffs' claims "are too dependent upon the individual circumstances surrounding each of their experiences" and because "the legal standard by which each class member's claim is judged will differ . . . depending upon [*20] whether the conduct in question was perpetrated by a supervisor or a coworker." (Docket No. 280 at 57.)

As discussed above, the plaintiffs' claims, although perhaps factually disparate to some extent, are bound by (1) their common assertions about the defendant's alleged practice of failing to respond to their complaints about racial harassment that was perpetuated, or at least tolerated, by their supervisors; and (2) their shared allegations that this practice resulted, at least in part, from the defendant's lack of a policy that prohibited racial harassment. In this sense, the plaintiffs' claims all arise from the same course of conduct and stem from the same legal theory. *See In re Am. Med. Sys., Inc., 75 F.3d at 1082.* As go the claims of one plaintiff with respect to the defendant's practices and policies, so will go the claims of the class. *See Sprague, 133 F.3d at 399.* Thus, the plaintiffs have met their burden of establishing typicality.

### D. The plaintiffs have demonstrated adequate representation.

*Rule 23(a)(4)* requires that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)* [*21] . The Sixth Circuit has recognized that this adequacy of representation requirement encompasses two criteria: (1) the representative plaintiffs must have common interests with unnamed members of the class; and (2) it must appear that the representative plaintiffs will vigorously prosecute the interests of the class through qualified counsel. *Senter, 532 F.2d at 525.* The first criterion, that of common interest, essentially requires that there be no antagonism or conflict of interest between the representative plaintiffs and the other members of the class that they seek to represent. *See In re Am. Med. Sys., 75 F.3d at 1083.* The second criterion inquires into the competency of counsel. *See id.* The Sixth Circuit has observed that the adequacy of representation prerequisite overlaps with the typicality requirement because, "in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.* That court has also noted that this

prerequisite is essential to due process because a final judgment in a class action is binding on all class members. *Id.*

As to the first criterion, the plaintiffs [*22] assert that they have no antagonism of interest with respect to the putative class members because both they and the putative members "seek[] to remedy Whirlpool's discriminatory employment practices so that racially hostile conditions . . . will be eradicated." (*See* Docket No. 250 at 55.) The defendant believes that conflicts exist within the class because the interests of the former employees, which the defendant hypothesizes will be primarily financial, could conflict with the interests of the current employees, which the defendant sees as more focused on obtaining injunctive relief. (*See* Docket No. 280 at 58.) The defendant also speculates as to potential conflicts among the representative plaintiffs themselves, given that, among other things, some of them appear to have used racist language, some of them allegedly feel that their claims against the union should have been pursued, and at least one of them purportedly professed that he was concerned only about the harassment that affected him personally. (*See id.* at 59.) In response, the plaintiffs assert that the defendant's former employees do want its LaVergne facility to be free of discrimination and note that [*23] monetary and injunctive relief are not mutually exclusive. (*See* Docket No. 286 at 15.)

This case is not like those cited by the defendant, in which recovery by one part of the class would undermine the interests of another part. (*See, e.g.,* Docket No. 280 at 58 (referring to *Gen. Tel. Co. of Nw. v. EEOC, 446 U.S. 318, 331, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980)*)(noting that a conflict could arise between employees and applicants who were denied employment where, if the applicants were granted relief, they would compete with the employees for fringe benefits or seniority)).) Rather, as confirmed by the plaintiffs themselves, the plaintiffs and the putative class members here share a common interest in reforming the environment at the defendant's LaVergne facility and in potentially obtaining monetary damages. *See Leonard v. Southtec, LLC, No. 3:04-0072, 2005 U.S. Dist. LEXIS 32751, 2005 WL 2177013, at *10 (M.D. Tenn. Sept. 8, 2005)*(unpublished)(finding that adequate representation existed where current and former employees sought monetary and injunctive relief in an employment discrimination case). Accordingly, the plaintiffs have demonstrated the existence of the adequate representation prerequisite's first [*24] criterion.

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 117 of 123

2007 U.S. Dist. LEXIS 14635, *24; 99 Fair Empl. Prac. Cas. (BNA) 1682

Page 7

As to the second criterion, the plaintiffs assert that their class representatives and counsel have aptly demonstrated their adequacy throughout the long history of this litigation. (*See* Docket No. 250 at 55.) Additionally, plaintiffs' counsel has "extensive experience in employment discrimination and specifically class action litigation before federal courts around the country." (*See id.* at 55-56.) The defendant does not contest the competency of plaintiffs' counsel. Accordingly, the plaintiffs satisfy the second criterion of adequate representation and have, therefore, demonstrated that adequate representation exists in this case.

Having found that the plaintiffs have demonstrated the existence of each *Rule 23(a)* prerequisite, the court now must determine whether the plaintiffs' case also falls within at least one of the subcategories of *Rule 23(b)*. *See In re Am. Med. Sys., 75 F.3d at 1079.*

## II. The plaintiffs have not demonstrated that their claims are amenable to certification under any subsection of *Rule 23(b)*.

The plaintiffs suggest that certification of their class is appropriate under both *Rule 23(b)(2)* and *Rule 23(b)(3)* or as [*25] a hybrid action under both rules combined. (*See* Docket No. 250 at 56, 62, 64.) The court will address each of these options in turn.

### A. The plaintiffs cannot seek certification of their class under *Rule 23(b)(2)*.

*Rule 23(b)(2)* authorizes "mandatory" class actions under which potential class members do not have an automatic right to notice or a right to opt out of the class. *See Reeb v. Ohio Dep't of Rehab. & Corr., 435 F.3d 639, 645 (6th Cir. 2006).* Certification under this rule is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Fed. R. Civ. P. 23(b)(2).* In other words, class actions may be maintained under this rule when the primary relief sought is injunctive or declaratory. *See id.* advisory committee's note (noting that *Rule 23(b)(2)* "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages").

The Sixth Circuit last year created a limitation on

Title [*26] VII plaintiffs who seek 23(b)(2) certification. *See Reeb, 435 F.3d at 651.* In *Reeb,* it found that "claims for individual compensatory damages of members of a Title VII class necessarily predominate over requested declaratory or injunctive relief and, therefore, that plaintiffs seeking to recover individual compensatory damages cannot do so in the context of a 23(b)(2) class action. *See id.*

The plaintiffs claim that *Reeb* does not preclude them from bringing a 23(b)(2) action here because, in addition to injunctive and declaratory relief, they seek compensatory and punitive damages only on a "class-wide basis." (*See* Docket No. 250 at 8.) Indeed, as noted by the defendant, the plaintiffs, in the wake of *Reeb* and in response to the defendant's motion for a more definite statement as to the nature of the relief they planned to seek "and/or whether [they] intend[ed] . . . to certify a class under *Rule 23(b)(3),*" amended their Complaint to specify that they sought, under *Rule 23(b)(2),* only compensatory and punitive damages that "inure[d] to the group benefit." (*See* Docket No. 280 at 27. *Compare* Docket No. 165 at 42 (listing, among other [*27] things, nominal, compensatory, and punitive damages) *with* Docket No. 242 at 38 (listing, among other things, nominal, compensatory, and punitive damages "that inure to the group benefit").)

The defendant claims that, "when applied to the reasoning in *Reeb,* . . . Plaintiffs' mere claim that their compensatory and punitive damages 'inure to the group benefit' is form over substance and does nothing to render this case compatible with *Rule 23(b)(2).*" (Docket No. 280 at 27.) The court agrees.

In *Reeb,* the Sixth Circuit recognized as inuring to the group benefit those claims that are "concomitant with, not merely consequential to, class-wide injunctive or declaratory relief," the computation of damages for which should not be "dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *See Reeb, 435 F.3d at 647-48* (quoting *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)).* The plaintiffs, in attempting to shape their damages to fit within the newly limited rubric of damages allowed under *Rule 23(b)(2)* after *Reeb,* argue that both their compensatory and their punitive [*28] damages claims can be calculated without reference to each class member's particular circumstances. (*See* Docket No. 250 at 58-60.) Because the plaintiffs' claims for compensatory

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 118 of 123

2007 U.S. Dist. LEXIS 14635, *28; 99 Fair Empl. Prac. Cas. (BNA) 1682

Page 8

damages cannot be addressed without running afoul of the Sixth Circuit's holding in *Reeb,* the court need not address their claims for punitive damages.

The plaintiffs maintain that their requests for compensatory damages inure to the group benefit because they "may be pursued without the presentation of complex medical or expert testimony" and because the alleged harmed caused by the defendant "is not limited to particular persons directly affected by those acts." (*See* Docket No. 250 at 60-61.) Even if both of these assertions are true, however, the court cannot properly analyze the plaintiffs' claims for compensatory damages without evaluating each plaintiff's individual circumstances. The nature of the compensatory damages available under Title VII is simply too dependent on the circumstances of each individual plaintiff to allow for such a practice. *See 42 U.S.C. § 1981a(b)(3)(2000)*(stating that compensatory damages may be awarded for "future pecuniary losses, emotional [*29] pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses"); *Reeb, 435 F.3d at 651.*

As recognized by the defendant, any analysis of the compensatory damages due to each plaintiff would require, for instance, a determination as to whether they were exposed to racist graffiti or to Dale Travis's discriminatory conduct and, if so, the effect upon them of that exposure. (*See* Docket No. 280 at 29.) Thus, although the plaintiffs assert that they seek only compensatory damages that "inure to the group benefit," a review of the true nature of their claims reveals that the damages they seek fit within *Reeb's* requirements in name only and, instead, are more correctly categorized as individual compensatory damages. *Reeb, 435 F.3d at 647-48* (describing damages that "inure to the group benefit"). Accordingly, because "certification of a plaintiffs' class under *Rule 23(b)(2)* is improper in a Title VII case in which the plaintiffs seek individual compensatory damages," the plaintiffs here cannot seek certification of their claims under *Rule 23(b)(2). Reeb, 435 F.3d at 645.*

The court must now [*30] determine whether the plaintiffs can, instead, seek certification under *Rule 23(b)(3).*

**B. The plaintiffs have not demonstrated that *Rule 23(b)(3)* is an appropriate vehicle for their claims.**

Initially, the court notes the defendant's assertion that the plaintiffs, by not explicitly stating that they were seeking 23(b)(3) certification in their previous filings, have waived their ability to now use this rule as a vehicle for their claims. (*See* Docket No. 36-38.) As discussed below, however, the plaintiffs' claims are not appropriate for *Rule 23(b)(3)* certification. Thus, the court need not determine whether the plaintiffs have waived their right to seek such certification.

Framed for situations in which class-action treatment is not as clearly called for as it is in *Rule 23(b)(1)* and *(b)(2)* situations, *Rule 23(b)(3)* permits certification of a class action where such treatment may nevertheless be convenient and desirable. *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*(internal quotations omitted). To qualify for certification under *Rule 23(b)(3),* a class must meet two requirements beyond the *Rule 23(a)* prerequisites: (1) common questions must "predominate [*31] over any questions affecting only individual members"; and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* (quoting *Fed. R. Civ. P. 23(b)(3)*).

*Rule 23(b)(3)* includes a non-exhaustive list of factors that are pertinent to a court's examination of the predominance and superiority prerequisites: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." *Fed. R. Civ. P. 23(b)(3); Amchem Prods., Inc., 521 U.S. at 615-16.*

**1. The plaintiffs have not demonstrated that common questions predominate over individual issues.**

*Rule 23(b)(3)* parallels the *Rule 23(a)(2)* commonality requirement in that both rules require that common questions [*32] exist, "but *[Rule 23](b)(3)* contains the more stringent requirement that common issues predominate over individual issues." *In re Am. Med. Sys., Inc., 75 F.3d at 1084* (internal citation omitted); *see also Amchem Prods., Inc., 521 U.S. at 623-24* (finding that the predominance criterion is "far more demanding" than *Rule 23(a)(2)*'s commonality

2007 U.S. Dist. LEXIS 14635, *32; 99 Fair Empl. Prac. Cas. (BNA) 1682

Page 9

requirement).

Here, the plaintiffs claim that the common issues in their case predominate over the individual ones because "common liability and damages issues . . . concerning Whirlpool's uniform practices and procedures constitute major elements of the class members' claims." (*See* Docket No. 250 at 63.) Specifically, they argue that, because "this case is directed at the practices and procedures at Whirlpool" and because, in their view, "punitive damages can be awarded to the class as a whole without determining liability with respect to individual class members," "those questions concerning Whirlpool's systemic discrimination predominate over individual questions." (*See id.*)

The defendant refutes the plaintiffs' assertions about the predominance of common issues and alleges that "hostile work environment [*33] claims tend to require determination of individualized issues, thereby weighing heavily against *Rule 23(b)(3)* certification." (*See* Docket No. 280 at 39.) The defendant lists a number of issues that, in its opinion, must be individually analyzed with respect to each plaintiff in order to determine whether he or she has made out a valid hostile work environment claim. (*See id.* at 39-40 (listing, among others, issues such as (1) whether the harassment was perpetrated by a coworker or a supervisor; (2) the nature, severity, and duration of the conduct; and (3) whether the defendant knew or should have known about the harassment and yet failed to correct it).) The defendant also takes issue with the plaintiffs' claim that they have pled this case under the pattern-or-practice standard outlined in *International Brotherhood of Teamsters v. United States, 431 U.S. 324, 360-62, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).* (*See id.* at 41.)

An examination of the plaintiffs' claims reveals that, despite their strenuous assertion to the contrary, common issues do not predominate over individual issues in this case. The plaintiffs allege that the defendant subjected them to a racially hostile work environment [*34] in violation of Title VII and *Section 1981*. (*See* Docket No. 242 at 34-36.) The court will assume for the sake of analysis that the plaintiffs have properly raised the issue of whether the defendant subjected them to an impermissible pattern or practice of racial harassment. (*See* Docket No. 286 at 10 (reflecting the plaintiffs' arguments that they have "pled the *Teamsters* standard, contrary to Defendant's assertions").)

The plaintiffs have not provided the court with a standard under which to analyze class action, hostile work environment claims brought under a pattern-or-practice theory. The court's research has not uncovered any Sixth Circuit standard for these claims, to which "[t]he typical pattern or practice construct . . . does not wholly apply." n2 *See Bremiller, 195 F.R.D. at 25.*

> n2 The applicability of pattern-or-practice theory to discriminatory harassment claims has recently been called into question. *See* Michael Delikat, *Pattern or Practice Litigation,* in Litigating Employment Discrimination and Sexual Harassment Claims 2006, at 21, 28 (PLI Litig. & Admin. Practice Course, Handbook Series No. 8483, 2006)(noting that, while "recently, pattern or practice theory has been extended by some of the federal trial courts to claims of discriminatory harassment . . . no appellate court has yet accepted this application of the theory").

[*35]

Other district courts within the Sixth Circuit have indicated that harassment-based class action claims are generally divided into two phases: a liability phase and a relief phase. *See id; see also Elkins, 219 F.R.D. at 425.* At issue in the liability phase is whether "the plaintiff class has established that the employer engaged in a pattern or practice of tolerating . . . harassment." *See Bremiller, 195 F.R.D. at 25* (quoting *Jenson v. Eveleth Taconite Co., 139 F.R.D. 657, 665 (D. Minn. 1991)).* Factors to be analyzed at this phase mirror those that constitute individual hostile work environment claims. n3 *See Bremiller, 195 F.R.D. at 26-31* (analyzing a class-action harassment claim and noting that such an analysis focuses on "whether a reasonable [plaintiff] would find the work environment hostile"). The relief phase evaluates whether each plaintiff subjectively viewed his or her work environment as hostile. *See id. at 26; see also Elkins, 219 F.R.D. at 425.*

> n3 A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bowman v.*

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 120 of 123

Page 10
2007 U.S. Dist. LEXIS 14635, *35; 99 Fair Empl. Prac. Cas. (BNA) 1682

*Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000)*(citing *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295(1993)).*

In order to make out an individual claim that she was subjected to a racially hostile work environment, a plaintiff must demonstrate the following: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment created a hostile working environment; and (5) her employer has respondeat superior liability. *See Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078-79 (6th Cir. 1999)*; *Williams v. General Motors Corp., 187 F.3d 553, 560-61 (6th Cir. 1999).*

Here, the plaintiffs seek to hold the defendant liable for harassment by both co-workers and supervisors. A plaintiff demonstrates employer liability for co-worker harassment by showing that her employer "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999).* In contrast, an employer is subject to vicarious liability for an actionable hostile work environment created by a supervisor with immediate or successively higher authority over a victimized employee. *Id.* (quoting *Faragher v. City of Boca Raton, 524 U.S. 775, 777, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)).*

Where no adverse employment action has been taken against the plaintiffs, "the employer may raise an affirmative defense to liability by proving, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of corrective opportunities provided by the employer." *Jackson v. Quanex Corp., 191 F.3d 647, 663 (6th Cir. 1999)*(citing *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).*

[*36]

A number of district courts, some within the Sixth Circuit, have found class action hostile work environment

claims to be inappropriate for *Rule 23(b)(3)* certification because of the predominance of individual issues in such cases. In particular, in *Elkins,* the United States District Court for the Southern District of Ohio found that, even if the plaintiffs were able to establish that the plant-wide environment was hostile to a reasonable plaintiff, "issues as to whether a given individual perceived the environment to be hostile would remain." *Elkins, 219 F.R.D. at 425-26* (finding that "[t]he need to inquire into individual perceptions of the varying behaviors alleged by plaintiffs . . . makes a class action an inappropriate method by which to resolve the claims of the [plaintiffs]").

Similarly, in *Levels,* the United States District Court for the Northern District of Ohio denied a plaintiff class's motion for 23(b)(3) certification of its race-based hostile work environment claims because, after considering the individual nature of the conduct complained of, the disparity among the individuals accused of perpetrating the harassment, and the "lack of similarity [*37] of damages involved," it found that "common questions do not predominate over individual issues." *See Levels v. Akzo Nobel Salt, Inc., 178 F.R.D. 171, 180 (N.D. Ohio 1998)*; *see also Adler v. Wallace Computer Servs., 202 F.R.D. 666, 672 (N.D. Ga. 2001)*(indicating that, while a defendant's pattern and practice of discrimination "may be relevant in a particular case . . . it does not establish that the [defendant] discriminated against each member of the putative class" and denying the plaintiffs' motion for 23(b)(3) certification of their hostile work environment claims where "[a]dditional plaintiff-specific issues could be raised with regard to the [hostile work environment] claim . . . especially since that claim requires a showing that the employee perceived the environment to be abusive"); *Miller v. Hygrade Food Prods. Corp., 198 F.R.D. 638, 644 (E.D. Pa. 2001)*(denying 23(b)(3) certification of plaintiffs' hostile work environment claims in part because the court found that individual issues predominated over class ones where "the putative class members were exposed to the alleged discrimination in varying ways, by different [*38] people, for different amounts of time and experienced different injuries").

In contrast, at least one court -- the United States District Court for the Northern District of Illinois -- has certified hostile work environment claims under *Rule 23(b)(3). See Warnell v. Ford Motor Co., 189 F.R.D. 383, 387-88 (N.D. Ill. 1999)*; *Markham v. White, 171*

Case 1:06-cv-00480-GLS-DRH   Document 18-2   Filed 04/19/07   Page 121 of 123

Page 11

2007 U.S. Dist. LEXIS 14635, *38; 99 Fair Empl. Prac. Cas. (BNA) 1682

*F.R.D. 217, 224 (N.D. Ill. 1997)*. In *Warnell*, that court relied on the Seventh Circuit's comment that "welcome sexual harassment is an oxymoron" and found that "the required [23(b)(3)] showing [would] not call for individualized hearings for each class member" in a sexual harassment, pattern-or-practice case where the court "d[id] not think that the law require[d] . . . a woman to introduce further evidence that she [found] it subjectively hostile to be . . . subjected to [the discriminatory] conduct that the plaintiffs [t]here allege[d] [was] widespread and pervasive at [the defendant's] plants"). *See Warnell, 189 F.R.D. at 387-88* (quoting *Carr v. Allison Gas Turbine Div., Gen. Motors Corp., 32 F.3d 1007, 1008 (7th Cir. 1994))*. In *Markham*, the court [*39] found that common issues prevailed in a hostile work environment case in which each of the plaintiffs complained of nearly identical discriminatory comments made by the defendants at a number of similar training seminars. *See Markham, 171 F.R.D. at 224* (noting that "the allegations as to [the] Individual Defendant's conduct at the seminars in question shows that the same or substantially similar comments were made at each").

The individual factual scenarios presented in this case render it distinguishable from *Warnell* n4 and *Markham*, which are two of the cases upon which the plaintiffs rely. (*See* Docket No. 250 at 62.) Indeed, the case at hand presents a situation more like those presented in *Elkins* and *Levels*. Like the plaintiffs in those cases, the plaintiffs here complain of harassment that was perpetrated by both coworkers and supervisors. (*See* Docket No. 250 at 29-37); *see also Elkins, 219 F.R.D. at 424*; *Levels, 178 F.R.D. at 177*. While the plaintiffs in each of these cases were employed at a single geographic location, *e.g.*, one assembly plant, they all worked in various places within that location [*40] and interfaced with different coworkers and supervisors. (*See* Docket No. 280 at 8); *see also Elkins, 219 F.R.D. at 424*; *Levels, 178 F.R.D. at 177*. Additionally, like the plaintiffs in *Elkins* and *Levels*, the plaintiffs here allege that they were subjected to a wide array of discriminatory acts, for which the defendant may choose to present various affirmative defenses. (*See* Docket No. 280 at 9-10); *see also Jackson, 191 F.3d at 663 (6th Cir. 1999)*(outlining the affirmative defenses available to an employer accused of sexual harassment); *Elkins, 219 F.R.D. at 424-27*; *Levels, 178 F.R.D. at 177*.

n4 Unlike *Warnell*, in which the district court seemed to somewhat diminish the subjective requirements of a hostile work environment claim, this court is bound by the Sixth Circuit's directive that, when analyzing a hostile work environment claim, a court must consider whether the victim subjectively regarded his or her environment as hostile. *See Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000)*.

[*41]

Simply put, even if the plaintiffs are able to establish that the defendant subjected them to a common practice of failing to promptly and appropriately respond to their allegations of racial harassment, so many individual disparities exist here that common issues cannot be accurately said to prevail. *See Butler v. Sterling, Inc., No. 98-3223, 2000 U.S. App. LEXIS 6419, 2000 WL 353502, at *6 (6th Cir. 2000)*(unpublished)(noting that the advisory committee notes to *Rule 23(b)(3)* "advise against class certification where a defendant has a defense to liability that will vary with each individual class member")(citing *Fed. R. Civ. P. 23(b)(3)* advisory committee notes); *O'Neal v. Wackenhut Servs., No. 3:03-CV-397, 2006 U.S. Dist. LEXIS 34634, 2006 WL 1469348, at *23 (E.D. Tenn. May 25, 2006)*(unpublished)(noting that *Rule 23(b)(3)* certification is unavailable where there is a likelihood that significant individualized questions would be present)(internal quotation omitted); *Reeb v. Ohio Dep't of Rehab. & Corr., 203 F.R.D. 315, 324 (S.D. Ohio 2001)*(finding that, "[a]lthough the Plaintiffs . . . presented a common question of law," this question did [*42] not predominate where "individual issues regarding both claims and defenses will dominate," in part because "individualized proof will be necessary for each plaintiff to prove compensatory damages"); *see also Reeb, 435 F.3d at 645* (indicating the recognition by the Sixth Circuit of the district court's 23(b)(3) determinations in *Reeb*). As such, the plaintiffs have failed to meet *Rule 23(b)(3)*'s predominance requirement.

**2. The plaintiffs have not demonstrated that class treatment is superior to other methods that are available for resolving this controversy.**

Taking into account *Rule 23(b)(3)*'s non-exhaustive list of factors that a court should consider in making a determination under this rule, the court finds that the

Page 12

2007 U.S. Dist. LEXIS 14635, *42; 99 Fair Empl. Prac. Cas. (BNA) 1682

plaintiffs have not established that class treatment is the superior method for the fair and efficient adjudication of this case. *See Fed. R. Civ. P. 23(b)(3)*(listing, among other considerations, the interest of members of the class in individually controlling the prosecution or defense of separate actions and the difficulties likely to be encountered in the management of a class action); *Amchem Prods., Inc., 521 U.S. at 615-16.* [*43]

While the plaintiffs assert that a class action will save judicial resources, prevent the likelihood of inconsistent verdicts, and shelter the plaintiffs from the burden of "the cost and risk of individual trials on liability and remedy," the court notes that, even if a single fact-finder could make the determinations attendant to the "liability phase" of the plaintiffs' case, which they purport to bring under a pattern-or-practice theory, the issues relevant to the "relief phase" would remain. *See Bremiller, 195 F.R.D. at 26.* In accordance with the scope of this second phase, the fact-finder would have to evaluate whether each plaintiff subjectively viewed his or her work environment as hostile, which likely would require the revisiting of much of the evidence that was considered in the first phase, as well as a series of mini-trials that would lead to the inefficient use of judicial resources. n5 *See id; see also O'Neal, 2006 U.S. Dist. LEXIS 34634, 2006 WL 1469348, at *23* (rejecting 23(b)(3) certification where the court would be required to conduct mini-trials in order to determine whether each class member's claim had merit); *Elkins, 219 F.R.D. at 425* (mising [*44] concerns that class certification in a hostile work environment case would require the revisiting of evidence). Thus, "the economy to be achieved by class treatment of the stated issues is more than offset by the individualization of numerous issues relevant only to a particular plaintiff." *Ilhardt v. A.O. Smith Corp., 168 F.R.D. 613, 619 (S.D. Ohio 1996).*

> n5 Any suggestion that these claims be bifurcated and heard by separate fact-finders likely would raise serious *Seventh Amendment* concerns. *See Bacon,* 205 F.R.D. at 489 (noting that a proposal to try liability and punitive damages issues in one trial and compensatory damages issues in a subsequent one would violate the *Seventh Amendment*)(citing *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 417-18 (5th Cir. 1998))*; *(see also* Docket No. 250 at 58 n.20 (reflecting the plaintiffs' arguments that "the

question the Court should consider when contemplating this class certification motion is not *whether* a Title VII class action which includes compensatory and punitive damages may be certified, but simply *how* such cases can best be managed")).

[*45]

Moreover, if the fact-finder were to determine that the plant-wide environment was not a hostile environment, members of the class who may have been subjected to a hostile environment in a particular area of the plant during a certain time period would be precluded from pursuing their claims. *See Elkins, 219 F.R.D. at 425* (raising similar concerns). Finally, as indicated by other courts confronted with Title VII and *Section 1981* claims, "this is not a situation where there exists 'negative value suits.'" *See O'Neal, 2006 U.S. Dist. LEXIS 34634, 2006 WL 1469348, at *23.* Rather, under these statutes, "[a]n individual plaintiff with a meritorious case has a panoply of remedies available, including compensatory damages, as well as attorneys['] fees and costs." *Id.*

Each of the factors discussed above weighs against class treatment. As such, the plaintiffs have not demonstrated that such treatment is the superior method for the resolution of their claims. Thus, because the plaintiffs have failed to establish that either commonality or superiority exists with respect to their class claims, their case is not amenable to 23(b)(3) certification.

**C. The plaintiffs have not [*46] demonstrated that hybird certification is a viable option in this case.**

The plaintiffs encourage the court to consider the possibility of the certification of a "hybrid" class, *i.e.,* one in which the court certifies the injunctive aspects of the suit under *Rule 23(b)(2)* and the damages aspects under *Rule 23(b)(3)*. *(See* Docket No. 250 at 64.) As noted above, plaintiffs' claims are not amenable to class certification under either rule. Thus, for this reason, among others, hybrid certification is not a viable option in this case.

**CONCLUSION**

Although the plaintiffs have demonstrated that they meet the requirements of *Rule 23(a)*, they have not shown that their claims are appropriate for certification under either *Rule 23(b)(2)* or *Rule 23(b)(3)*. As such, the

2007 U.S. Dist. LEXIS 14635, *46; 99 Fair Empl. Prac. Cas. (BNA) 1682

plaintiffs' motion for class certification will be denied. n6 The court notes that this denial of the plaintiff's motion for class certification does not mean that the plaintiffs will ultimately be denied relief if they can prove their claims. Rather, today's ruling affects only the appropriate model for the adjudication of these claims.

> n6 The plaintiffs have moved to strike three declarations offered by the defendant. (*See* Docket No. 287 at 1; Docket No. 288 at 1 (asking the court to strike the declarations of Pierre Hill, Bea Rucker, and Jerry McGowan).) While the defendant has responded to this motion, the court need not rule on it because it did not rely on any of these declarations in arriving at its decision. (*See* Docket No. 289.) This motion, therefore, will be denied as moot.

[*47]

An appropriate order will enter.

Date: March 1, 2007

ALETA A. TRAUGER

United States District Judge

**ORDER**

For the reasons expressed in the accompanying Memorandum, the Plaintiffs' Motion for Class Certification (Docket No. 248) is **DENIED.** In addition, the plaintiffs' Motion to Strike Coerced Declarations of Whirlpool Employees or, in the Alternative, Afford Such Declarations Little or No Weight (Docket No. 287) is **DENIED AS MOOT.**

It is so ordered.

Enter this 1st day of March 2007.

ALETA A. TRAUGER

United States District Judge